**UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA**

KARL JOBST,

                    Plaintiff,

     v.

WILLIAM JAMES MITCHELL,

                    Defendant.

Case No.

**JURY DEMANDED**

FILED BY＿＿＿＿ D.C.

APR 08 2026

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

**COMPLAINT**

Plaintiff Karl Jobst files this Complaint against Defendant William James Mitchell for defamation per se, unauthorized appropriation of name or likeness and intentional infliction of emotional distress.

**PARTIES**

1.     Plaintiff Karl Jobst ("Jobst") is an individual residing in Brisbane, Australia. Jobst operates a widely viewed YouTube channel with over 1 million subscribers and substantial viewership, from which Jobst derives income from that audience through advertising, sponsorships, and platform monetization. Jobst's reputation for credibility and trustworthiness is a central component of that business, and damage to that reputation directly impairs his ability to generate revenue and maintain audience engagement.

2.     Defendant William James Mitchell ("Mitchell") is an individual residing in Weston, Florida. Mitchell has publicly held himself out as a prominent figure in the competitive gaming community and has claimed widespread recognition for his video game records and appearances in gaming related media. Mitchell promotes commercial products

1

and business ventures associated with his public persona and regularly communicates with a large online audience through social media and video broadcasts.

## JURISDICTION AND VENUE

3.     The United States District Court for the Southern District of Florida has subject matter jurisdiction over this action pursuant to Title 28 U.S.C. § 1332 (Diversity).

4.     Plaintiff is a citizen of a foreign state and Defendant is a citizen of the State of Florida, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

5.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(1) because Defendant resides in Weston, Florida, within the Southern District of Florida.

## RELATIONSHIP OF THE PARTIES

6.     Jobst publishes YouTube content. Jobst regularly produces content concerning prominent figures in the videogaming community, including Mitchell.

7.     In September 2021, Mitchell filed a defamation lawsuit against Jobst in Australia relating to a May 2021 video publication.

8.     The litigation resulted in a judgment in Mitchell's favor. As a result of that judgment, Jobst became bankrupt on May 9, 2025, with Mitchell being a creditor in that bankruptcy.

## DEFAMATORY PUBLICATIONS AND RELATED FACTS

**Statements Alleging Criminal Conduct in Connection with Bankruptcy**

9.     On 18 May 2025, Mitchell republished on X (Exh. 1) a hyperlink to a Reddit post (Exh. 2) titled "Karl Jobst boasts about moving assets to his wife before declaring bankruptcy – a possible 'creditor-defeating' scheme," asserting that Jobst had engaged in illegal conduct to defraud creditors. Mitchell endorsed the allegation by attaching the words

2

"The plot thickens…" in his X post. In response to Mitchell's republication, multiple readers replied by stating that Jobst had engaged in "fraud," "bankruptcy fraud," and other unlawful conduct, reflecting how Mitchell's post conveyed and reinforced an allegation of criminal wrongdoing to its audience. (Exh. 3)

10.    The Reddit post's assertions were false. The conversation referenced in the post contained no statement in which Jobst boasted about or admitted to moving assets to his wife, and Jobst did not transfer assets to his wife to defeat creditors or engage in any unlawful conduct in connection with his bankruptcy.

11.    On June 6, 2025, the bankruptcy trustee issued an Initial Notice and Report to Creditors (Exh. 4) stating that the trustees' investigations had identified **no offences** in relation to Jobst's affairs. The report was sent to all creditors, including Mitchell.

## 6.1. Offences

Information pertaining to types of offences a bankrupt could commit are provided in the **attached information sheet for creditors.**

To date, our investigations have not identified any offence under the Act by the Bankrupt. Should any such offence be identified, they will be reported to AFSA accordingly.

12.    On 24 June 2025, Mitchell posted on his X account: "Karl Jobst has engaged in serious illegal activity before and during this bankruptcy process." (Exh. 5)



56.8K

3

13.     The statement was false. Jobst did not engage in any illegal activity before or during the bankruptcy process. As described above, the bankruptcy trustee had already reported on June 6, 2025 that the trustees' investigations had identified no offences in relation to Jobst's affairs. Furthermore, prior to bankruptcy, Jobst provided Mitchell with a detailed disclosure of his financial position and offered to resolve the judgment for $300,000, an amount far exceeding the value ultimately recoverable through bankruptcy. Jobst further advised that, absent acceptance of the offer, bankruptcy would follow. Mitchell rejected the offer with knowledge of Jobst's financial position. (Exh. 6, 7)

14.     After seeing Mitchell's X post, Jobst e-mailed the bankruptcy trustee on June 25, 2025 asking whether he had engaged in any illegal conduct during the bankruptcy process. (Exh. 8)

15.     On June 26, 2025, the bankruptcy trustee responded by e-mail stating that the trustee was "not aware of the serious illegal activity" referenced by Mitchell. (Exh. 9)

16.     On June 26, 2025, the bankruptcy trustees also wrote to Mitchell's solicitor regarding the same X post. The trustees requested that Mitchell provide information or documentation substantiating his assertion that Jobst had engaged in "serious illegal activity" so that the allegation could be investigated as part of the administration of the bankrupt estate. (Exh. 10)

17.     No substantiation of the allegation was ever provided. In later correspondence, a supervisor from the trustee's office confirmed that no response had been received to the trustees' request for information or documentation supporting Mitchell's assertion of "serious illegal activity." (Exh. 11)

18.     On June 29, 2025, Mitchell posted on X: "Karl Jobst complained about one of my tweets to the bankruptcy officer. Imagine publicly attacking someone for four years just to privately whine like a cry baby," accompanied by an image depicting Jobst being hanged,

4

in which Mitchell is depicted as carrying out the act. In a reply to the same post, Mitchell

promoted his commercial website "RickeysSauce.com" using the discount code "CRY

BABY." (Exh. 12)



**Billy Mitchell** ✔
@BillyPacMan

Karl Jobst complained about one of my tweets to the bankruptcy officer. Imagine publicly attacking someone for four years just to privately whine like a cry baby.

Jobst is a serious contender for Lolcow of the year. Even iDubbbz wouldn't have done this.



The Saddest Albino Of All Time

9:51 PM · Jun 29, 2025 · **5,259** Views

◯ 25      ⇄ 22      ♡ 370      ⎗ 16      ↥

● Post your reply                                 Reply


**Billy Mitchell** ✔ @BillyPacMan · 2h
FLASH SALE: RickeysSauce.com discount code "CRY BABY" returns for 15% off! Valid thru July 6!

19. On August 11, 2025, Jobst published a video (the "August 11 Video") on YouTube titled "My Final Lawsuit Update," in which Jobst publicly addressed and denied Mitchell's allegations that he had engaged in illegal activity in connection with the bankruptcy process. (Exh. 13)

20. The following day, on August 12, 2025, Mitchell posted on X (the "August 12 X Post") and tagged Jobst in a message written in the first person as if spoken by Jobst, stating: "I LIED FOR FOUR YEARS, SCAMMED $200,000, WENT BANKRUPT, AND LOST EVERY SHRED OF CREDIBILITY TO MY NAME BUT AT LEAST I'M PROBABLY TOO MUCH OF A LAZY, BROKE, AND UNETHICAL SCUMBAG TO EVER FULLY PAY KING BILLY'S $1,000,000 AHHHHHH I WIN!" (Exh. 14)

21. On December 4, 2025, Mitchell broadcast a livestream on YouTube (the "December 4 Livestream") in which he again commented on Jobst and the bankruptcy proceedings. During the livestream, Mitchell stated in reference to Jobst: "You know, he's claiming that, you know, he's not getting any money. Of course he's claiming that. It's like somebody evading taxes." During the same livestream, a viewer message appeared stating "Karl is lying to the trustee…" Mitchell responded "Yeah." (Exh. 15)

22. During the December 4 Livestream, a caller asked: "How do you feel about Karl giving everything to his wife so that he doesn't have to pay you?" Mitchell responded: "That's not what happened at all. If he did that, he'd go to jail." (Exh. 15) Mitchell's statement directly contradicted the allegation he had previously republished and endorsed on May 18, 2025 that Jobst had moved assets to his wife to avoid paying creditors. Despite Mitchell's statement that "that's not what happened at all," Mitchell did not retract or correct his prior republication of the allegation.

6

23. Following Mitchell's December 4, 2025 livestream statements, the bankruptcy trustee again contacted Mitchell's solicitor requesting information supporting the allegations of misconduct. No response or substantiating information was provided. (Exh. 11)

**Statements Alleging Fraudulent Fundraising Through a 2022 GoFundMe Campaign**

24. On June 3, 2025, Mitchell published a video to YouTube titled: "A Statement From Billy Mitchell: Karl Jobst (Part 1/2)." (The "June 3 Video") In that video, Mitchell made a series of statements to the effect that Jobst had created a GoFundMe campaign on false premises, had misled the public as to the existence of legal proceedings, and had done so with knowledge and intent in order to obtain approximately $200,000 for personal benefit. (Exh. 16)

25. Referring to Jobst in the June 3 Video, Mitchell stated: "He needed money, and he needed money now." Mitchell would then address Jobst directly by saying: "You created a GoFundMe campaign with the **knowledge and intent** to fund the existing lawsuit on **false premises**. Period. End of paragraph." Mitchell also specified the exact amount of the fraud, saying: "So apparently the only time Mr Jobst ever believes me is after six months pass without follow up and he **stands to gain $200,000 from his audience.**" Throughout the video, Mitchell presents these statements as part of a broader accusation that Jobst engaged in a deliberate scheme to deceive viewers into funding the GoFundMe campaign. These statements conveyed that Jobst had committed fraud by knowingly soliciting money through deception for personal gain. In the same video, Mitchell further stated that Jobst had made a "hail Mary attempt to dismiss the lawsuit," referring to a July 2022 application.

26. The foregoing statements were false. On 27 October 2022, Jobst emailed his solicitor at Mills Oakley a draft script for an upcoming video (Exh. 17), which included the explanation of the GoFundMe campaign and the underlying litigation. On 28 October 2022,

7

Jobst's solicitor responded, confirming that they had reviewed the draft and identifying statements of concern, including statements that were clearly inaccurate, and recommending revisions to mitigate legal risk. (Exh. 18) Jobst revised the script in response to that feedback prior to publication. The GoFundMe campaign was subsequently created on 4 November 2022. (Exh. 19)

27.    The GoFundMe accurately described both the reason for its existence and the intended use of the funds, including that: (1) Mitchell had sued Jobst for defamation in 2021, (2) Mitchell's solicitor had provided Jobst with a legal complaint and stated that they would proceed with that complaint unless the existing proceeding resolved (Exh. 20, 21), and (3) Mitchell was threatening additional legal action. (Exh. 22) Funds raised through the GoFundMe were used for legal fees incurred in defending the proceedings, which substantially exceeded the amount raised. (Exh. 23) Mitchell's assertion that Jobst had made a "hail Mary attempt to dismiss the lawsuit" was also false; the July 2022 application was an application for security for costs, which the Court granted, ordering the provision of additional security to be held in trust and expressly finding that such an order would not be oppressive, and that it was not an application seeking dismissal of the proceeding. (Exh. 24)

28.    In the June 3 Video, Mitchell even admitted that his lawyers had indeed emailed Jobst's lawyers a copy of a legal complaint and had said he would proceed with that complaint unless the existing lawsuit resolved at mediation. Mitchell further stated in the video that he later chose not to begin a second lawsuit, that no further developments occurred after the mediation, but that Jobst "**should have known**" that no second lawsuit was coming.

29.    However, at the time of the creation of the GoFundMe campaign, Mitchell's stated position had never been withdrawn. Mitchell's later assertion that Jobst "should have known" that no further proceedings would be commenced is inconsistent with the

contemporaneous communications between the parties. Jobst created the GoFundMe in direct response to those communications.

30.     This was not news to Mitchell. On 7 November 2022, Mitchell's solicitor wrote to Jobst's solicitor querying why Jobst was "crowdfunding upon the basis that [Mitchell] has instituted a second defamation claim." (Exh. 25) In response, on 9 November 2022, Jobst's solicitor confirmed that proceedings had been sent to Jobst and that Mitchell had not withdrawn the threat of commencing those proceedings. (Exh. 26) These communications demonstrate that Mitchell, through his solicitor, was aware at the time of both the GoFundMe campaign and the basis upon which it had been created.

31.     Furthermore, in the June 3, 2025 Video, Mitchell directly addressed Jobst's prior public explanation for the GoFundMe, as set out by Jobst in an August 20, 2023 video, including Jobst's statements that Mitchell's lawyers had sent a further legal complaint and indicated it would be filed. (Exh. 27) Mitchell played and summarized that explanation, thus confirming that he was aware of the basis of the GoFundMe.

32.     Despite this, Mitchell in the June 3, 2025 Video stated that he did not "accept" Jobst's explanation for the GoFundMe and asserted that Jobst "obviously knew the second lawsuit was not coming or at the very least [was] unsure if it ever was," yet maintaining that Jobst had acted with "knowledge and intent" to fund a lawsuit on "false premises."

33.     Mitchell's assertions in the June 3 Video were also internally inconsistent. While acknowledging that his lawyers had sent a further legal complaint and indicated it would be filed, Mitchell nevertheless maintained that no second lawsuit was forthcoming and that Jobst "obviously knew" this to be the case. These conflicting positions cannot be reconciled and further demonstrate that Mitchell's statements were not grounded in the contemporaneous facts known to him.

9

34.     In the August 11 Video, Jobst publicly addressed and denied Mitchell's allegations that he had engaged in fraudulent fundraising and illegal conduct. Jobst explained the basis for the GoFundMe, including the existence of ongoing and threatened litigation, communications from Mitchell's solicitor, and the use of funds for legal expenses. The August 11 Video constituted a second direct and detailed rebuttal of the allegations that Jobst had acted with "knowledge and intent" to fundraise on false premises or had otherwise engaged in fraud or illegal activity.

35.     Following publication of the August 11 Video, Mitchell continued to publish statements repeating the same allegations, including his August 12 X Post, stating that Jobst had: "…LIED FOR FOUR YEARS, SCAMMED $200,000…" despite the public availability of Jobst's explanation and denial in the August 11 Video. (Exh. 14)

36.     Mitchell's publication of these allegations following his acknowledged awareness of the underlying facts and Jobst's public rebuttal supports the inference that his statements were not the product of mistake, confusion, or good-faith belief, but were made with knowledge of their falsity or with reckless disregard for the truth.

37.     On August 27, 2025, during a YouTube livestream (the "August 27 Livestream")(Exh. 28), Mitchell stated: "how do you feel about how [Jobst] misrepresented the lawsuits … to take advantage of his audience?" and further stated: "if I did that, I'd probably be in jail." In the same livestream, a viewer message appeared stating "you'd have to be low IQ to side with Jobst, after he scammed his viewers out of 200,000," to which Mitchell responded: "He actually scammed his viewers out of more than $500,000. So there, I'm telling you something that isn't reported. More than half a million dollars." Mitchell further stated that individuals who contributed to the GoFundMe had been "lied to," "deceived," and were "victims. These statements conveyed that Jobst had engaged in fraudulent and dishonest conduct by knowingly misrepresenting the litigation in order to

10

obtain approximately $200,000 through his GoFundMe campaign, and had engaged in conduct of a criminal nature.

38. During the August 27 Livestream, Mitchell denied that he had acknowledged the existence of a further complaint or proceedings, stating "No, I didn't acknowledge that," despite having previously admitted in the June 3 Video that his solicitor had provided a draft complaint and indicated it would be filed. Mitchell also stated that the relevant materials were "available for public consumption in the Australian courts." In fact, the draft complaint he had previously referenced was never filed and was not publicly available through any court record, and any Concerns Notices were not publicly available through any court record.

39. On November 12, 2025, during a YouTube livestream (the "November 12 Livestream")(Exh. 29), Mitchell again addressed Jobst's fundraising and referenced the GoFundMe campaign raising approximately $200,000, which he aggregated with other purported funding sources and characterized as having been wrongfully obtained. Mitchell stated: "He had $50,000 in one GoFundMe, 55, I think, and $200,000 in another GoFundMe… So, publicly there was $250,000 donated… He acknowledged that Notch gave him $300,000… So… 550… Let's just say 500… He deceptively took $500,000 from you."

40. These statements conveyed that Jobst had obtained funds from the GoFundMe campaign by deception and had misled donors into contributing money under false pretenses. The statements therefore impute fraudulent fundraising and dishonest conduct in connection with the solicitation of donations.

11

**Statements Alleging Fraudulent Misappropriation of Funds Through a 2021 GoFundMe Campaign**

41.     During the November 12 Livestream, Mitchell discussed a GoFundMe campaign created by Jobst in May 2021 to raise funds for third parties, including individuals who had been sued by Mitchell, for the purpose of covering their legal expenses. The campaign raised approximately $55,000 and was established for the benefit of those third parties rather than Jobst personally. (Exh. 30)

42.     In the same livestream, Mitchell stated in reference to Jobst: "He had $50,000 in one GoFundMe, 55, I think, and $200,000 in another GoFundMe... So, publicly there was $250,000 donated... He acknowledged that Notch gave him $300,000... So... 550... Let's just say 500... He deceptively took $500,000 from you."

43.     These statements conveyed that Jobst had wrongfully obtained funds from the 2021 GoFundMe campaign and had misappropriated money intended for third parties, including by deceptively taking or retaining those funds for his own benefit. The statements therefore impute fraudulent conduct, theft, and dishonest misappropriation of funds.

44.     These statements are false. The funds raised through the May 2021 GoFundMe campaign were not obtained through deception and funds were not retained for personal use and were held only for the purpose of disbursement to beneficiaries in accordance with the stated terms. The funds were raised for the benefit of third parties and were in fact transferred for that purpose, including to David Race, who was listed as a beneficiary on the GoFundMe campaign page. Jobst did not misappropriate, retain, or convert those funds for his own use.

45.     On 20 September, 2024, David Race testified in court that he received the funds raised through the May 2021 GoFundMe campaign as intended, consistent with the

campaign's stated purpose of supporting third parties facing legal expenses. This testimony confirms that the funds were not retained or misappropriated by Jobst. (Exh. 31)

> Okay. Thank you. And was all of that money – that 55 thousand-odd dollars – was that provided to you in defence of your claim of – from Mr Mitchell?---I would say probably most of it was. The – the initial – at least, in my perspective – or my understanding is that this GoFundMe was set up to help victims – not just me – but it ends up that Jeremy Young and Jeff Harrist, they were never served. And so – uh – my understanding is that – uh – most of that money – uh – if not close to all of it was – uh – sent to help me in the defence against Mitchell's base – Mr Mitchell's baseless case against me.
>
> All right. Do you feel like you owe anything Mr Jobst – to Mr Jobst for him doing that for you?---No. Not at all. Uh – actually, it wasn't Mr Jobst. It was the community that basically donated to this thing. So if there's any thanks to be given, it's the very – you know, to be very grateful to all the people that donated on the – for this Go Fund Me.

46. Mitchell knew the truth about the funds as he was present in the courtroom on September 20, 2024 when David Race gave sworn testimony regarding the May 2021 GoFundMe campaign. Despite this, Mitchell later asserted that Jobst had deceptively taken those funds for his own benefit. Mitchell's statements were therefore not the product of mistake or confusion, but were made with actual malice.

**Statements Alleging Deceptive Taking of $300,000 from Markus Persson (Notch)**

47. On May 27, 2021, prior to the commencement of any litigation against Jobst, Markus Persson publicly stated to Jobst on X: "If you ever need help dealing with Mitchell, let me know. I'll pay your legal fees any day of the week." (Exh. 32)

48. In or about June 2021, following his public offer, Persson confirmed directly to Jobst that he was willing to provide financial support for legal expenses arising from Jobst's dispute with Mitchell, and explained that his motivation was to assist in addressing that conduct and the anticipated cost burden. Persson then indicated that the practical

13

handling of any such support would be coordinated through his representatives, and directed Jobst to communicate with his manager for that purpose. (Exh. 33)

49.     Beginning in or about June 2021, and continuing thereafter, following Persson's direction, Jobst was contacted by Persson's representative, who confirmed that Persson intended to fund Jobst's legal expenses and requested documentation relating to the dispute, including correspondence, pleadings, and invoices. Jobst provided those materials, which were reviewed by Persson's representative and legal advisors, after which Persson's representatives approved the funding and arranged for payment of legal expenses, including by direct payment of invoices. (Exh. 34)

**From: Lisa Prick** ███████████████
**Sent:** Thursday, July 29, 2021 7:09 PM
**To:** KARL Jobst ◄ ██████████████ ►
**Subject:** Re: Notch

Hi again,

Both me and our lawyer have looked through all the documents you sent and everything looks good.
I think we would actually prefer to pay it to an Australian account if you don't mind?
If that works for you, please send me your bank details and I'll make sure you'll get your money as promised :)

50.     Between 2021 and 2024, Persson provided approximately $300,000 in financial support to assist with Jobst's legal defence.

51.     On April 25, 2025, Persson published a post on X stating: "People turning on Karl Jobst like they got bored of being part of the good guys. Is it possible the real problem here is the cheating narcissistic pathological liar and not the up until this moment trusted community member?" (Exh. 35)

52.     In response to Persson's post, on April 25, 2025, Mitchell published a quote post stating: "People turning on Karl Jobst like they lost hundreds of thousands to him like I

did." By misrepresenting and altering Persson's supportive post, Mitchell conveyed the false impression that Jobst had caused financial loss to Persson and others and had wrongfully obtained or retained funds, despite the fact that Persson voluntarily and knowingly provided support. (Exh. 36)



53.     During the November 12 Livestream, Mitchell discussed funds received by Jobst from Markus Persson (Notch), and referenced those funds alongside other amounts in forming his statements about Jobst's fundraising. Mitchell stated in reference to Jobst: "He had $50,000 in one GoFundMe, 55, I think, and $200,000 in another GoFundMe… So, publicly there was $250,000 donated… He acknowledged that Notch gave him $300,000… So… 550… Let's just say 500… He deceptively took $500,000 from you." (Exh. 29)

54. These statements conveyed that Jobst had deceptively obtained approximately $300,000 from Markus Persson, and had wrongfully taken or retained those funds for his own benefit. The statements therefore impute fraud, theft, and dishonest conduct in relation to funds provided by Persson.

55. These statements are false. The funds provided by Markus Persson were not obtained through deception and were not wrongfully taken or retained by Jobst. As stated earlier, the funds were offered voluntarily and with full knowledge of their purpose. Prior to any funds being provided, Persson and his representatives were given all information, including all legal documents regarding the legal matters for which support was sought, and the funding was approved on that basis.

**Statements Alleging Criminal Fraud of More Than Half a Million Dollars**

56. Beginning in or about August 2025, Mitchell escalated his prior allegations by asserting that Jobst had engaged in large scale fraud involving more than half a million dollars. These statements did not identify any specific transaction or conduct, but instead asserted as fact that Jobst had fraudulently taken over $500,000 from his audience and viewers, thereby conveying that Jobst had deceived his own audience as part of a general scheme of criminal conduct.

57. During the August 27 Livestream, a viewer message appeared stating "you'd have to be low IQ to side with Jobst, after he scammed his viewers out of 200,000," to which Mitchell responded: "He actually scammed his viewers out of more than $500,000. So there, I'm telling you something that isn't reported. More than half a million dollars." (Exh. 28)

58. On October 29, 2025, during a YouTube livestream (the "October 29 Livestream"), Mitchell stated in reference to Jobst: "The guy who took over half a million dollars fraudulently from his listeners." (Exh. 37)

16

59.     During the November 12 Livestream, Mitchell stated, referring to Jobst: "So the $250,000 public dollars, from the two different GoFundMe's, and $300,000 is $550,000… and let's forget 550, let's just say 500, it's an easier number… he deceptively took $500,000 from you… If that doesn't piss you off, I can't help you." (Exh. 29)

60.     Mitchell's statement that "let's just say 500, it's an easier number" demonstrates that he was not attempting to convey an accurate figure, but instead selected a number for rhetorical effect while asserting that Jobst had "deceptively" taken that amount. By adding "If that doesn't piss you off, I can't help you," Mitchell encouraged his audience to react with anger toward Jobst, evidencing an intent to undermine Jobst's credibility and relationship with his viewers.

61.     During the December 4 Livestream, Mitchell stated, referring to Jobst: "He took over half a million dollars of people's money. Okay. Based upon, let me be kind, based upon the falsehood. Yes, he took over a half a million dollars. I mean, some people argue that you should go to jail for doing something like that… if I did that, I would go to jail…" (Exh. 15)

62.     By attributing the taking of money based upon a "falsehood," Mitchell expressly framed the alleged conduct as deceptive rather than legitimate. Mitchell further invoked and personally endorsed the prospect of criminal punishment by stating that if he engaged in such conduct he "would go to jail," thereby reinforcing the allegation that Jobst had engaged in serious criminal wrongdoing.

63.     Mitchell's repeated defamatory statements are false. Jobst did not obtain any funds from members of the public through fraud, deception, or any unlawful conduct. No individual transaction, nor any combination of transactions, constitutes fraud or deceptive conduct, and no facts exist that could support an assertion that Jobst obtained more than half

17

a million dollars through fraudulent means. The statements assert, without any factual basis, that Jobst engaged in large scale criminal fraud.

## UNAUTHORIZED USE OF NAME AND LIKENESS

64.     Beginning on May 10, 2025, and continuing thereafter, Mitchell engaged in a course of conduct using Jobst's name and likeness in connection with the promotion and sale of commercial products.

65.     Mitchell used images and video footage depicting Jobst in connection with the promotion of commercial products, including posts directing users to rickeyssauce.com. (Exh. 38)

66.     Mitchell used Jobst's name or likeness in promotional discount codes, including "JOBST," "KARL LOST," and "KARL LOBST," and did so in direct responses to Jobst's own posts. (Exh. 39)

67.     Mitchell republished statements made by Jobst and used those statements in posts promoting commercial products, including by pairing them with links and discount codes intended to drive sales. (Exh. 40)

68.     Beginning at least in July 2025, Mitchell offered for sale on rickeyssauce.com a product titled "Signed Billy Mitchell Red Joystick Headshot," which prominently featured Jobst's name and likeness as part of the product itself; and on April 3, 2026, Mitchell further promoted that product by posting that it had "officially sold out," that it might return "by popular demand," and that it was "very poetic" that it sold out exactly one year after the judgment. (Exh. 41)

69.     These uses of Jobst's name and likeness were made for commercial purposes, including to advertise, promote, and sell products to the public, and were undertaken without Jobst's consent. Mitchell's use of Jobst's identity was not incidental but formed part of a

18

broader effort to attract attention, drive sales, and commercially benefit from the association with Jobst, and was undertaken willfully.

## MITCHELL'S MALICE AND PATTERN OF CONDUCT

70.     In addition to the foregoing allegations, Mitchell engaged in further conduct evidencing malice and demonstrating that his statements were not made for the purpose of conveying factual information, but as part of a broader effort directed at Jobst.

71.     Mitchell repeatedly paired references to Jobst's alleged financial condition with promotion of his own commercial products, including the use of discount codes referencing bankruptcy, thereby linking his statements to financial gain. (Exh. 42)

72.     Mitchell also endorsed statements advocating harm to Jobst's livelihood, including reposting commentary suggesting an opportunity to "cripple Jobst's future income." (Exh. 43) During the August 27 Livestream, in response to a viewer stating, in reference to Jobst: "I fully appreciated that you busted his entire career to pieces", Mitchell stated: "You ain't seen nothing yet." After another viewer commented: "Karl's voice is shaking in his recent videos. He's on the ropes badly," Mitchell again repeated: "You ain't seen nothing yet." (Exh. 44)

73.     Mitchell further made statements referencing Jobst's assets and financial position, including comments suggesting that Jobst's property or equity would be transferred to him, and invoked ongoing litigation in a manner indicating pressure rather than legitimate dispute resolution. (Exh. 45)

74.     Mitchell encouraged his audience to react emotionally to his statements, including by framing his allegations in terms intended to provoke anger rather than to present verifiable facts. Defendant further indicated an intent to expand the reach of his statements by considering paid promotion of his posts.

19

75. Mitchell engaged in repeated public ridicule and degrading commentary directed at Jobst, including statements attacking Jobst's character and personal circumstances, and portraying him in a humiliating and demeaning manner before a public audience. These statements were not isolated but formed part of a sustained course of conduct intended to demean Jobst, damage his reputation, and undermine his standing with his audience. (Exh. 46)

76. Mitchell went beyond rhetoric by publicly circulating imagery depicting Jobst as physically restrained, overpowered, or destroyed - including graphics showing Mitchell holding a weapon over Jobst and imagery evoking hanging and "wasted life" themes. These posts were accompanied by taunting captions and ridicule for Jobst's attempts to seek protection or respond. This was not commentary or satire. It was the deliberate use of violence-coded, dehumanizing imagery to intimidate, signal domination, and portray Jobst as deserving of harm before a mass audience. (Exh. 47)

77. As a direct and proximate result of Mitchell's repeated conduct, Jobst suffered severe emotional distress, including mental anguish, humiliation, embarrassment, and ongoing emotional harm. Jobst also experienced significant disruption to his sleep, including persistent insomnia requiring treatment, and required medical intervention, including prescription medication and other sleep aids, as well as ongoing personal and professional stress.

## CLAIMS FOR RELIEF

## COUNT I – DEFAMATION PER SE

78. Plaintiff repeats and realleges paragraphs 1–77 as if fully set forth herein.

79. Mitchell published statements concerning Jobst, including statements asserting that Jobst had engaged in "serious illegal activity" before and during the bankruptcy process.

80. Mitchell further published and endorsed statements conveying that Jobst had engaged in unlawful conduct to defraud creditors, including allegations that Jobst had improperly moved or concealed assets in connection with the bankruptcy.

81. These statements were false.

82. Mitchell made these statements with knowledge of their falsity or with reckless disregard for the truth.

83. The statements constitute defamation per se because they impute criminal conduct.

84. As a direct result of Mitchell's defamation, Jobst suffered presumed damages and actual injury, including, but not limited to, insult, pain, embarrassment, humiliation, emotional suffering, injury to his reputation, harm to his relationship with his audience, lost future earnings and diminished earning capacity, and other economic losses, in a sum to be determined by the Jury.

85. Mitchell's conduct was willful and malicious, entitling Jobst to punitive damages.

## COUNT II – DEFAMATION PER SE

86. Plaintiff repeats and realleges paragraphs 1–77 as if fully set forth herein.

87. Mitchell published statements asserting that Jobst created a GoFundMe campaign on false premises with knowledge and intent to deceive the public.

88. Mitchell further stated that Jobst engaged in fraudulent fundraising and obtained approximately $200,000 from his audience through deception.

89. These statements were false.

90. Mitchell made these statements with knowledge of their falsity or with reckless disregard for the truth.

21

91. The statements constitute defamation per se because they impute criminal conduct.

92. As a direct result of Mitchell's defamation, Jobst suffered presumed damages and actual injury, including, but not limited to, insult, pain, embarrassment, humiliation, emotional suffering, injury to his reputation, harm to his relationship with his audience, lost future earnings and diminished earning capacity, and other economic losses, in a sum to be determined by the Jury.

93. Mitchell's conduct was willful and malicious, entitling Jobst to punitive damages.

## COUNT III – DEFAMATION PER SE

94. Plaintiff repeats and realleges paragraphs 1–77 as if fully set forth herein.

95. Mitchell published statements asserting that Jobst had wrongfully obtained or misappropriated funds from a 2021 GoFundMe campaign intended for third parties.

96. Mitchell's statements conveyed that Jobst had deceptively taken or retained approximately $50,000 for his own benefit.

97. These statements were false.

98. Mitchell made these statements with knowledge of their falsity or with reckless disregard for the truth.

99. The statements constitute defamation per se because they impute criminal conduct.

100. As a direct result of Mitchell's defamation, Jobst suffered presumed damages and actual injury, including, but not limited to, insult, pain, embarrassment, humiliation, emotional suffering, injury to his reputation, harm to his relationship with his audience, lost future earnings and diminished earning capacity, and other economic losses, in a sum to be determined by the Jury.

101.   Mitchell's conduct was willful and malicious, entitling Jobst to punitive damages.

## COUNT IV – DEFAMATION PER SE

102.   Plaintiff repeats and realleges paragraphs 1–77 as if fully set forth herein.

103.   Mitchell published statements asserting that Jobst deceptively obtained approximately $300,000 from Markus Persson.

104.   Mitchell's statements conveyed that Jobst had wrongfully taken or retained those funds through dishonest or fraudulent means.

105.   These statements were false.

106.   Mitchell made these statements with knowledge of their falsity or with reckless disregard for the truth.

107.   The statements constitute defamation per se because they impute criminal conduct.

108.   As a direct result of Mitchell's defamation, Jobst suffered presumed damages and actual injury, including, but not limited to, insult, pain, embarrassment, humiliation, emotional suffering, injury to his reputation, harm to his relationship with his audience, lost future earnings and diminished earning capacity, and other economic losses, in a sum to be determined by the Jury.

109.   Mitchell's conduct was willful and malicious, entitling Jobst to punitive damages.

## COUNT V – DEFAMATION PER SE

110.   Plaintiff repeats and realleges paragraphs 1–77 as if fully set forth herein.

111.   Mitchell published statements asserting that Jobst had engaged in large scale fraud involving more than half a million dollars obtained from his audience.

112. Mitchell's statements conveyed that Jobst had engaged in a broad scheme of criminal conduct and deception affecting members of the public.

113. These statements were false.

114. Mitchell made these statements with knowledge of their falsity or with reckless disregard for the truth.

115. The statements constitute defamation per se because they impute criminal conduct.

116. As a direct result of Mitchell's defamation, Jobst suffered presumed damages and actual injury, including, but not limited to, insult, pain, embarrassment, humiliation, emotional suffering, injury to his reputation, harm to his relationship with his audience, lost future earnings and diminished earning capacity, and other economic losses, in a sum to be determined by the Jury.

117. Mitchell's conduct was willful and malicious, entitling Jobst to punitive damages.

## COUNT VI – UNAUTHORIZED APPROPRIATION OF NAME OR LIKENESS

118. Plaintiff repeats and realleges paragraphs 1–77 as if fully set forth herein.

119. Mitchell used Jobst's name and likeness, including Jobst's image, video footage, name, and persona in connection with posts and materials promoting commercial products.

120. Mitchell's use of Jobst's identity was for commercial purposes, including to advertise, promote, and sell products through links and promotional discount codes directing users to rickeyssauce.com.

121. Mitchell did so without Jobst's consent.

122.   As a result of Mitchell's unauthorized use of Jobst's name and likeness, Jobst has suffered injury, including damage to his reputation, commercial value, and the value of his identity.

123.   Mitchell's conduct was knowing and willful.

124.   Plaintiff seeks all available damages, including compensatory and punitive damages, as well as injunctive relief prohibiting further unauthorized use of his name and likeness.

## COUNT VII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

125.   Plaintiff repeats and realleges paragraphs 1–77 as if fully set forth herein.

126.   Mitchell engaged in a sustained course of conduct directed at Jobst, including the repeated publication of statements and imagery designed to humiliate, intimidate, and degrade Jobst before a public audience.

127.   This conduct included, among other things, the use of imagery depicting Jobst as being hanged or otherwise subjected to violence, the publication of dehumanizing and degrading images and content portraying Jobst in humiliating circumstances, repeated statements mocking Jobst's financial condition, including references to bankruptcy, homelessness, and loss of assets, and the invocation or threat of further legal action in conjunction with such public accusations and conduct.

128.   Mitchell further amplified this conduct by encouraging audience reaction, pairing such statements and imagery with ridicule and taunting commentary, and linking the content to the promotion of his own commercial products.

129.   Mitchell's conduct, taken as a whole, was extreme and outrageous and exceeded all bounds of decency tolerated in a civilized community.

130.   Mitchell engaged in this conduct intentionally, or with reckless disregard of the high probability that his actions would cause severe emotional distress to Jobst.

25

131. As a direct and proximate result of Mitchell's conduct, Jobst suffered severe emotional distress, including mental anguish, humiliation, embarrassment, and ongoing emotional harm.

132. Mitchell's conduct was willful and malicious, entitling Jobst to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Mitchell as follows:

A. Awarding damages for injury to Plaintiff's reputation, lost profits, and diminished earning capacity, and Plaintiff's mental anguish, distress, and humiliation;

B. Awarding punitive damages in the maximum amount permitted by law;

C. Awarding pre- and post-judgment interest;

D. Assessing costs incurred in the prosecution of this action; and

E. Granting such other and further relief as the Court deems just and proper.

Dated: April 6, 2026

Respectfully submitted,

Karl Jobst
32 Ventura Street
Pallara, QLD, Australia 4110
Karljobstgaming@gmail.com
+61 432 597 334
Pro Se Plaintiff