# DISTRICT COURT OF QUEENSLAND

| | |
|---|---|
| CITATION: | *Mitchell v Jobst* [2025] QDC 41 |
| PARTIES: | **WILLIAM JAMES MITCHELL**<br>(Plaintiff)<br>**v**<br>**KARL JOBST**<br>(Defendant) |
| FILE NO/S: | BD 1075/2024 |
| DIVISION: | Civil |
| DELIVERED ON: | 1 April 2025 |
| DELIVERED AT: | Brisbane |
| HEARING DATE: | 16-20 September; 8, 11 October 2024 |
| JUDGE: | Barlow KC, DCJ |
| ORDERS: | **1. Judgment for the plaintiff:**<br><br>**(a) for damages for non-economic loss, in the sum of $300,000, plus interest of $34,668.50 (subject to either party seeking a different order as to interest, upon delivery of this judgment or by filing and serving a written submission within 14 days); and**<br><br>**(b) for aggravated damages in the sum of $50,000, plus interest of $5,778.08 (subject to either party seeking a different order as to interest, upon delivery of this judgment or by filing and serving a written submission within 14 days).**<br><br>**2. Unless either party seeks a different order as to costs, either upon delivery of this judgment or by filing and serving a written submission within 14 days, the defendant pay the plaintiff's costs of the proceeding.** |
| CATCHWORDS: | DEFAMATION – PUBLICATION – GENERALLY – INTERNET PUBLICATIONS –extent of publication – the plaintiff sued in respect of comments made on the defendant's YouTube channel – direct evidence of publication of the video in United States of America, Australia and Jamaica – indirect evidence the video was downloaded before it was taken down – whether extensive publication proved.<br><br>DEFAMATION – STATEMENTS AMOUNTING TO DEFAMATION – PARTICULAR STATEMENTS – IMPUTATION – the meaning of the publication – the |

ii

plaintiff alleged the offending words carried five defamatory imputations – whether the offending words were capable of conveying a defamatory meaning – whether the imputations were capable of being conveyed by the publication to the ordinary reasonable person – whether the imputations were defamatory. DEFAMATION – JUSTIFICATION – TRUTH – SUBSTANTIAL TRUTH AND CONTEXTUAL TRUTH – the defendant sought to establish the defence of contextual truth – the defendant alleged five contextual imputations – whether any reasonable viewer would conclude that the matters were contextually and substantially true – whether the contextual imputations were more serious than the plaintiff's imputations.

DEFAMATION – DAMAGES – GENERAL DAMAGES – ASSESSMENT – IN GENERAL – extent to which the plaintiff was personally affected – extent to which the plaintiff's reputation was damaged – grapevine effect – the proceeding was covered extensively in the media and online – whether plaintiff's publication of response video that showed the defamatory words was a mitigating factor – whether the defendant's retraction video was a mitigating factor – appropriate measure of general damages.

DEFAMATION – DAMAGES – GENERAL DAMAGES – ASSESSMENT – IN GENERAL – SPECIAL MATTERS – AGGRAVATION – whether amendments to s 35 of the *Defamation Act* 2005 made in 2001 affected the factors which a court should take into account in determining whether aggravated damages should be awarded and, if so, in what sum.

DEFAMATION – DAMAGES – GENERAL DAMAGES – ASSESSMENT – IN GENERAL – SPECIAL MATTERS – AGGRAVATION – the plaintiff claimed aggravated damages – the imputations were based on a fallacy – the defendant repeated the publication – the defendant used extravagant and sensationalised language – the defendant had malice towards the plaintiff – the defendant's conduct of the litigation was aggravating – the retraction video did not demonstrate a genuine apology – whether the defendant's conduct was aggravating in the circumstances – appropriate measure of aggravated damages.

| | |
|---|---|
| LEGISLATION: | *Defamation Act* 2005, ss 8, 14, 18, 26, 34, 35, 38, 39 <br> *Defamation (Model Provisions) and Other Legislation Amendment Act* 2021, ss 2, 15, 21 <br> *Uniform Civil Procedure Rules* 1999, rr 166(5), 681, 698 |

iii

| CASES: | *Ali v Nationwide News Pty Ltd* [2008] NSWCA 183, applied |
|---|---|
| | *Amalgamated Television Services Pty Ltd v Marsden* (1998) 43 NSWLR 158, applied |
| | *Ames v Spamhaus Project Ltd* [2015] 1 WLR 3409, cited |
| | *Armagas Ltd v Mundogas SA ('The Ocean Frost')* [1985] 1 Lloyd's Rep 11, cited |
| | *Associated Newspapers v Dingle* [1964] AC 371, applied |
| | *Australian Broadcasting Corporation v McBride* (2001) 53 NSWLR 430, considered |
| | *Australian Securities and Investments Commission v Australian Lending Centre Pty Ltd (No 3)* (2012) 213 FCR 380, cited |
| | *Australian Securities and Investments Commission v Fortescue Metals Group Ltd (No 5)* (2009) 264 ALR 201, cited |
| | *Banks v Cadwalladr* [2022] 1 WLR 5236, cited |
| | *Barilaro v Google LLC* [2022] FCA 650, considered |
| | *Bauer Media Pty Ltd v Wilson (No 2)* (2018) 56 VR 674, cited |
| | *Belbin v Lower Murray Urban and Rural Water Corporation* [2012] VSC 535, applied |
| | *Bolton v Stoltenberg* (2018) Aust Torts Reports 82-417, applied |
| | *Brose v Baluskas (No 6)* [2020] QDC 15, applied |
| | *Camden v McKenzie* [2008] 1 Qd R 39, cited |
| | *Campbell v T. L. Clacher No. 2 Pty Ltd* [2019] QSC 218, cited |
| | *Carson v John Fairfax & Sons Ltd* (1993) 178 CLR 44, applied |
| | *Cassell & Co Ltd v Broome* [1972] AC 1027, applied |
| | *Cerutti v Crestside Pty Ltd* [2016] 1 Qd R 89, applied |
| | *Channel Seven Sydney Pty Ltd v Mahommed* (2010) 278 ALR 232, applied |
| | *Chapman v Australian Broadcasting Corporation* (2000) 77 SASR 181, applied |
| | *Chappell v Mirror Newspapers Ltd* (1986) Aust Torts Rep 80,691, cited |
| | *Deeming v Pesutto (No 3)* [2024] FCA 1430, considered |
| | *Doak v Birks* [2022] NSWDC 625, applied |
| | *Dow Jones and Co Inv v Gutnick* (2002) 210 CLR 575, applied |
| | *Favell v Queensland Newspapers Pty Ltd* (2005) 221 ALR 186, applied |
| | *Forrest v Askew* [2007] WASC 161, followed |
| | *Fox v Percy* (2003) 214 CLR 118, cited |
| | *Goody v Odhams Press Ltd* [1967] 1 QB 333, cited |
| | *Greenwich v Latham* [2024] FCA 1050, applied |
| | *Guirguis Pty Ltd v Michel's Patisserie System Pty Ltd* [2018] 1 Qd R 132, cited |

iv

*Hallam v O'Connor* [2024] QDC 187, considered

*Harrington v Shoard* [2023] QDC 11, considered

*Hockey v Fairfax Media Publications Pty Ltd* (2015) 237 FCR 33, applied

*Hospitality Group Pty Ltd v Australian Rugby Union Ltd* (2001) 110 FCR 157, cited

*Jeynes v News Magazines Ltd* [2008] EWCA 130, applied

*Jones v Dunkel* (1959) 101 CLR 298, applied

*Jones v Skelton* [1964] NSWR 485, applied

*Lewis v Daily Telegraph Ltd* [1964] AC 234, applied

*Ley v Hamilton* (1935) LT 384, applied

*Makita (Australia) Pty Ltd v Sprowles* (2001) 52 NSWLR 705, cited

*Malco Engineering Pty Ltd v Ferreira* (1994) 10 NSWCCR 117, cited

*Manly Council v Byrne* [2004] NSWCA 123, cited

*Marsden v Amalgamated Television Services Pty Ltd* [1999] NSWSC 1119, applied

*Massoud v Nationwide News Pty Ltd* (2022) 109 NSWLR 468, applied

*McQuire v West Morning News* [1903] 2 KB 100, cited

*Mickle v Farley* [2013] NSWDC 295, applied

*Mirror Newspapers Ltd v Harrison* (1982) 149 CLR 293, applied

*Mitchell v Race*, unreported, Supreme Court of Florida No SC2023-0432, referred to

*Mitchell v Twin Galaxies*, LLC, Court of Appeal of the State of California, Second Appellate District, Division Eight, B308889, considered

*Murray v Raynor* [2019] NSWCA 274, cited

*Nationwide News Pty Ltd v Weatherup* [2018] 1 Qd R 19, applied

*Nine Network Australia Pty Ltd v Wagner* (2020) 6 QR 64, applied

*O'Hagan v Nationwide News Pty Ltd* (2001) 53 NSWLR 89, considered

*O'Reilly v Edgar* [2019] QSC 24, considered

*Onassis and Calogeropoulos v Vergottis* [1968] 2 Lloyds Rep 403, cited

*Palmer Bruyn & Parker Pty Ltd v Parsons* (2001) 208 CLR 388, applied

*Papatonakis v Australian Telecommunications Commission* (1985) 156 CLR 7, cited

*Peros v Nationwide News Pty Ltd (No 3)* [2024] QSC 192, cited

*Plato Films Ltd v Speidel* [1961] AC 1090, considered

*Queensland Newspapers Pty Ltd v Palmer* [2012] 2 Qd R 139, applied

*Race v Mitchell*, 357 So 3d 720 (2023), referred to

v

*Radio 2UE Sydney Pty Ltd v Chesterton* (2009) 238 CLR 460, applied

*Rayney v State of Western Australia (No 9)* [2017] WASC 367, considered

*Readers Digest Services Pty Ltd v Lamb* (1982) 150 CLR 500, applied

*Roberts v Prendergast* [2014] 1 Qd R 357, applied

*Rogers v Nationwide News Ltd* (2003) 216 CLR 327, applied

*Rudd v Starbucks Coffee Company (Australia) Pty Ltd* [2015] QDC 232, cited

*Scali v Scali* [2015] SADC 172, considered

*Sims v Jooste (No 2)* [2016] WASCA 83, applied

*Sirocki v Klerck (No 2)* [2015] QSC 92, considered

*Smith v Lucht* [2015] QDC 289, cited

*Sobrinho v Impresa Publishing SA* [2016] EMLR 12, applied

*Societe D'Avances Commerciales (Societe Anonyme Egyptienne) v Merchants' Marine Insurance Co (The "Palitana")* (1924) 20 Ll L Rep 140, cited

*State Rail Authority (NSW) v Earthline Constructions Pty Ltd (In Liq)* (1999) 73 ALJR 306, applied

*Stocker v Stocker* [2020] AC 593, applied

*Stoltenberg v Bolton* (2020) 380 ALR 145, cited

*The Gleaner Co Ltd v Abrahams* [2004] 1 AC 628, applied

*Trad v Harbour Radio Pty Ltd (No 2)* [2013] NSWCA 477, applied

*Trawl Industries v Effem Foods Pty Ltd* (1992) 27 NSWLR 326, cited

*Triggell v Pheeney* (1951) 82 CLR 497, applied

*V'Landys v Australian Broadcasting Corporation* [2023] FCAFC 80, cited

*Wagner v Harbour Radio Pty Ltd* [2018] QSC 201, considered

*Wagner v Nine Network Australia Pty Ltd* [2019] QSC 284, applied

*Watney v Kencian* [2018] 1 Qd R 407, applied

*Watson v Foxman* (1995) 49 NSWLR 315, cited

*White v The King* (1947) 89 CCC 148, cited

*Withyman (by his tutor Glenda Ruth Withyman) v State of New South Wales and Blackburn; Blackburn v Withyman (by his tutor Glenda Ruth Withyman)* [2013] NSWCA 10, cited

OTHER MATERIAL:

*Defamation (Model Provisions) and Other Legislation Amendment Bill 2021 Explanatory Note*

*Gatley on Libel and Slander* (Sweet & Maxwell, 13th ed, 2022)

George, P, *Defamation Law in Australia* (LexisNexis, 4th ed, 2023)

Heydon, JD, *Cross on Evidence* (LexisNexis Australia)

vi

|  | Lord Devlin, *The Judge* (Oxford University Press, 1979)<br>Rolph, D, *Rolph on Defamation* (Lawbook Co, 2nd ed, 2024) |
| --- | --- |
| COUNSEL: | P Somers for the plaintiff |
|  | M de Waard for the defendant |
| SOLICITORS: | Bennett & Philp Lawyers for the plaintiff |
|  | Mills Oakley for the defendant |

## Contents

Introduction and summary of findings ................................................................ 1

Mr Mitchell and his history ............................................................................... 4

The contested scores .......................................................................................... 6

    The challenge to Mr Mitchell's scores ........................................................... 6

    Twin Galaxies' findings and consequences .................................................... 7

Litigation by Mr Mitchell .................................................................................. 8

    Twin Galaxies ................................................................................................. 8

    Donkey Kong Forum, Jeff Harrist, Jeremy Young ........................................ 10

    Guinness World Records ................................................................................ 10

    David Race ..................................................................................................... 11

    Benjamin Smith – "Apollo Legend" ............................................................. 11

Apollo Legend's last actions ............................................................................ 13

Mr Jobst ........................................................................................................... 13

    A little about Mr Jobst ................................................................................... 13

    Earlier and later publications by Mr Jobst about Mr Mitchell ...................... 14

The publications .............................................................................................. 14

    The first version (the first publication) – 26 May 2021 ................................ 15

    Mr Mitchell's response video – 3 June 2021 ................................................ 17

    The second version of the video – 4 June 2021 ............................................ 18

    The third version (republication) – 9 June 2021 .......................................... 19

    The fourth version – 13 June 2021 ............................................................... 19

    Mr Jobst's "retraction video" – 29 July 2021.............................................. 20

The extent of the publications .......................................................................... 21

    The parties' contentions ................................................................................ 21

    What constitutes publication?........................................................................ 21

    Evidence of the extent of publication ........................................................... 22

    Conclusions on the extent of publication ...................................................... 26

    Extent of publication of response video and retraction video ....................... 28

Meanings of the publications ........................................................................... 28

The imputations alleged ............................................................................... 28

Determining the meaning of the publications ................................................. 29

The ordinary reasonable person ................................................................... 30

Did the imputations arise from the video? ..................................................... 32

    Imputation 1 – Mr Mitchell required Apollo Legend to pay him a large sum, etc .... 32

    Imputation 2 – a major contributing factor to Apollo Legend's decision to commit suicide was the requirement to pay Mr Mitchell a large sum to settle Mr Mitchell's claim ...................................................................................................... 32

    Imputation 3 – Mr Mitchell hounded Apollo Legend to death ................................. 35

    Imputation 4 – Mr Mitchell was the main cause, or a cause, of Apollo Legend committing suicide ...................................................................................... 36

    Imputation 5 – Mr Mitchell's conduct was a contributing factor to Apollo Legend committing suicide ...................................................................................... 36

    Conclusions on imputations alleged by Mr Mitchell ................................................ 36

Were the publications defamatory? ............................................................... 36

    The first imputation ..................................................................................... 37

    The second, fourth and fifth imputations ................................................................ 37

    The third imputation .................................................................................... 37

    Conclusion – the imputations were defamatory ...................................................... 37

Issues of credit ............................................................................................ 38

    General approach to issues of credit ............................................................ 38

    Mr Mitchell .................................................................................................. 40

    Mr Jobst ...................................................................................................... 47

    Other witnesses .......................................................................................... 51

        Mr Mitchell's witnesses ............................................................................... 51

        Mr Jobst's witnesses ................................................................................... 53

    The absent witness – Mrs Mitchell ............................................................... 56

Contextual truth defence .............................................................................. 58

    The components of contextual truth ............................................................. 58

    Did the contextual imputations arise and were they substantially true? ........................ 60

        First contextual imputation – publicly exposed as having cheated ............................ 60

        Second contextual imputation – banned from submitting scores to Twin Galaxies for cheating ...................................................................................................... 62

        Third contextual imputation – Mr Mitchell planned a fraudulent video ...................... 63

        Fourth contextual imputation – callously expressed joy at reported death of Apollo Legend ........................................................................................................ 64

        Fifth contextual imputation – using litigation to force others to recognise his achievements ............................................................................................... 67

        Conclusions on contextual imputations ................................................................. 69

Effects of imputations and contextual imputations on Mr Mitchell's reputation............... 69

viii

Evidence of reputation generally ................................................................. 69

The alleged pre-existing bad reputation ...................................................... 70

Mr Mitchell's reputation, before and after publication ................................. 71

    Witnesses ............................................................................................. 71

    Other evidence ..................................................................................... 77

Conclusions on Mr Mitchell's reputation .................................................... 79

The sectors of Mr Mitchell's reputation ...................................................... 81

Did the publications harm Mr Mitchell's reputation? .................................. 83

Conclusions – Mr Jobst defamed Mr Mitchell and caused him harm ............................ 85

Damages ............................................................................................................ 85

  General damages ....................................................................................... 86

    Principles .............................................................................................. 86

    Personal effects on Mr Mitchell .......................................................... 87

    Extent of harm to reputation ................................................................ 90

    Vindication ........................................................................................... 91

    The grapevine effect ............................................................................ 92

    Mitigating factors ................................................................................ 94

  Aggravated damages ................................................................................ 97

    Reckless indifference to the facts ........................................................ 100

    Repeated publication ........................................................................... 101

    Sensationalised and extravagant video ................................................ 102

    Malice toward Mr Mitchell .................................................................. 103

    Obtaining pecuniary benefits ............................................................... 103

    The "retraction" .................................................................................. 104

    Conduct of litigation ........................................................................... 105

    Conclusions – Mr Jobst's conduct merits aggravated damages ............. 105

  The award of damages .............................................................................. 105

    Other damages awards ......................................................................... 106

    Amount of general damages ................................................................. 108

    Aggravated damages amount ............................................................... 109

Other matters ................................................................................................... 109

  Rulings on evidence ................................................................................. 109

  Interest on damages .................................................................................. 110

  Costs ........................................................................................................ 110

1

### Introduction and summary of findings

[1]   The plaintiff, William Mitchell III, lives in Florida, United States of America.  He has been well known (as Billy Mitchell) among adherents of video and arcade gaming in many countries, including Australia, since about November 1982.

[2]   At an arcade and video gaming competition in November 1982 that took place in Ottumwa, Iowa, USA, playing an arcade game called Donkey Kong, Mr Mitchell scored a world record 874,300 points and was the first person ever recorded as reaching the "kill screen" (that is, reaching the end of the game).  At the time he was 17 years old.

[3]   Mr Mitchell went on to be recognised as having achieved a number of world records and world firsts in video and arcade gaming.  They included achieving the first perfect score of 3,333,360 in another game called Pac-Man in 1999, setting a new world record (and the first score of over 1,000,000 points) of 1,047,200 in Donkey Kong in June 2005, another Donkey Kong world record of 1,050,200 in July 2007 and a third Donkey Kong world record of 1,062,800 in July 2010.

[4]   The defendant, Karl Jobst, lives in Queensland and describes himself as a "professional YouTuber."  Since about the end of 2018, he publishes videos on his own YouTube channel, from which he earns income.  He has over 1,000,000 followers on that channel.  His videos mostly concern "speed running,"[1] but since about late 2019 he has also covered gaming world records and cheating in arcade and video games.  Since about June 2020 he has published many videos about Mr Mitchell (including about this and other litigation).  He is also a video game player himself and said that he has earned a large number of world records in certain games.

[5]   Twin Galaxies Inc (later Twin Galaxies LLC) is a company incorporated in Florida, USA.  It was founded by Walter Day, who sold it to Jace Hall in February 2014.  Its role (apparently self-determined) was and remains, in essence, to set rules for video and arcade gaming competitions and records, to organise and hold competitions and to publish the achievements of gamers, including records set by them and recognised by Twin Galaxies as legitimate.  Perhaps its role is best described in the following passage taken from its current website:[2]

> Twin Galaxies stands as a cornerstone in the world of competitive gaming, offering a specialized platform for video game enthusiasts. It serves as the authoritative body for setting rules, verifying achievements, and maintaining a comprehensive database of records and rankings across various electronic gaming platforms. This platform is committed to acknowledging and promoting video game player achievements globally, emphasizing the significance of players' skills and accomplishments in the gaming community.

[6]   Records of video and arcade games scores were also, at the relevant times, published by Guinness World Records, mostly in special "Gamers' Editions" of its ubiquitous Guinness Book of World Records.  It appears that Guinness World Records may take into account Twin Galaxies' published records in Guinness World Records'

---

[1]   Which Mr Jobst described as competing to see how fast you can beat a video game: T4-93.

[2]   https://www.twingalaxies.com/wiki_index.php?title=Policy:What-is-Twin-Galaxies.  This description was not in evidence but it does, although somewhat floridly, reflect the evidence about Twin Galaxies.

2

consideration of what records it may recognise and publish itself.  Guinness World Records did publish Mr Mitchell's records referred to above in several editions.

[7]     Twin Galaxies makes available on its website a forum for members to discuss matters of relevance to video and arcade gaming.  It also has a documented process under which a member[3] may dispute a score that has been recognised (or submitted for recognition) by Twin Galaxies.  As I understand the system, other members can then discuss the dispute, including submitting further evidence about it, until ultimately a decision on the dispute is made by Twin Galaxies.

[8]     One of Twin Galaxies' rules for the conduct of competitions and the acknowledgement of records in arcade games, including Donkey Kong, was that the gamer use "original unmodified arcade hardware" to play the game.[4]

[9]     In August 2017, a member of Twin Galaxies, Jeremy Young, submitted a dispute against the last three of Mr Mitchell's historical and then current original arcade Donkey Kong scores referred to above.  Mr Young contended that the scores were not achieved on original Donkey Kong hardware, but were generated through the use of software known as MAME.[5]

[10]    MAME software was explained by Mr Jobst during the trial in the following way:[6]

> So you've got the original arcade machines that were produced in the eighties, um, which is called the original hardware.  And over the years, people have, ah, sort of, extract – extracted the code from the game so that you could play it on computers.  So you don't actually need to play it on an arcade anymore.  You can just, sort of, download the raw code and play it on a computer.  So you don't need to play the actual arcade.  But the thing about that is, because computers work differently and they load – graphics load differently, there's specific signatures that you can see in the way it loads that differ between arcade and MAME.  Now, to a lay person who watches arc – you know, the two different – MAME versus arcade, they wouldn't be able to tell the difference.  Um, but if you pause it on the – on certain screen transitions and see how it loads, there's a very distinct difference.  …  The only reason it's a concern is because if you play it on a computer, there are tools available to you that allow you to cheat, which aren't available to you on arcade.

[11]    At the end of the dispute process, on 12 April 2018 Twin Galaxies announced that it had decided to remove all of Mr Mitchell's scores and to ban him from participating in its competitive leaderboards.[7]  The following day, Guinness World Records announced that, based on Twin Galaxies' decision, it would also remove all Mr Mitchell's record scores from its records.[8]

---

[3]     "Member" does not mean shareholder, but someone who has registered with Twin Galaxies to have access and to contribute to its member forums.

[4]     Twin Galaxies does recognise other records in which arcade games are played on other hardware, including computers, but as separate categories from games played on the original hardware.

[5]     One witness, David Race, said that means Multiple Arcade Machine Emulator: T5-49.

[6]     T4-97 - 98.  I do not understand this description to be disputed.  Another useful description of MAME software appears on the MAME website: https://www.mamedev.org, which records that the term MAME is a registered trademark.

[7]     Twin Galaxies' announcement of the decision is in the trial bundle (exhibit 1) at tab 5 (TB[5]), as well as exhibit 17.  The date of the announcement was recorded in exhibit 18.

[8]     The text of Guinness World Records' announcement is set out in exhibit 18.

3

[12]   Thereafter, many people in the online "community" maintained that Mr Mitchell was a cheat. Mr Mitchell commenced proceedings for defamation in the USA against Twin Galaxies, as well as against a number of others. One of these lawsuits was against a young man, Benjamin Smith, who was known online as "Apollo Legend".[9] He published videos on YouTube about gaming, including a number in which he accused Mr Mitchell of cheating, falsifying his Donkey Kong scores and not using legitimate gaming hardware.[10]

[13]   Mr Mitchell and Apollo Legend settled that proceeding on 22 August 2020.[11] Their agreement provided that Apollo Legend agreed to remove all of his YouTube videos and social media posts that referred to Mr Mitchell, to assign the copyright in those YouTube videos to Mr Mitchell and permanently to cease producing any oral, written or electronic documents or communications that in any way mentioned or referred to Mr Mitchell or his family, apart from an agreed statement in terms provided in the settlement agreement. Any breach by Apollo Legend of the last of these obligations would result in him being liable to Mr Mitchell for US$25,000 in liquidated damages for each breach. Unless he committed such a breach, he did not have to pay Mr Mitchell any money.

[14]   Apollo Legend appears to have complied with that agreement. However, on 20 December 2020 he published a video on YouTube (referred to in this proceeding as his "goodbye video"[12]), in which he told viewers that he was recording his final video and "this is the end of my life" and he explained why. Neither in that video nor in the accompanying message did he mention Mr Mitchell, the claim against him or the settlement agreement. Shortly after publishing it, he committed suicide.

[15]   On 26 May 2021, Mr Jobst published a YouTube video entitled "The Biggest Conmen in Video Game History Strike Again!"[13] In some detail, he accused Mr Mitchell (and another person, Todd Rogers) of cheating and of pursuing unmerited litigation against people who accused him of cheating. He also said the following about Mr Mitchell:

> He also sued YouTuber Apollo Legend for $1,000,000. I haven't spoken about this publicly but this lawsuit ultimately ended with Apollo giving in and settling with Mitchell. He was forced to remove all his videos about Mitchell's cheating and paid him a large sum of money. This left him deeply in debt, which required him to find extra work, but with his ongoing health issues this was all too much of a burden and he ultimately took his own life. Not that Billy Mitchell would ever care, though. In fact, when Billy Mitchell thought Apollo died earlier he expressed joy at the thought. The lawsuit against Apollo was just as frivolous as the rest and Apollo definitely would have won in court, but again he was extremely ill and couldn't handle the ongoing stress.

[16]   In this proceeding, Mr Mitchell sues Mr Jobst for defamation arising from the publication of that video (in particular, the words set out above, to which I shall refer

---

9    Out of respect for Mr Smith and because he is so widely known as "Apollo Legend", I propose to refer to him in these reasons by that moniker.

10   The videos published by Apollo Legend are not in evidence. I take these descriptions from the complaint filed by Mr Mitchell against Apollo Legend in the Circuit Court for the 17th Judicial Circuit in Florida: TB[10].

11   The settlement agreement is at TB[12].

12   TB[13].

13   TB[16]. The passage set out starts at 16:40 and ends at 17:24.

4

as the "offending words").[14]  I shall set out and discuss later the specific imputations that Mr Mitchell alleges arise from the publication.  For now, it suffices to say that Mr Mitchell does not complain that Mr Jobst called him a cheat.  Rather, he alleges to the effect that a reasonable person watching that video would understand the offending words as meaning that Mr Mitchell was a major contributing factor in Apollo Legend's decision to commit suicide and, in essence, hounded Apollo Legend to death.

[17]  Mr Jobst denies that the imputations alleged by Mr Mitchell arise from the video.  He also alleges that Mr Mitchell had a settled bad reputation (the details of which I shall set out later) that was not damaged further by the video. He relies, in the alternative to his denial of the imputations alleged by Mr Mitchell, on the defence of contextual truth,[15] contending that the video contained a number of other imputations (including that Mr Mitchell had a reputation as a cheat) that were substantially true and, as a result, his reputation was not further harmed by any of the imputations alleged by Mr Mitchell that the court may find to have been made in the offending video.

[18]  Mr Mitchell seeks general damages of $400,000 plus aggravated damages of $50,000.

[19]  For the reasons below, I have made the following findings:

   (a)  Mr Jobst defamed Mr Mitchell by making all the imputations that Mr Mitchell alleged;

   (b)  Mr Mitchell has suffered significant personal and reputational harm as a consequence;

   (c)  although he had the previous reputations alleged by Mr Jobst, and the defamatory video raised other substantially true contextual imputations about him, Mr Mitchell suffered substantially more personal and reputational harm as a consequence of Mr Jobst's imputations about which Mr Mitchell complains;

   (d)  Mr Jobst's conduct since the first publication of the video, including during this proceeding, has been aggravating and has caused additional personal hurt and reputational damage to Mr Mitchell.

[20]  I therefore award Mr Mitchell $300,000 in general damages for non-economic loss and $50,000 in aggravated damages, plus interest on those sums at 3% per annum since the first publication on 21 May 2021.  Subject to any submissions to the contrary, Mr Jobst should pay Mr Mitchell's costs of this proceeding.

**Mr Mitchell and his history**

[21]  In his evidence, Mr Mitchell described himself in this way:

> I'm a business salesman/manufacturer.  I also play video games on a professional level at times, and a film personality.

[22]  His business is known as Rickey's World Famous Sauce, manufacturing and selling hot sauce under that name.  Apparently it is very successful.  Mr Mitchell claimed, in

---

[14]   As I refer to below, Mr Jobst published the video containing the offending words on two occasions. He also published a version without those words, in between and after those two publications.  I propose simply to refer to the two videos containing the offending words in the singular, as the "offending video" or "Mr Jobst's video."

[15]   *Defamation Act* 2005, s 26.

5

his statement of claim in a proceeding against Twin Galaxies to which I refer below, that, "He painstakingly built the company into a highly-successful business, in part trading on his fame as a video game record-holder."[16]

[23]   It is necessary briefly to trace Mr Mitchell's rise to fame, as disclosed in the evidence, given that his reputation, both before and after the publication by Mr Jobst, is one of the principal issues in this proceeding.  It is also relevant to the evidence about his reaction to the publication of Mr Jobst's video.

[24]   As I have said in the introduction, Mr Mitchell first rose to prominence in 1982, when he made a world record score in Donkey Kong at an arcade and video gaming convention held by Twin Galaxies.  He (and his subsequent rise to fame) was greatly supported by the then owner of Twin Galaxies, Walter Day, who was very impressed by his skill as an arcade gamer and clearly became a good friend.

[25]   Over the years since 1982, Mr Mitchell became famous among devotees of arcade and video gaming, due to his skill and success in obtaining high scores, in Donkey Kong in particular but also in Pac-Man.  He attended many gaming conventions around the USA where, as well as playing games, he spoke to fans, signed autographs and promoted and sold his company's hot sauce.

[26]   Mr Mitchell's first world record at Donkey Kong was obtained at a gaming convention.  He said that virtually all of his scores were obtained at Twin Galaxies' premises or at a Twin Galaxies event.  His subsequent world records were obtained out of the public glare, with his games recorded on videos that he then submitted to Twin Galaxies for verification.  That method – of submitting videos of his games – is common to most gamers, but it seems to have led to the later controversies that arose about his records.

[27]   Mr Mitchell gave evidence of a number of tributes, both by awards and in articles in mostly online publications, to his skills in gaming since 1982.  It is unnecessary to record them here.  It suffices to say that he has been well-recognised over the years as a master player of certain arcade and video games.  But is worthwhile quoting from one article, published in 2015,[17] as it demonstrates that his talent and fame were not only about his Donkey Kong scores.

> Mitchell is probably the greatest arcade-video-game player of all time.  When the *Guinness Book of World Records* first included a listing for video games in 1985 (discontinued in 1987), Mitchell held the records for Pac-Man, Ms Pac-Man, Donkey Kong, Donkey Kong Jr, Centipede, and Burger Time.  In 1999, he achieved the Holy Grail of arcade gaming, executing the first-ever perfect game on Pac-Man.  The feat requires navigating 256 boards, or levels, and eating every single possible pellet, fruit, and ghost, for the highest score of 3,333,360, all without dying once.

[28]   In addition to his gaming records, Mr Mitchell has been the subject of, or played roles in, a number of films.  From the titles listed by him in his evidence, they all appear to be related to video and arcade games.  According to Mr Mitchell, the most successful was "King of Kong: A Fistful of Quarters", which was produced in 2007.[18]  It appears

---

[16]   TB[8], p 2, [6].
[17]   David Ramsay, "The Perfect Man", *Oxford American*, 1 July 2015: exhibit 12.
[18]   A copy is exhibit 78.

6

to be a documentary, but one might more accurately describe it as a "docu-drama:"[19] some of the scenes appear to be very staged rather than spontaneous, which Mr Mitchell confirmed was the case. The end result of the film is that Mr Mitchell is not portrayed in a good light, but rather as a self-important person who refuses to accept or to acknowledge that others might beat his scores and his records. It also portrays Mr Day and Twin Galaxies, while under his control, as hypocritical and prepared to change the rules for recognition of score records to suit Mr Mitchell.

[29]   Regardless of his portrayal in the film, it clearly added considerably to Mr Mitchell's fame in several countries. He said that, before its release, he would have one or two paid appearances a year at gaming conventions, but after the film's release, that quickly increased to around 10 a year and it grew from then on. In 2015, he attended 15 to 20 events in paid appearances and others unpaid. He was not able to accept all the invitations that he received.

**The contested scores**

***The challenge to Mr Mitchell's scores***

[30]   As I outlined in the introduction, by 2010 Mr Mitchell had been recognised by Twin Galaxies and Guinness World Records for three world records in Donkey Kong after his first record in 1982: the first (and the first score of over 1,000,000 points) of 1,047,200 in June 2005, another of 1,050,200 in July 2007 and a third of 1,062,800 in July 2010.

[31]   The first of these scores featured in the film "King of Kong," in which his challenger (Steve Wiebe) is shown as beating Mr Mitchell's 1982 record and achieving more than 1,000,000 points for the first time by any player. The film records that Mr Mitchell then submitted a video to Twin Galaxies, said by him to have been taken before Mr Wiebe's performance, which showed Mr Mitchell achieving 1,047,200. Twin Galaxies then recognised it as both the new record score and the first recorded score over 1,000,000.[20]

[32]   On 28 August 2017,[21] Twin Galaxies member Jeremy Young filed a dispute claim, challenging Mr Mitchell's records in Donkey Kong. Although I have not seen the claim itself (nor the ensuing thread of contributions to the investigation), in its announcement of its decision, Twin Galaxies relevantly described Mr Young's assertions:[22]

> On 08-28-2017 Twin Galaxies member Jeremy Young (@xelnia) filed a dispute claim assertion against the validity of Billy Mitchell's historical and current original Donkey Kong score performances of 1,047,200 (the King of Kong 'tape'), 1,050,200 (the Mortgage Brokers score), and 1,062,800 (the Boomers score) on the technical basis of a demonstrated impossibility of original unmodified Donkey Kong arcade hardware to produce specific board transition images shown in the videotaped recordings of those adjudicated performances.

---

[19]   As one witness, Isaiah Johnson, did: T4-83.

[20]   Whether these events are true or simply a dramatization is not clear to me.

[21]   I take this date from Twin Galaxies' announcement of the result of its investigation - TB[5] – although in his evidence Mr Mitchell said it happened on 2 February 2018. This date appears to have been when Jeremy Young posted on the website of DonkeyKongForum.com a similar claim to that which he had posted on the Twin Galaxies website in August 2017: TB[9], [10].

[22]   TB[5]; also exhibit 17. In this and other quotations in these reasons, I have left spelling and any errors as they were in the originals.

Jeremy's assertion concluded that not only can original Donkey Kong arcade hardware not produce the board transition images shown in the recordings, but that these transitions were actually generated through the use of MAME (emulation software).

[33] Some more detail appears in the reasons for a decision of the Californian Court of Appeal in subsequent litigation between Mr Mitchell and Twin Galaxies:[23]

Young presented evidence that original Donkey Kong arcade printed circuit board (PCB) hardware draws the Donkey Kong levels frame-by-frame with the first frame drawing ½ portions of five girders, and the rest of the frames filling in those girders. Young presented evidence that the Donkey Kong game on emulation software – that is the game loaded on a computer other than a PCB – similarly draws the game's levels frame-by-frame, but with the first frame drawing three girders, with one girder having a protruding line which has been nicknamed the "girder finger."

Young posted screenshots from video footage of the Disputed Scores which showed Donkey Kong levels with three girders in the first frame, with one being the girder finger. There were other unexplained anomalies and artifacts in the footage which led him to believe the games played in the video were inconsistent with original Donkey Kong arcade games.

### *Twin Galaxies' findings and consequences*

[34] It appears from Twin Galaxies' announcement that many people contributed to the dispute thread. It recorded that two different third parties conducted their own investigations and came to the same conclusions.

Most notable was the 3rd party (Carlos Pineiro) that Billy Mitchell engaged to help examine the dispute case on his behalf, utilizing whatever original equipment Billy could provide, whose final finding was consistent with Twin Galaxies investigation and others.

[35] Twin Galaxies' most relevant findings were:

- The taped Donkey Kong score performance of 1,047,200 (the King of Kong "tape"), 1,050,200 (the Mortgage Brokers score) that were historically used by Twin Galaxies to substantiate those scores and place them in the database were not produced by the direct feed output of an original unmodified Donkey Kong Arcade PCB.

- The 1,062,800 (the Boomers score) Donkey Kong performance does not have enough of a body of direct evidence for Twin Galaxies to feel comfortable to make a definitive determination on at this time. …

- While we know for certain that an unmodified original DK arcade PCB did not output the display seen in the videotaped score performances, we cannot definitively conclude that what is on the tapes is MAME. …

With this ruling Twin Galaxies can no longer recognize Billy Mitchell as the 1st million point Donkey Kong record holder. According to our findings, Steve Wiebe would be the official 1st million point record holder.

[36] The consequence announced by Twin Galaxies was:

---

[23]   TB[26], *Mitchell v Twin Galaxies, LLC*, Court of Appeal of the State of California, Second Appellate District, Division Eight, B308889, 12 October 2021, 4-5.

8

> Based on the complete body of evidence presented in this official dispute thread, Twin Galaxies administrative staff has unanimously decided to remove all of Billy Mitchell's scores as well as ban him from participating in our competitive leaderboards.

[37] The following day, 13 April 2018, Guinness World Records announced that it had disqualified Mr Mitchell as the holder of all his records (both Donkey Kong and Pac-Man) because Twin Galaxies had removed them from its records and it was Guinness World Records' source of verification for those scores.

[38] Mr Mitchell said that Twin Galaxies' decision hurt him for a short time.  He could recall one event cancelled his appearance, a couple of others stopped communicating with him, but he also received requests to appear for the first time from other events.

[39] Mr Mitchell said he then took to playing and recording Donkey Kong on live streams through the social media platform Twitch.  He played many of those games in public venues.  He said he did this to prove that he had the ability and could achieve those scores.  He beat each of the scores that had previously been his world records and he said he has done that more than 20 times.

**Litigation by Mr Mitchell**

[40] The Twin Galaxies decision appears to have led to many people believing that Mr Mitchell had cheated in obtaining his world records in Donkey Kong, by using MAME software instead of original unmodified Donkey Kong hardware.

[41] Several people and companies published allegations to the effect that Mr Mitchell was a cheat.  Mr Mitchell commenced legal proceedings against a number of them, although why he elected to sue some and not others is not clear.

*Twin Galaxies*

[42] His first proceeding was against Twin Galaxies.  Mr Mitchell said that, following the publication of its decision, "we" (by whom I infer he meant he and lawyers engaged by him) prepared what he referred to as an evidence package containing eye witness and expert testimony and "all the facts we could put together."

[43] On 9 September 2019, Mr Mitchell's lawyers sent a letter to Twin Galaxies and to Guinness World Records,[24] demanding that they both retract their claims against him and restore his records.  They attached a link to the "evidence package", contending that it "proves that the claims of Twin Galaxies and Guinness World Records are false."

[44] The nature and extent of the evidence package were described in some detail by the Californian Court of Appeal in the reasons for decision to which I have referred above.[25]  It is unnecessary to set out those details here.

[45] Twin Galaxies' "outside general counsel" responded to that letter on 27 September 2019, refusing to reinstate Mr Mitchell's scores and denying (with reasons) that anything said by Twin Galaxies in its announcement of the result of its investigation

---

24  Exhibit 18.
25  At [33], footnote 23, at 8-11, 15.

was defamatory of Mr Mitchell, or that Twin Galaxies would be liable to Mr Mitchell even if anything it had said was *prima facie* defamatory.[26]

[46]   On 11 April 2019, Mr Mitchell commenced a proceeding against Twin Galaxies in the California Superior Court,[27] claiming damages for defamation and "false light."[28] Mr Mitchell contended that he had undertaken the games on original Donkey Kong PCBs that had been verified by independent engineers, he had done so in front of multiple witnesses and the complaint by Mr Young and Twin Galaxies' investigation were biased and inadequate, so Twin Galaxies published its assertions maliciously.

[47]   That proceeding lasted for some time and many pre-trial steps were taken, including Mr Mitchell giving deposition evidence (where he was cross-examined by lawyers for Twin Galaxies).

[48]   The proceeding settled in January 2024.   In accordance with that settlement, on 16 January 2024 Twin Galaxies published a statement on its website,[29] in which it said that:

(a)   Mr Mitchell had produced expert opinion that the game play on the tapes of Mr Mitchell's record game plays could depict play on original unmodified Donkey Kong arcade hardware if the hardware involved was malfunctioning, likely due to degradation of components; and

(b)   Twin Galaxies noted that opinion and consequently would reinstate all of Mr Mitchell's scores as part of the official historical database on its website and would permanently archive and remove from public display the dispute thread concerning Mr Mitchell's records.

[49]   Twin Galaxies took the latter steps.  Mr Mitchell said that, in fact, Twin Galaxies had not previously had an historical database but wanted to create one rather than restore his records to the competitive leaderboard, to which Mr Mitchell had agreed.[30]

[50]   Mr Mitchell also commenced a proceeding against Twin Galaxies in the Circuit Court of the 17th Judicial Circuit of Florida, in which the complaint was filed on 13 May 2020.[31]   The allegations in that proceeding were identical to those in the Californian proceeding.   However, Mr Mitchell said, in his evidence, that he commenced that proceeding simply to preserve a limitation period in Florida as, at that stage, he and his lawyers were uncertain whether the Californian court would accept jurisdiction. The complaint was never served on Twin Galaxies and eventually expired.[32]

---

[26]   Exhibit 43.

[27]   TB[8].

[28]   False light was described by the Court of Appeal in its decision referred to above, citing an earlier decision: "False light is a species of invasion of privacy, based on publicity that places a plaintiff before the public in a false light that would be highly offensive to a reasonable person, and where the defendant knew or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed." TB[26], 14.

[29]   Exhibit 37.

[30]   T1-95.

[31]   TB[11].  Although the complaint was dated 12 April 2020 at its end, it is stamped as having been e-filed on 13 May 2020.

[32]   T1-69, understood in the light of similar evidence concerning the litigation against the Donkey Kong Forum referred to below.

### *Donkey Kong Forum, Jeff Harrist, Jeremy Young*

[51]   On 3 February 2020, Mr Mitchell commenced a proceeding in the Circuit Court of the 17th Judicial Circuit of Florida, naming the defendants as Donkey Kong Forum.Com, Jeff Harrist and Jeremy Young, seeking damages for defamation.[33]   In the complaint, he described the defendants in this manner:

> Donkey Kong Forum, a website media outlet organized under laws governing corporate entities for the State of Alaska.
>
> Jeff Harrist is an individual who owns the website domain name DonkeyKongForum.com.
>
> Jeremy Young is an individual who serves as a moderator, using the online username "Xelnia", for the DonkeyKongForum.com website.

[52]   The complaint concerned allegations that, on 2 February 2018, Mr Young posted a claim on Donkey Kong Forum that Mr Mitchell had cheated and falsified his scores on Donkey Kong by using MAME and, on 12 April 2018, Mr Young was quoted in an online article in which he had used the word "cheater" to refer to Mr Mitchell and had stated that Twin Galaxies was built on a foundation of video game high scores and, with another cheater removed, that foundation grew more solid.

[53]   Mr Mitchell said, in his evidence, that he also commenced that proceeding simply to preserve a limitation period in Florida as, at that stage, he and his lawyers were uncertain whether the Californian court would accept jurisdiction.  The complaint was never served on the defendants and it eventually expired because, Mr Mitchell said, they decided to proceed in California.[34]   However, there is no evidence of such a proceeding ever having been commenced.  One witness said that the Florida proceeding was dismissed almost two years later for failure to prosecute, but the source of that belief was not stated.[35]   Mr Young himself simply agreed that it was never served on him.[36]

### *Guinness World Records*

[54]   I have already referred to the letter that Mr Mitchell's lawyers sent to Twin Galaxies and Guinness World Records on 9 September 2019.[37]   In that letter, the writer quoted the text of an announcement that had been made by Guinness World Records on 13 April 2018, that it had "disqualified" Mr Mitchell's highest scores on Donkey Kong and on Pac-Man and removed them from its records because of Twin Galaxies' action in removing Mr Mitchell's scores.  Guinness World Records said that it had done so because Twin Galaxies was the source of verification for all those scores.

[55]   It appears that Mr Mitchell did not commence any court proceedings against Guinness World Records.  Mr Mitchell's son (Mr Mitchell Jnr), who also gave evidence, said that his father threatened to sue it if it did not reinstate his scores.  It was put to him that the threat ended with it reinstating his scores, although he did not appear to accept that the threat of litigation was Guinness World Records' reason for reinstating the scores.

---

[33]      TB[9].
[34]      T1-68.
[35]      David Race, T5-53.
[36]      T6-64.
[37]      Exhibit 18.

[56] In any event, on 17 June 2020, Guinness World Records announced that it had reinstated Mr Mitchell's scores after "a re-examination of the records in question and the emergence of key eye witness and expert testimonials."[38]

[57] I am satisfied that Mr Mitchell did not sue Guinness World Records.

### David Race

[58] Mr Mitchell described David Race as a competitive video game player. Mr Race himself gave evidence and said that he has a few world records on classic arcade games such as various versions of Pac-Man.

[59] Mr Mitchell sued Mr Race in Florida, in a proceeding commenced on 8 April 2021[39] and amended on 11 April 2022.[40] Mr Mitchell claimed that, unknown to him, Mr Race had recorded 27 telephone conversations between them and had provided the recordings and transcripts of them to Twin Galaxies for use by it in its defence of Mr Mitchell's claim against it. Mr Mitchell claimed that, in recording those conversations without his knowledge or consent, Mr Race had breached a Florida statute that made it illegal to record any conversation without the consent of all parties. He claimed a statutory entitlement to an award of damages for those breaches.

[60] What is clear from Mr Race's evidence, is that he feels that Mr Mitchell deceived him and used him to defend Mr Mitchell against the allegations of cheating and then, since Mr Race changed his mind and decided that Mr Mitchell had cheated, Mr Mitchell has victimised him.

[61] What happened to that litigation did not appear in the evidence. However, while not relevant to this proceeding it is of some interest to record that, since the trial in this proceeding finished, I have become aware of two decisions in the United States concerning Mr Mitchell's claim against Mr Race. In the first, in the District Court of Appeal of Florida (Fourth District),[41] Mr Race successfully appealed from a decision of the Circuit Court which had refused his motion to dismiss Mr Mitchell's proceeding against him for lack of personal jurisdiction. The Court of Appeal allowed his appeal and remitted the proceeding to the Circuit Court with a direction to enter an order dismissing the case for lack of jurisdiction. Mr Mitchell sought a review of that decision in the Supreme Court of Florida, which dismissed his proceeding for review in November 2024.[42]

### Benjamin Smith – "Apollo Legend"

[62] As I said in the introduction, Benjamin Smith was a young man who published videos about gaming on his own YouTube channel, under the assumed name of "Apollo Legend."

[63] On 17 February 2018, he posted a video on YouTube, called "The World's Most Infamous Donkey Kong Player Caught Cheating."[43] It appears to be uncontroversial

---

[38]   Exhibit 24.
[39]   TB[14].
[40]   Exhibit 22.
[41]   *Race v Mitchell*, 357 So 3d 720 (2023).
[42]   *Mitchell v Race*, unreported, Supreme Court of Florida No SC2023-0432, 7 November 2024.
[43]   T3-13. The video itself is not in evidence, so I have not seen it.

12

in this proceeding that, in that video, he accused Mr Mitchell of cheating and falsifying his scores on Donkey Kong by using MAME instead of original Donkey Kong hardware.[44]  Mr Mitchell said that Apollo Legend also said that Mr Mitchell "owned" Twin Galaxies, financially supported it and bullied the referees.[45]

[64]   Subsequently, Apollo Legend published the following additional videos on his YouTube channel:

(a)   on 13 September 2019, a video entitled "Disgraced Gaming Legend Threatens Lawsuit!" in which he also accused Mr Mitchell of cheating and falsifying his Donkey Kong scores;

(b)   on 27 September 2019, a video entitled "The Greatest Hoax in Gaming History," in which he claimed that Mr Mitchell had falsely claimed to be the first person to achieve a perfect score in Pac-Man; and

(c)   on 1 October 2019, a video entitled "Arcade Cheater Files Fraudulent Copyright Claims," in which he said that Mr Mitchell did "stupid stuff" by not acknowledging that he submitted bogus scores and by threatening lawsuits and he accused Mr Mitchell of filing fraudulent copyright claims to have videos removed from YouTube.

[65]   On 14 February 2020, Mr Mitchell filed, in the Circuit Court in Florida, a complaint against Apollo Legend claiming damages for defamation arising from those videos. The amount of damages he claimed was not stated in the claim.

[66]   Apollo Legend subsequently published two more videos about Mr Mitchell on his YouTube channel:[46]

(a)   on 10 May 2020, a video entitled "Angry Cheater Sues Me for $1,000,000;" and

(b)   on 13 May 2020, a video entitled "Billy Mitchell Won't Be Sued (For Now)."

[67]   Mr Mitchell said that the complaint was served on Apollo Legend, who later contacted Mr Mitchell's son through an intermediary, eventually resulting in a settlement agreement between them dated 22 August 2020.  Under that agreement,[47] Apollo Legend agreed to remove the six videos from YouTube and any other public or private forum, to assign copyright in the videos to Mr Mitchell, never again to publish (without Mr Mitchell's consent) anything referring to Mr Mitchell or his family, or to Mr Mitchell's scores and records in video games, nor to disparage Mr Mitchell, his family or (in essence) anyone associated with Mr Mitchell.  Apollo Legend agreed that, if he breached any of those terms, he would pay Mr Mitchell liquidated damages of US$25,000 for each breach.  The parties agreed that Apollo Legend could publish a statement about the settlement in agreed terms.  They agreed that Mr Mitchell's proceeding against Apollo Legend would be dismissed by consent and each released the other from any claims.  The terms of the agreement were to be confidential.

[68]   To be clear, the agreement did not require Apollo Legend to pay any money to Mr Mitchell unless he breached his non-publication obligations.

---

[44]   I take this and following descriptions from Mr Mitchell's claim against Apollo Legend - TB[10] and the later settlement agreement between them – TB[12].

[45]   T1-56.

[46]   Again, these videos are not in evidence.  They are referred to in the settlement agreement between Mr Mitchell and Apollo Legend.

[47]   TB[12].

[69]   Apollo Legend published the agreed statement on his YouTube channel on 22 August 2020.  Its terms are relevant to some of the issues in this proceeding, so it is necessary to reproduce it in full:

> Today, I made the decision to remove many videos from my YouTube channel.  I did this to fulfil an agreement I have reached with Billy Mitchell but also because I thought it was the right thing to do.  I have also taken the opportunity to remove a few additional videos that have nothing to do with Billy Mitchell.  This has nothing to do with our agreement, I deleted them due to the rapidly changing nature of YouTube.
>
> For your own protection, I ask that you not republish any of the videos I produced about Billy.  As part of our agreement, I have given Billy ownership of these videos.  This means he has the ability to remove these videos if they are republished to YouTube or any other public space.
>
> Billy and I agree it is in our best interest to make a deal and move on so that's what we are doing.  I will no longer discuss this topic either publicly or privately.  If you ask, I will just send you this post.  I'm sure many of you will be disappointed with this decision but I believe as the months pass you will understand why I did this.

[70]   It is also relevant to note that the first comment recorded on Apollo Legend's channel in response to his statement was by Mr Jobst, saying, "Dont worry guys.  I will never back down."[48]

## Apollo Legend's last actions

[71]   On 30 December 2020, Apollo Legend published a video on one of his YouTube channels,[49] in which he said it was his final video and "this is the end of my life."  He discussed his physical and mental health problems.  He did not mention Mr Mitchell or their settlement in the video and he said, "This doesn't have to do with anyone really."  The only debts he mentioned were "unpaid taxes."

[72]   Apollo Legend also posted a message,[50] in which he went into further details about his childhood and his health issues, as well as criticising the "speedrun community" as hypocrites.  Notably, he started by thanking "Dark Viper and EZScape for giving me the final push that I needed."  One might think he is identifying the people using those monikers as having in some way contributed to his decision to commit suicide.  Again, he did not mention Mr Mitchell, nor any consequences of their settlement.

[73]   Later that day, Apollo Legend committed suicide.

## Mr Jobst

### *A little about Mr Jobst*

[74]   I have briefly described Mr Jobst and his activities in the introduction.  Mr Jobst could not be described as a shrinking violet, nor as having any concept of tact or diplomacy.  Both in his YouTube videos that were played to the court and in giving his evidence, he was self-confident, forthright in expressing his views and he struck me as very hard to dissuade from a view (whether an opinion or as to the existence of a fact) once he

---

48   Exhibit 20.
49   TB[13].
50   Exhibit 21.  Mr Mitchell Jnr identified this as being in the description of the video: T3-81.

14

had formed it.  These character traits are clear in his videos, on occasions when he has been interviewed by other online producers and in his demeanour and evidence in the witness box.

[75]   Mr Jobst also has a self-aggrandising and perhaps self-protective tendency not to admit error and not to back down once he has taken a stance.  This trait was clear from a number of things arising during the evidence.  I have already mentioned one:  his response to Apollo Legend's announcement of his settlement with Mr Mitchell: "Dont (*sic*) worry guys.  I will never back down."  He also demonstrated that trait in his videos about Mr Mitchell, continually calling him a cheat and asserting that his legal proceedings against others (and against Mr Jobst, in this proceeding) were frivolous, bullying and bound to be lost by Mr Mitchell.

### Earlier and later publications by Mr Jobst about Mr Mitchell

[76]   Mr Jobst did not engage with the topics of video game records and cheaters until late 2018.  He did not produce any YouTube videos concerning Mr Mitchell until late 2019.  Since then, however, he has produced and published quite a number of videos about Mr Mitchell.  While most of the videos themselves are not in evidence, there is evidence that Mr Jobst has posted at least 19 videos that substantially or principally concerned Mr Mitchell and in which Mr Mitchell is shown in the "thumbnail" of the video.[51]  Additionally, the first in which he mentioned Mr Mitchell was a video about Guinness World Records' reinstatement of his records, on or shortly after 18 June 2020,[52] although Mr Mitchell was not shown in the thumbnail to that video.[53]  Mr Jobst agreed that he would put an image of Mr Mitchell in a thumbnail to a video when he wanted people to know that the video was about Mr Mitchell.[54]

[77]   Mr Jobst said, in his evidence, that he posted so many videos about Mr Mitchell because his litigation against other people was newsworthy and he commenced "so much litigation against other people," particularly video game players (and Mr Jobst's YouTube channel is about video games and gaming record holders).[55]  Mr Jobst insisted that the subject matters of the video were Mr Mitchell's litigation against others (and against Mr Jobst, once this proceeding was commenced) rather than Mr Mitchell's alleged cheating itself.  That evidence is supported by the titles and thumbnails of the video themselves (and their contents, to the extent that they were shown in the evidence).

### The publications

[78]   I turn now to consider Mr Jobst's publications the subject of Mr Mitchell's claim.  It is necessary to consider, in chronological order, when he published each version of the video, with and without the offending words, and in the context of what he apparently knew or believed were the facts about the matters discussed in each

---

51   A thumbnail is a small picture, apparently taken from the video and often over-written with words, that appears to indicate the subject matter of the video.  19 thumbnails are shown in exhibit 68, including for the video the subject of this proceeding.  Those videos appear to have been produced between May 2021 and May 2024 (10 of them in 2023).  In addition is the video, subsequently taken down, in which Mr Jobst apparently criticised Guinness World Records for reinstating Mr Mitchell's records.

52   T5-21.

53   T5-39.

54   T5-39.

55   T5-6 – 7.

version.  It is also necessary to consider the offending words in their context within the overall video and having regard to the manner in which they were published:  that is, in a video (rather than, for example, in writing) in which not only the words were spoken but, at the same time, screenshots relevant to the words were shown.  The overall contents of the video also forms part of the context of the offending words and potentially could affect their meanings.

[79]   Mr de Waard of counsel, who appeared for Mr Jobst, submitted that the following factors are relevant to the context of the offending words:

(a)   the video is over 20 minutes long;

(b)   it relates equally to Mr Rogers and Mr Mitchell and to allegations that they are conmen and cheats who bully and sue people to get their fake records recognised;

(c)   the title refers to conmen, not just to Mr Mitchell, and it does not identify him (although clearly the thumbnail accompanying the title did identify him);

(d)   in addition to the spoken words, the video showed photographs or footage that corresponded with the topic or person being discussed in the voiceover, including some that were humorous and made fun of Mr Mitchell in a form of satire;

(e)   the video included the written words of Apollo Legend's statement in settlement of Mr Mitchell's case against him; and

(f)   the offending words take up about 30 seconds approximately 17 minutes into the 20 minute video.

[80]   I agree with those descriptions.  They are certainly relevant to the context and import of the offending words.  But those facts do not necessarily detract from the meanings of the offending words and the effects they may have had.

[81]   I shall now describe chronologically and in some detail each of the versions of the video posted by Mr Jobst on his YouTube channel.

### *The first version (the first publication) – 26 May 2021*

[82]   The first version was published on Mr Jobst's YouTube channel on 26 May 2021.  The entire video is just under 20 minutes long.  It concerns alleged cheating and litigation by both Mr Mitchell and another video gamer, Todd Rogers.  The thumbnail of the video is shown below:

16



[83] Mr Jobst's introductory comments and the substantive part concerning Mr Mitchell constitute about half of the video.

[84] In his introduction (lasting one minute), while referring briefly to Mr Rogers, Mr Jobst mostly discussed Mr Mitchell (from 00:12 to 01:03). He commenced by saying (at 00:12):

> By now, you're almost certainly all familiar with Billy Mitchell, the disgraced Donkey Kong player and star of King of Kong who was exposed as cheating in many of his records.

[85] He went on, among other introductory comments, to say, "The man is trying to ruin lives and I'm now of the opinion he is legitimately evil and hopefully something can be done to stop him soon" (00:55). In the section about Mr Rogers (which began at 01:04), Mr Jobst made some comments comparing him with Mr Mitchell, such as, "Rogers never appeared to be as villainous as Mitchell" (01:50) and "[Rogers] wants to prove to the world that he is just as big a scumbag as Mitchell" (02:00).

[86] The section devoted to Mr Mitchell starts at 11:19. The bulk of it concerns the background to litigation then recently commenced by Mr Mitchell against David Race, which I have briefly described above. He went on (at 16:01) to "do a quick rundown of all of the current legal action Mitchell is taking," referring to his proceedings against Twin Galaxies in California (alleging that he was suing for $1,000,000) and in Florida (allegedly for $10,000,000), against Jeremy Young (allegedly for $1,000,000), against Donkey Kong Forum and Jeff Harrist (allegedly for $2,000,000) and against Apollo Legend (allegedly for $1,000,000). The offending words were at 16:40-17:24. While he related the offending words, he showed an image of Apollo Legend in his goodbye video, some of Mr Mitchell's earlier text messages about Apollo Legend's suspected death and an extract from Mr Mitchell's court proceeding against Apollo Legend. He went on to say that Mr Mitchell had threatened to sue Mr Jobst himself and was trying to extort Mr Jobst for $150,000.

[87] In his evidence, Mr Jobst was asked about his basis for stating that Apollo Legend had paid Mr Mitchell a large sum of money. Apart from Apollo Legend's public statement

17

about his settlement with Mr Mitchell, Mr Jobst said he was also aware of a post on Reddit that had been made several days before the settlement became public, in which the person posting said something to the effect, "Karl's playing a dangerous game. Billy forced Apollo Legend to settle and pay him money."[56]

[88]   It is apposite at this stage to set out the evidence about Reddit.  Relatively early in the trial, Mr Mitchell referred to Reddit and I, revealing my ignorance about such sites on the internet, asked what is Reddit.  Mr Mitchell's description was:[57]

> Reddit is an anonymous – you can put your name, but almost no one does.  But an anonymous forum where you can go on and talk about anything – literally anything.  And you're right, I think it's popular in the US and not so much here. But, um, very rarely do you see a comment on Reddit that – that someone puts their name.  It just always says "anonymous".  And, ah, it's the last place you would ever look for news.

[89]   Mr Jobst said that Reddit is popular in the video game industry as a source of news.[58] He said that it can be a reliable source of information, but it depends on who posts something or if the source of a fact is disclosed.[59]

[90]   Mr Mitchell said that he first saw the video on 28 May 2021.  I shall deal later with his reaction to it.  One thing he did was to have his son call a YouTuber, Daniel Keem, known online as "Keemstar," who was personally known to him and to Mr Jobst, and to ask him to contact Mr Jobst to tell him that what he had said in the video was wrong. Mr Mitchell Jnr did that and Mr Keem agreed to contact Mr Jobst for that purpose.  I shall come later to the evidence of their communications.

### *Mr Mitchell's response video – 3 June 2021*

[91]   On 3 June 2021, Mr Mitchell Jnr suggested to Mr Mitchell that he post online a video that responded to Mr Jobst's claims.  Together they drafted what Mr Mitchell should say and recorded the video, titled, "Response to Karl Jobst Regarding Apollo Legend."[60]  Mr Mitchell Jnr said that he uploaded the video at about 2.00am on 4 June 2021,[61] after first checking whether the offending words were still in Mr Jobst's video (which they were).  When he woke up the next morning, he checked again and saw that they were no longer in the online video.[62]  He said later that, if the words had been edited out before he had uploaded the response video, he would not have posted the latter.[63]

---

56   T4-103.  At T5-105, he said he thought the sum of $50,000 was mentioned.  The Reddit post is not in evidence, nor is the identity of the person who made the post, although Mr Jobst said (T4-104) it (or a subsequent message to him about it) was by "Ersatz Katz," whoever that is.  I should note that counsel for Mr Jobst did attempt to tender the post, or the message, from Ersatz Katz, but I refused to allow its tender on the basis that, on the pleadings, Mr Jobst was deemed to have admitted the allegation in paragraph 16(a)(i) of the statement of claim that he had published the offending words on each occasion with reckless indifference, manifested by his failure to make any or any proper pre-publication enquiry as to the true position: T4-104 – 107.
57   T1-61.
58   T4-100 – 101.
59   T5-87 – 88.
60   TB[18].  It was referred to at trial as the "response video."
61   United States eastern summer time, 14 hours behind Australian eastern standard time, so it was then 4.00pm on 4 June in eastern Australia.
62   T3-96.
63   T4-47.

[92]   In this video (in summary), Mr Mitchell played the offending words from Mr Jobst's video. He vehemently denied that he had been paid anything by Apollo Legend or that he had had any involvement with Apollo Legend that had led him to commit suicide. He asserted that Mr Jobst had effectively accused him of murder. He said that the terms of settlement did not involve any payment and that Apollo Legend had made it clear, even before settlement, that although the litigation had raised his stress levels, he had a lot else going on and, in his final video, he did not mention Mr Mitchell or the litigation at all as a factor in his decision. Mr Mitchell ended the video by saying that he had been going to ignore Mr Jobst for ever, but he could not ignore these allegations. He concluded, "I plan to respond the way that everybody anticipates for me to respond. And Karl, expect me."

[93]   This video has remained on Mr Mitchell's site since then. Mr Mitchell Jnr said they left it there because it shows that Mr Jobst's claim that had been "put out and circulated" is false.

### The second version of the video – 4 June 2021

[94]   On 4 June 2021, Mr Keem contacted Mr Jobst by Twitter, saying, "Hey gotta speak to you about Apollo & Billy Mitchell stuff" and asking for his telephone number. Mr Jobst told the court that he provided that number and Mr Keem then called him, telling him that Mr Mitchell was unhappy about the assertion that Apollo Legend had paid him money in settlement because it was not true. Mr Jobst told Mr Keem that he would remove that part of the video and investigate further, by contacting Apollo Legend's brother to check if it was correct. He told Mr Keem that, if it was incorrect, he would make a public statement and, if he did not hear anything back, he would leave out the words.

[95]   Having received the telephone call from Mr Keem, Mr Jobst altered the video on 4 June 2021,[64] to remove the following words:

> I haven't spoken about this publicly but this lawsuit ultimately ended with Apollo giving in and settling with Mitchell. He was forced to remove all his videos about Mitchell's cheating and paid him a large sum of money. This left him deeply in debt, which required him to find extra work, but with his ongoing health issues this was all too much of a burden and he ultimately took his own life. Not that Billy Mitchell would ever care, though. In fact, when Billy Mitchell thought Apollo died earlier he expressed joy at the thought.

[96]   Having done so, he sent a message to Mr Keem,[65] saying:

> I have edited out that section, will take a few hours, this is based on your word. I will be confirming from his brother also, if his brother backs up this, or mitchell provides any concrete evidence I was wrong, I will make a statement about it if I have nothing concrete I'll just leave the video as edited out and won't mention it anywhere.

[97]   Apparently he removed that part of the video before he saw Mr Mitchell's response video. When he saw it later that day, in response Mr Jobst published a Tweet[66] in which he said:

---

[64]   The altered version is at TB[17].
[65]   Exhibit 61; sent at 4.36pm AEST.
[66]   TB[19].

19

> So @BillyPacman claims he will sue me for saying Apollo Legend paid him money.  I removed that portion from my video, not because it is wrong, but because this isnt the issue I want to go to court over.  Id rather he sue me over his fake donkey kong scores.

[98]   On the same day, Mr Jobst emailed Apollo Legend's brother, Jesse Gravelle, relevantly saying:[67]

> Hope you are well.  Just letting you know the footage of Ben has been removed from my video.
>
> I was hoping you wouldn't mind confirming something from me.  In the video I mentioned that as part of Ben's settlement with Billy he was required to pay money.  I received this information from a few sources but not from Ben directly.
>
> Billy is threatening to sue me about this, claiming that I provided wrong information.  I really don't want to ever give out the wrong information.  Do you know if money was exchanged?

### The third version (republication) – 9 June 2021

[99]   On 6 June 2021, Mr Jobst posted a comment on his YouTube channel, in apparent response to a comment asking if the mention of Apollo Legend's suicide had been cut from the video.  Mr Jobst said:[68]

> Yes I removed it. Not because I dont believe anything that was said, but because Billy wants to sue me for it. And that particular segment isnt worth going to court over.

[100]   On 7 June 2021, Mr Mitchell's Australian solicitors sent a concerns notice to Mr Jobst about the original video.[69]  Mr Jobst's reaction was to post this Tweet:[70]

> Billy Mitchell's lawyer has contacted me.  This is very exciting lol.  We go to war soon.  This will be an amazing experience, cant wait to share it with you all.

[101]   Despite Mr Jobst's statement to Mr Keem that, if he did not hear anything back from Apollo Legend's brother or if he had nothing concrete, he would leave out the words concerning the alleged payment by Apollo Legend to Mr Mitchell, on 9 June 2021 Mr Jobst again altered the video, reinstating the original version on his channel.

### The fourth version – 13 June 2021

[102]   On 13 June 2021, Apollo Legend's brother, Jesse Gravelle, sent Mr Jobst an email responding to his email of 4 June.  Mr Gravelle said that, from what he could tell, Apollo Legend had not paid Mr Mitchell any money.[71]  Consequently, on the same day Mr Jobst again edited the video to remove the following words:[72]

> He was forced to remove all his videos about Mitchell's cheating and paid him a large sum of money.  This left him deeply in debt, which required him to find

---

[67]   Exhibit 59.

[68]   TB[23], line 7307.  The comment to which he was responding appears to be at line 7303.

[69]   TB[20]. *Defamation Act* 2005, s 14.

[70]   Exhibit 34.

[71]   Exhibit 60.

[72]   TB[22].

20

extra work, but with his ongoing health issues this was all too much of a burden and he ultimately took his own life. Not that Billy Mitchell would ever care, though. In fact, when Billy Mitchell thought Apollo died earlier he expressed joy at the thought.

[103] The balance of the video remained online at all relevant times after then. The section concerning Apollo Legend has, since then, comprised:

> He also sued YouTuber Apollo Legend for $1,000,000. I haven't spoken about this publicly but this lawsuit ultimately ended with Apollo giving in and settling with Mitchell. The lawsuit against Apollo was just as frivolous as the rest and Apollo definitely would have won in court, but again he was extremely ill and couldn't handle the ongoing stress.

### Mr Jobst's "retraction video" – 29 July 2021

[104] As I have recorded above, in his discussion with Mr Keem, Mr Jobst said that, if what he had said in the first publication was incorrect, he would make a public statement.

[105] On 29 July 2021, Mr Jobst uploaded a video to his YouTube channel entitled "The Greatest Feat in Video Game History."[73] This video was, in total, a little over 30 minutes long. For the first 28 minutes and 24 seconds, it had nothing to do with arcade gaming, cheating or Mr Mitchell. Rather, it was about a particular type of gaming called "no hit" and the achievements of a particular gamer in that genre. The thumbnail for the video showed a still from the relevant game over-written with the words "DARK SOULS NO HIT."

[106] When Mr Jobst had finished with that topic, the screen went black for about three seconds. It then played a portion of some other game, while Mr Jobst said:

> Now, before I finish the video, I would like to take this opportunity to correct something that I said in a previous video.

[107] Commencing at 28:30, the video showed the opening screen from the "Biggest Conmen" video, showing Mr Mitchell's and Mr Rogers' heads and then as background showed excerpts from that video and others (including Mr Mitchell's video of 4 June) while Mr Jobst spoke. It is relevant to set out all that he said.

> Back in May I talked about the new lawsuits filed by Todd Rogers and Billy Mitchell. In that video I made the claim that Apollo Legend paid money to Billy Mitchell as part of their settlement. I would never make such a claim unless I had very good evidence to support my position.

> In response to this, Billy Mitchell released a video accusing me of lying and claimed that no money was exchanged. He didn't provide any evidence to back up this claim, nor did he attempt to get in contact with me to clear up any misinformation I may have had.

> However, I did investigate further as I would never want to provide false information to my viewers. I reached out to a member of Apollo's family who graciously agreed to clarify some details. According to them, despite Mitchell's best efforts, Apollo Legend would not pay any money and in the final version of the settlement there was no clause indicating that he was required to do so. Therefore, the statement I made in that video was almost certainly incorrect. I sincerely apologise for providing false information and no matter what kind of

---

[73]   TB[25].

relationship I have with Mitchell, I do not believe that it is ever justified to lie or mislead.

Mitchell also claimed that I was accusing him of murder. This is certainly not the case. I do have my opinion regarding the impact of the settlement on Apollo's decision, but ultimately it was no-one's responsibility but his own. The only reason I mentioned it in that video was because I felt like it was important to let you know what happened and as I know many of you enjoy his videos.

[108] This became known as the "retraction video" in the course of this proceeding.

## The extent of the publications

### *The parties' contentions*

[109] Mr Mitchell claims that the video containing the offending words was published online on two separate occasions, for both of which he claims damages. He pleads and submits that the video was available online and downloaded or viewed (and therefore published) and comprehended:[74]

(a)     first, from 26 May to 4 June 2021 (10 days), by at least 519,800 individuals across the world, including at least 21,311 individuals in Australia, including in Queensland; and

(b)     secondly, from 9 June to 13 June 2021 (5 days), by at least another 7,500 individuals worldwide, including at least 248 individuals in Australia.

[110] Mr Jobst submits that Mr Mitchell has not proved where, nor how often, nor by how many people or whom, the offending words themselves have been watched and heard. He submits that, even if the court finds that the video was downloaded by some people, that does not adequately prove that any person actually heard the offending words, which appeared near the end of a 20 minute video. A person who downloaded the video may not have actually watched it through to completion, or even at all. Therefore, he contends, Mr Mitchell has not proved publication of the video containing the offending words.

### *What constitutes publication?*

[111] Where allegedly defamatory material is uploaded to the internet, the act of uploading itself does not constitute "publication" of the material. Publication is a bilateral act, in which the publisher makes the material available and another person takes the necessary steps to comprehend the material. In the context of publication on the internet, ordinarily publication comprises someone "downloading" the material from the internet and reading or watching the material using the recipient's computer. It is only when the material is downloaded in comprehensible form and read or (in the case of a video) watched and heard that it is published by the person who made the material available on the internet by uploading it. The corollary is that such material is published on each separate occasion that a person downloads and reads or watches and hears it and it is published where the person who downloads it is located. If the plaintiff then has a reputation in the place where the publication occurs and the

---

[74]     Second amended statement of claim, [4AA] and [7A].

22

reputation is damaged in that place by that publication, then the person who published it has committed the tort of defamation in that location.[75]

[112] The mere fact of posting material online does not lead to an inference that it has been downloaded. But it is not necessary, in order to prove publication of a defamatory video that was placed online by the defendant, for a plaintiff to call evidence from particular individuals to the effect that they downloaded, watched and understood the video. Publication, in the legal sense, may be established by pleading and proving a "platform of facts" from which an inference that material has been downloaded and viewed can properly be drawn. An inference to the effect that the material of which complaint is made has been downloaded by somebody might be drawn from a combination of facts, such as the number of "hits" on the site on which the allegedly defamatory material was posted and the period of time over which the material was posted on the internet.[76] In one case, screenshots of the defendant's YouTube posts were relied on by the parties and accepted by the judge as accurately demonstrating the number of times the allegedly defamatory videos had been viewed as at the date of the screenshots and therefore as evidence of the fact that the video about which complaints were made had been downloaded and comprehended by third parties.[77] In another case, Bradley J expressed the view that tendered copies of 10 Facebook posts the subject of the defamation allegations before him, together with the surrounding "comments", "likes" and "shares", were evidence, or at least evidence from which it could be inferred, that each of the posts had been downloaded and read. His Honour was also satisfied that the defamatory posts, which had been effectively made available to anyone in the world with access to the internet and a Facebook application, had been published or republished to some thousands of readers.[78]

[113] I shall now consider the evidence before me from which Mr Mitchell seeks to prove, either directly or by inference, the widespread publication of Mr Jobst's video and, in particular, the offending words.

### *Evidence of the extent of publication*

[114] Ten witnesses (other than Mr Mitchell) gave direct evidence that they saw the video containing the offending words shortly after it was uploaded by Mr Jobst.

[115] Mr Steve Grunberger is a systems engineer residing in Melbourne, Victoria. He is a fan of video gaming and knows Mr Mitchell. He said that he saw Mr Jobst's video, watching the whole of it, following which he sent a text message to Mr Mitchell with the link to the video on 31 May 2021.[79] At that time, he lived on the Gold Coast. He recalled seeing the video then because it concerned Apollo Legend's suicide and linked it to Mr Mitchell, which is why he sent the link to Mr Mitchell.

---

[75] *Dow Jones and Co Inc v Gutnick* (2002) 210 CLR 575, [26], [44].

[76] *Sims v Jooste (No 2)* [2016] WASCA 83, [18]-[20]; *Bolton v Stoltenberg* (2018) Aust Torts Reports 82-417, [187]; affirmed *Stoltenberg v Bolton* (2020) 380 ALR 145, [28].

[77] *Scali v Scali* [2015] SADC 172, [23]; referred to by the New South Wales Court of Appeal in *Stoltenberg v Bolton*, [19], as an example of the inference of publication. However, the parties in *Scali* had agreed that the number of views shown was accurate, which is not the case here. Nor was there any submission, as there is here, to the effect that downloading a video does not prove that the relevant part of the video was watched and understood.

[78] *O'Reilly v Edgar* [2019] QSC 24, [28], [206]. See also *Barilaro v Google LLC* [2022] FCA 650, [260].

[79] Exhibit 33.

[116] Isaiah Johnson lives in Jamaica. He creates YouTube videos concerning the gaming culture, industry and community. He said he saw the video when Mr Mitchell showed it to him and talked with him about it. He said that it "blew up the internet because it went outside of the realm of normal gaming."

[117] Other witnesses who said that they had seen the video were Mr Mitchell's son; Charles White (who lives in Florida and described himself as a full-time online content creator and the owner of an e-sports organisation); David Race (a video gamer holding a number of world records who lives in Ohio); Carlos Piñeiro (who lives in Florida and is an information technology engineer with an interest in gaming scores and game players' videos); Jeremy Young (the administrator of the Donkey Kong Forum, who lives in Arizona); Jesse Gravelle (Apollo Legend's brother, who lives in Oregon); James Angliss (known as "Jimmy Nails", who lives in Brisbane, owns a bar in Fortitude Valley, runs competitive pinball tournaments and created the Australian version of a Donkey Kong classic arcade tournament known as the "Kong Off"); and Elliott Watkins (a YouTube content creator and talent manager for on-line content creators, who lives in Tamarama, New South Wales).

[118] Thus, there is direct evidence of the publication of the video in four states of the United States of America, three states of Australia (including Queensland) and Jamaica.

[119] Mr Mitchell also relies on indirect evidence as proving, by inference, that the video was seen by thousands of people before it was taken down by Mr Jobst on the second occasion. That evidence comprised:

(a) a series of video analytics documents,[80] produced by YouTube and disclosed by Mr Jobst, which show that:

(i) between 26 May and 4 June 2021, there had been 672,800 views and 519,800 unique views of the video;

(ii) between 26 May and 13 June 2021, there had been 722,100 views and 552,600 unique views of the video;

(b) another such document that broke down viewers by country,[81] which shows that, between 26 May 2021 and 2 September 2023:

(i) there had been a total of 1,232,964 views, of which 562,376 were in the United States of America and 44,527 were in Australia;

(ii) the average view durations for those two countries were 10 minutes 26 seconds and 10 minutes 45 seconds respectively, with the total average of all countries 10 minutes 28 seconds;

(iii) other countries in which it was viewed included the United Kingdom, Germany, Sweden, the Netherlands, Finland, Brazil, Poland, Norway, the Philippines, Denmark, France and Mexico; and

(iv) the highest average view time was 11 minutes 42 seconds, in Denmark;

---

[80] Exhibit 2.
[81] Exhibit 3.

(c)  a third document that relevantly showed that, from 26 May 2021 to 6 September 2023, YouTube paid Mr Jobst a total of US$7,552.49 in respect of this video and also shows the total number of views in that period at 1,233,217;[82]

(d)  a fourth document that, as well as showing the number of unique views (519,800), of which 4.1% (equivalent to 21,312) were from Australia, also showed such details as the age, gender and countries of the people who generated unique views of the video between 26 May and 4 June 2021 – 96.8% were male, 43.7% were aged from 25 to 34 years, 27.6% from 18 to 24 years and 19.2% from 35 to 44 years;[83]

(e)  a screenshot of Mr Jobst's video page taken by Mr Mitchell Jnr on 26 May 2021 that shows that the video had been viewed that day 400,924 times;[84] and

(f)  finally, another document showing 7,500 unique viewers from 11 June to 13 June 2021, of which 3.3% (equivalent to 248) were from Australia.[85]

[120]  Mr Jobst agreed that "views" meant the number of times the video had been played, but he was not sure what "unique views" meant.  Mr Somers, appearing for Mr Mitchell, submitted that I should infer that that term refers to the occasions when the video was downloaded to and played on a separate device.

[121]  Mr Jobst agreed that he had been paid by YouTube the amount shown in exhibit 4.  He was also paid by a company called Skillshare, whose services he advertised and endorsed during the video.

[122]  Mr Mitchell also relied on the number of comments that were made on Mr Jobst's website and were attached to the various iterations of the video.  Mr Mitchell pleaded that, from 26 May 2021 to 13 September 2021, there were 7,874 public comments on the video, of which at least 396 concerned the initial publication and the republication of the video containing the offending words, from which it can be inferred that the viewers had viewed and comprehended the video and which reflected the commentators' understanding that the video in that format conveyed the alleged imputations or some of them.[86]

[123]  There is evidence of some 7,837 comments from 26 May 2021 to 13 September 2021, and a total of 8,005 comments up to 7 August 2023.[87]  Of those total comments, 396 were extracted by Mr Mitchell's solicitors as particulars of the comments referred to in the statement of claim.[88]  Those 396 comments spanned the period from 26 May 2021 to 8 July 2021 plus one dated 5 August 2023, although the vast majority (243) were made on 26 May 2021.  While it is unnecessary to set out all 396 comments in these reasons, it is appropriate to select a sample.  The comments included:[89]

---

[82]  Exhibit 4.
[83]  Exhibit 5.
[84]  Exhibit 53.
[85]  Exhibit 6.
[86]  Second amended statement of claim, [11].
[87]  TB[23]:  rows 9 to 7845 up to 13 September 2021, with additional comments to row 8013.
[88]  Exhibit 7.
[89]  The numbers of the comments are those set out in exhibit 7, not those from the spreadsheet at TB[23].  Spelling and grammar as in the originals.

25

| Number | Date, time | Comment |
|---|---|---|
| 1 | 26.5.21 11:57:10 | Litle donate but i hope i help . Lets be no more victims of this cheaters like apollo . Sad ... |
| 2 | 256.5.21 12:50:50 | *Can the GoFundMe also support the Family of Apollo* ? He had his life taken from him by this despicable liar, and I would love if you could bring solace to those who mourn him. |
| 4 | 26.5.21 13:52:23 | He killed Apollo |
| 7 | 27.5.21 16:40:06 | omfg i didn't know apollo was gone you hold all the evidence for a legit wrongful death lawsuit he was being extorted due to his situation and it took his life that's actually criminal he could get a manslaughter charge he's directly responsible for the death and it wouldn't have happened without his direct actions |
| 11 | 26.5.21 11:03:49 | Me at 4 am: Oh boy a new Karl Jobst video!<br><br>Edit: Fuck. I did not know Apollo took his own life because he had to pay Billy a ridiculous sum of money (on top of health problems, but still). That's horrible and now I'd like to retract my previous joy. May he rest in peace and smile with satisfaction when Billy finally has to face the consequences of his actions. |
| 19 | 26.5.21 16:54:29 | Didn't have a clue either until I watched this. It's quite upsetting knowing the whole Billy Mitchell episode was a part of it. Billy's reaction too is absolutely disgraceful. What a terrible human being he is |
| 29 | 26.5.21 11:31:42 | The fact that Billy Mitchell is responsible for Apollo Legend going into debt - which was a factor in his suicide - is INFURIATING. |
| 41 | 26.5.21 13:04:56 | @Jacob it's not murder, but the vexatious litigation and following settlement definitely was contributory to his decision to commit suicide. In any case, Billy's remarks are detestable indeed. I hope he gets a vexatious litigant hold placed on him for his cases, like many copyright and patent trolls eventually get if not jailed. |
| 56 | 26.5.21 12:02:04 | Billy is a scumbag, how can you live with yourself knowing somebody took their own life due to stress YOU primarily piled on. How do you wake up with an innocent smile and feel like you're living a great life, the best life . I think you may be right Karl, the man is evil and damn near a sociopath. |
| 63 | 26.5.21 12:11:27 | This is the first I'm hearing about Apollo. My god, I knew billy was a scumbag, but this is blatant evil. There needs to be consequences for that animal. Not "boo hoo, muh vidya scores", but actual criminal consequences. |

26

| 382 | 3.6.21 17:25:10 | Before this, I thought he was just a cheater a conman. But now I see Mitchell is a complete piece of human garbage. He has actual blood on his hands and he thinks it's funny. |
|---|---|---|
| 389 | 6.6.21 01:32:41 | I wanted to say I respect you so much for removing the portion about Apollo's passing. I know was hard and Billy's video he posted was dumb. Hell, he said they reached a settlement, flashed a folded paper. Makes me think of the "Arcade Board swap" for DK and DKJr. Billy may have driven Apollo to what happened, even if money wasn't spilled. |
| 391 | 9.6.21 15:19:28 | I enjoyed the video, but I would have been very careful about what was said. The narrative of the video at the end has an implication that Billy Mitchell was inadvertently responsible for Appollo's suicide. This could give Billy actual ammo for a defamation lawsuit, as there is no concrete proof of this being the case presented. |
| 393 | 12.6.21 19:56:53 | All of this time I've seen Mitchell as a petty con-man. Turns out, he's also a murderer. |
| 396 | 5.8.23 14:06:25 | Dont forget that billies lawsuit and harrassment is one of the reasons apollo legend took his own life. Like zoe quinn who made someone commit suicide there lfore murderingbthem billy mitchell has killed in the name of a lie. |

### Conclusions on the extent of publication

[124] I am prepared to infer that the distinction between views and unique views is as Mr Somers submitted: particularly, the figure for unique views represents the number of times that the video was downloaded to a unique device. While some people may have downloaded the video to more than one device, I infer that most of the devices on which it was downloaded would represent a different viewer.

[125] Mr de Waard submitted that, even if I were satisfied that many people downloaded the video, the evidence does not prove how many (if any) saw those parts of the video that concerned Mr Mitchell, let alone heard the offending words themselves. He noted that the principal part concerning Mr Mitchell followed on from the part dealing with Mr Rogers. The unique part concerning Mr Mitchell did not start until over 11 minutes through the video and the offending words began 16 minutes and 40 seconds from the start of the video. Even Mr Mitchell, in cross-examination about Mr Jobst's later retraction toward the end of an approximately 30 minute video, said that:

> When you have a 30-minute video and you bury something in the last 100 seconds, most people don't make it to the last 100 seconds.

[126] Therefore, Mr de Waard submitted, the court cannot be satisfied how many people (in addition to the 10 who gave evidence) actually saw and heard the offending part of the video.

[127]  A similar submission was made by the defendant in *Barilaro v Google LLC*.[90]  In dismissing it, Rares J said:

> Google submitted that the total views figures did not reflect the more limited extent to which viewers watched the whole of either video.  The difficulty in dealing with this evidence is that Google gave no evidence or qualitative breakdown of the view data that could be used to evaluate what the viewer would have looked at during the average view duration, how many viewers watched the whole video, whether a viewer used fast forward or skipped to go to any part of the video when the view occurred or watched any particular segment.  As with the use of news media readership figures in trials, it is safe to infer that the vast majority of viewers saw the portions that conveyed the defamatory imputations.

[128]  Although Mr de Waard did not refer to it, the fact that the average viewing time for the 20 minute video was only between 10 and 11 minutes might lend some support to his proposition that many viewers would not have watched the full video.  However, that does not demonstrate that few or no people watched the full video, or watched only the introduction and the section concerning Todd Rogers.  It may be that Mr Jobst could not have produced figures enabling the analysis of views in ways that Rares J described but, even in the introduction, most of Mr Jobst's material concerns Mr Mitchell rather than Mr Rogers.  It is also notable that most of the comments on the video concern Mr Mitchell, not Mr Rogers.  Many of the commenters expressly or impliedly indicated that they had seen the section concerning Mr Mitchell and, in particular, the offending words.  It seems more likely to me that many people who only watched part of the video would have watched the introduction  and then skipped to the section concerning Mr Mitchell and watched that.  Notably, the combination of those two sections lasts about 9½ minutes: not much less than the average viewing times.

[129]  I am satisfied that, during the two periods when the video containing the offending words was available online, over 500,000 people downloaded and (I infer) watched it, of whom over 20,000 were in Australia.  It was published in at least 14 countries around the world.  Even if those unique numbers were fewer, there is no doubt that some hundreds of thousands of people downloaded the video containing the offending words.

[130]  I am also satisfied that most, if not all, of the people who downloaded the video watched the sections concerning Mr Mitchell and would therefore have seen the offending section and heard the offending words.  The thumbprint of the video had a photograph of Mr Mitchell and the introduction was mostly about Mr Mitchell, including the statement that Mr Jobst was "now of the opinion that he is legitimately evil."  Those characteristics (but especially the introduction) were clear hooks to ensure that viewers initially downloaded the video and, having done so, landed on the section dealing with Mr Mitchell, where a viewer might expect (as was the case) that Mr Jobst would explain that comment.  My conclusion is also supported by the analytics and by the number and content of the comments on the video, particularly during the periods when the offending version was available online.

---

[90]     [2022] FCA 650, [260].

28

[131] Having regard to all these matters, I am prepared to infer that the vast majority of viewers, if not all, watched those parts of the video relevant to Mr Mitchell.[91]

[132] Consequently, I find that the video containing the offending words was published to and seen and comprehended by several hundred thousand people.  Most (if not all) would have had an interest in video gaming and, in that context, in any allegations about Mr Mitchell, as he was then notorious in that community for having been accused of cheating and found to have most likely used MAME software to obtain at least two of his record Donkey Kong scores.

### *Extent of publication of response video and retraction video*

[133] Having considered the extent of publication of Mr Jobst's videos, it is relevant also to consider how widely Mr Mitchell's response video and Mr Jobst's retraction video were published.

[134] The extent of publication of the response video is shown in exhibits 54, 55 and 57, supported by evidence about them by Mr Mitchell Jnr.[92]  Those exhibits, as explained, demonstrate that:

(a)   between 4 June 2021 and 1 June 2024, the video had been viewed 155,048 times around the world;

(b)   of those viewers, 65,923 were in the USA, 12,379 in the UK, 7,929 in Canada and 4,417 in Australia; and

(c)   by 3 June 2024, it had been viewed 155,120 times.[93]

[135] The extent of publication of Mr Jobst's retraction video is shown in exhibits 62 and 63.  They show that:

(a)   between 28 July and 4 August 2021, the video had been viewed 585,800 times, with 466,000 unique views; and

(b)   between 28 July 2021 and 18 September 2024, it had been viewed 2,600,000 times.

### **Meanings of the publications**

### *The imputations alleged*

[136] Mr Mitchell alleges that the offending words carried five defamatory imputations:

(a)   Mr Mitchell had required Apollo Legend to pay him a large amount of money to settle Mr Mitchell's defamation claim against him, which caused Apollo Legend to go into considerable debt and to take on extra work to survive;

(b)   a major contributing factor in Apollo Legend's decision to take his own life was Mr Mitchell's requirement that Apollo Legend pay him a large sum of money to settle the defamation claim;

---

91   Similar inferences were made by Flanagan J in *O'Reilly v Edgar* and Rares J in *Barilaro v Google LLC*: note 78 above.

92   At T3-97 – 98, T3-100 and T4-52 – 54.

93   Mr Mitchell Jnr said that he understood that "views' were the number of times it had been viewed by someone, whether or not one person viewed it more than once, while "unique views" constitute the number of people who had viewed it.

(c)     Mr Mitchell had hounded Apollo Legend to death;

(d)     Mr Mitchell was the main cause, or alternatively a cause, of Apollo Legend taking his own life; and

(e)     Mr Mitchell's conduct was a contributing factor in Apollo Legend taking his own life.

### *Determining the meaning of the publications*

[137]   Whether a publication is capable of bearing the imputations pleaded by the plaintiff is a question of law.  Whether it does bear those imputations is a question of fact.  The mode or manner of publication is a material matter in determining what imputation is capable of being conveyed.  In deciding whether a particular imputation is capable of being conveyed in the natural ordinary meaning of the words complained of, the question is whether it is reasonably so capable to the ordinary reasonable reader or viewer.  The ordinary reasonable meaning of the matter complained of may be either the literal meaning of the published matter, or what is inferred from it.[94]

[138]   In deciding whether the offending words are capable of conveying a defamatory meaning, a court must reject a meaning that can only emerge as a product of some strained or forced or unreasonable interpretation.  The test of reasonableness guides and directs the court in deciding whether the words are capable of bearing the meaning for which the plaintiff contends.[95]

[139]   The forum, medium and context in which the offending words are published are relevant to the meaning of the publication, as they may affect the nature and understanding of the ordinary reasonable reader or viewer and the mode of publication can affect the way in which the ordinary viewer absorbs the information, including the amount of time the viewer devotes to viewing it.[96]  The context of the offending words within the whole of the publication is also relevant to their meaning.  They must be considered in that context: that is, within the publication as a whole.[97]  The natural and ordinary meaning of words contains "all such insinuations and innuendoes as could reasonably be read into them by the ordinary man".[98]

[140]   Where the mode of publication provides an opportunity to review the publication before understanding it, the meaning of the words, or their interpretation, may be different from reading or hearing a more ephemeral mode of publication.  Traditionally a distinction might be drawn between, on the one hand, seeing and hearing an article published on television or radio (in the times before viewing or hearing on demand), on the one hand, and on the other reading the publication in a book or a newspaper.

> The mode or manner of publication is a material matter in determining what imputation is capable of being conveyed.  The reader of a book, for example, is assumed to read it with more care than he or she would read a newspaper.  The more sensational the article in a newspaper, the less likely is it that the ordinary

---

[94]     *Queensland Newspapers Pty Ltd v Palmer* [2012] 2 Qd R 139, [19].

[95]     *Jones v Skelton* [1964] NSWR 485, 491 (Privy Council); applied by the High Court in *Favell v Queensland Newspapers Pty Ltd* (2005) 221 ALR 186, [9].

[96]     *Watney v Kencian* [2018] 1 Qd R 407, [19] per Applegarth J (with whom Morrison and McMurdo JJA agreed).

[97]     *Watney v Kencian*, [21]-[22].

[98]     *Lewis v Daily Telegraph Ltd* [1964] AC 234, 277.

30

reasonable reader will have read it with the degree of analytical care which may otherwise have been given to a book, and the less the degree of accuracy which would be expected by the reader. The ordinary reasonable reader of such an article is understandably prone to engage in a certain amount of loose thinking. There is a wide degree of latitude given to the capacity of the matter complained of to convey particular imputations where the words published are imprecise, ambiguous, loose, fanciful or unusual.[99]

[141] The defendant's intention in publishing the relevant material is not relevant, nor is the understanding of those to whom the words have been published. The test is an objective one: whether reasonable people might understand the words in the alleged defamatory sense.[100] Where a range of meanings is available and where it is possible to light on one meaning which is not defamatory among a series of meanings which are, the court is not obliged to select the non-defamatory meaning. The touchstone remains what would the ordinary reasonable viewer consider the words to mean. Simply because it is theoretically possible to come up with a meaning which is not defamatory, the court is not impelled to select that meaning.[101]

### The ordinary reasonable person

[142] Who is the ordinary reasonable person whose interpretation of the published matter determines whether the alleged imputations arise from the publication? Such a person was helpfully described by Boddice J:[102]

> The ordinary reasonable reader is a person of fair, average intelligence who is neither perverse nor morbid nor suspicious of mind nor avid of scandal. However, that person does not live in an ivory tower but can, and does, read between the lines in light of that person's general knowledge and experience of worldly affairs. The ordinary reasonable reader considers the publication as a whole, and tends to strike a balance between the most extreme meaning that the publication could have and the most innocent meaning. That person has regard to the content of the publication. Emphasis given by conspicuous headlines or captions is a legitimate matter the ordinary reasonable reader takes into account.

[143] The hypothetical reasonable viewer:

> is not naïve, but he is not unduly suspicious. He can read between the lines. He can read in an implication more readily than a lawyer and may indulge in a certain amount of loose thinking, but he must be treated as being a man who is not avid for scandal and someone who does not, and should not, select one bad meaning where other non-defamatory meanings are available. … [The viewer] is taken to be representative of those who would [view] the publication in question.[103]

---

[99]   *Amalgamated Television Services Pty Ltd v Marsden* (1998) 43 NSWLR 158, 165-166 (citations omitted). See also, P George, *Defamation Law in Australia* (LexisNexis, 4th ed, 2023), 190.

[100]  *Chapman v Australian Broadcasting Corporation* (2000) 77 SASR 181, 189, [58]-[59].

[101]  *Stocker v Stocker* [2020] AC 593, [37].

[102]  *Queensland Newspapers Pty Ltd v Palmer* [2012] 2 Qd R 139, [20] (citations omitted).

[103]  *Jeynes v News Magazines Ltd* [2008] EWCA Civ 130, [14]; endorsed by the United Kingdom Supreme Court in *Stocker v Stocker* [2020] AC 593, [35] and seemingly by the Full Court of the Federal Court of Australia in *V'Landys v Australian Broadcasting Corporation* [2023] FCAFC 80, [108].

31

[144] It is especially important for the court to keep in mind that ordinary readers draw implications much more freely than lawyers, especially when they are derogatory.  Lord Devlin, in *Lewis v Daily Telegraph Ltd*,[104] put it this way:

> It is not ... correct to say as a matter of law that a statement of suspicion imputes guilt.  It can be said as a matter of practice that it very often does so, because although suspicion of guilt is something different from proof of guilt, it is the broad impression conveyed by the libel that has to be considered and not the meaning of each word under analysis.  A man who wants to talk at large about smoke may have to pick his words very carefully if he wants to exclude the suggestion that there is also a fire; but it can be done.  One always gets back to the fundamental question:  what is the meaning that the words convey to the ordinary man:  you cannot make a rule about that.  They can convey a meaning of suspicion short of guilt; but loose talk about suspicion can very easily convey the impression that it is a suspicion that is well founded.

[145] It is important, in this case, to note that the hypothetical reasonable viewer is taken to be representative of those who would view the publication.  In this case, that viewer is not necessarily the person sitting on the Bondi tram.[105]  The viewer is a devotee of, or has an interest in, online gaming, including arcade and video gaming and related topics (perhaps including cheating), is probably a regular viewer of YouTube videos on those subjects, may possibly read and post comments on YouTube videos and may also read and contribute to other online forums (such as Reddit) and social media.[106]  However, this hypothetical person must still be a "reasonable" viewer, consistently with the ordinary principle that reasonableness is the governing principle in determining meanings.[107]

[146] Furthermore, the reasonable viewer is not someone who already has some prejudice against the plaintiff that is confirmed by the offending words, or in whom some prejudice against the plaintiff derives from the words and leads to a conclusion unfavourable to him.  As Mason J has said:[108]

> A distinction needs to be drawn between the reader's understanding of what the newspaper is saying and the judgments or conclusion which he may reach as a result of his own beliefs and prejudices. It is one thing to say that a statement is capable of bearing an imputation defamatory of the plaintiff because the ordinary reasonable reader would understand it in that sense, drawing on his own knowledge and experience of human affairs in order to reach that result. It is quite another thing to say that a statement is capable of bearing such an imputation merely because it excites in some readers a belief or prejudice from which they proceed to arrive at a conclusion unfavourable to the plaintiff. The defamatory quality of the published material is to be determined by the first, not by the second, proposition. Its importance for present purposes is that it focuses attention on what is conveyed by the published material in the mind of the ordinary reasonable reader.

---

[104]   [1964] AC 234, 277; applied by the High Court in *Favell v Queensland Newspapers Pty Ltd* (2005) 221 ALR 186, [11].

[105]   *Papatonakis v Australian Telecommunications Commission* (1985) 156 CLR 7, 36: the Australian version of "the ordinary reasonable man, 'the man on the Clapham omnibus:'" *McQuire v West Morning News* [1903] 2 KB 100, 109.

[106]   See also *Brose v Baluskas (No 6)* [2020] QDC 15, [71]-[72].

[107]   *Jeynes v News Magazines Ltd*, [14].

[108]   *Mirror Newspapers Ltd v Harrison* (1982) 149 CLR 293, 301.

[147]   It became apparent to me during the trial that many members of the online gaming and YouTube "communities" are not people whom the majority of society would consider to be "reasonable", at least in their manners of expression and their willingness to insult, belittle and verbally attack other people in online forums (usually anonymously).   Many seem to be "avid for scandal."   This became particularly obvious from many of the comments on the offending video and other videos in evidence.   Indeed, even Mr de Waard described the YouTube forum as "a sensationalised, extravagant and dramatised forum" that includes satire and, as Mr Mitchell pleaded, is a medium "evidently intended to provoke commentary."[109] The views that viewers have expressed in comments online in response, both to Mr Jobst's video and to other comments, do not, therefore, all reflect the views of a "reasonable" viewer.   However, the comments do not determine the meanings of the video.   It is necessary for me to determine whether the video is capable of bearing, and bears, the meanings for which Mr Mitchell contends, but keeping in mind that:

> Ordinary men and women have different temperaments and outlooks.  Some are unusually suspicious and some are unusually naïve.  One must try to envisage people between these two extremes and see what is the most damaging meaning they would put on the words in question.[110]

### *Did the imputations arise from the video?*

*Imputation 1 – Mr Mitchell required Apollo Legend to pay him a large sum, etc*

[148]   Mr Jobst accepts that the offending words themselves are reasonably capable of conveying this meaning.   Indeed, he accepts that the words explicitly said this.

[149]   I am satisfied that this meaning is reasonably derived from the offending words.

*Imputation 2 – a major contributing factor to Apollo Legend's decision to commit suicide was the requirement to pay Mr Mitchell a large sum to settle Mr Mitchell's claim*

[150]   Mr Somers submitted that this imputation is straightforward and clearly arises from the offending words.   Mr de Waard submitted that, properly considered, the words cannot bear this meaning.   The relevant part of the words, he submitted, was the third sentence:

> This left him deeply in debt, which required him to find extra work, **but** with his ongoing health issues this was all too much of a burden **and** he ultimately took his own life.

[151]   The key to construing the meaning in this sentence, Mr de Waard submitted, is to consider the use of the words "but" and "and".   The opening words about debt and extra work are separated from the balance of the sentence by the word "but", which contrasts the subsequent words with the earlier part.   The word "and" then joins his ongoing health issues with his taking his life.   Thus, the words mean that the reason Apollo Legend took his own life was his ongoing health issues.

[152]   Mr de Waard submitted that this construction of this sentence was assisted and supported by the last sentence of the relevant passage, particularly "Apollo definitely would have won in court, but again he was extremely ill and couldn't handle the

---

[109]   Defendant's written closing submissions, [87]-[88].
[110]   *Lewis v Daily Telegraph Ltd* [1964] AC 234, 259; applied in *Favell v Queensland Newspapers Pty Ltd*, [17].

33

ongoing stress;" words that again connected his illness with inability to handle his stress (leading to his death).

[153] With respect, no reasonable viewer would construe the words in the manner for which Mr de Waard contended. While a lawyer might argue that a close analysis of the words gives rise to such a meaning, the viewer is not going to undertake such an analysis. Rather, the reasonable viewer obtains a broad impression from all the words spoken (in their context) and that impression constitutes the meaning of the words.[111]

[154] In any event, as I put to Mr de Waard in the course of his address, a more accurate analysis of the words is consistent with the overall impression given by them. In addressing his submission, I put the following to him:[112]

> The problem with that, it seems to me, is the word "and" – "and he ultimately took his own life" – connects "this was all too much of a burden". What was "this" that was all too much of a burden? It was his ongoing health issues, the need to find extra work and being deeply in debt. In other words, all three matters led to him ultimately taking his own life. Isn't that the way that that sentence can only properly be construed?

[155] Mr de Waard conceded that that is a way in which the sentence could be construed, but he referred to the last sentence as supporting the construction for which he contended. As to that, I put to him that it really supported the construction that I had suggested: because of his illness, he couldn't handle the ongoing stress which came from owing a large sum of money, being deeply in debt and being unable to work. Again, Mr de Waard accepted that that is one way it can be viewed.[113]

[156] I also raised with Mr de Waard whether I can take into account, in determining the meaning of the words, the contents of the comments made on the video, or at least some of them. If one takes them into account, they appear to show an immediate construction by the commenters to the effect that Mr Mitchell caused or substantially contributed to Apollo Legend's suicide. I asked whether I should treat all those commenters as unreasonable viewers. He submitted that, while to do that generally would help his case, I might be more discerning and consider whether particular comments (such as "He killed Apollo") were unreasonable. I did not understand Mr de Waard to contend that I should take the comments into account in determining the meaning of the words. As I have said above,[114] the understanding of the words by those to whom they were published is irrelevant in determining the meaning of the words as they would be understood by the ordinary reasonable viewer.

[157] Mr de Waard also submitted that, given the context in which the offending words were situated (at the 16 minute 45 second mark of a 20 minute YouTube video about Mr Mitchell and Mr Rogers being cheats), the ordinary reasonable viewer would be unlikely to attribute any importance (or would attribute less value) to the words and would take into account that the video "was by a disgruntled YouTuber who believed the plaintiff was a cheat and a bully who sues people who call him a cheater and who had just spent the last 16m 45s talking about how he and Mr Rogers were both pathetic cheats." Having regard to the specific wording and structure of the offending words,

---

[111] *Lewis v Daily Telegraph Ltd* [1964] AC 234, 285; adopted in *Favell v Queensland Newspapers Pty Ltd* (2005) 221 ALR 186, [11].
[112] T7-60.
[113] T7-61.
[114] At [141].

their placement in the video and the general nature of the video and its forum, the viewer would not consider the words to convey this imputation.[115]  He submitted that the important aspects of the video were in the title and the beginning, which concentrated on the allegations of cheating and people were unlikely to watch the video to the end, but merely the introduction.

[158]  With respect, this submission does not have any basis in the evidence.  The entire video was about two alleged "conmen" who cheated at video and arcade games and who were using litigation to retaliate against anyone who said their scores were fake. While some people may have looked at the introduction and decided not to watch the rest of the video, there is no basis to suggest that that was frequently the case.  If Mr de Waard intended to submit that the fact that the video was introduced in that manner weighed against the offending words bearing this imputation, I disagree.  The whole tenor of the video was that Mr Mitchell (and Mr Rogers) used litigation to retaliate against others.  The segment dealing with the action against Apollo Legend was given as an example of such litigation and the effect it had.

[159]  Mr Somers submitted that Mr de Waard's analytical approach to the offending words was not the correct way to determine their meaning.  He drew my attention to the words of Lord Devlin quoted by the plurality of the High Court in *Favell v Queensland Newspapers Pty Ltd* at [11]; in particular that "it is the broad impression conveyed by the libel that has to be considered and not the meaning of each word under analysis."[116] He submitted that Mr de Waard's approach conflicts with that requirement and is overly analytical.

[160]  With respect, I agree.  A viewer of the video, whether watching one time only or repeatedly, would be unlikely to analyse the grammatical structure of the words in the manner suggested by Mr de Waard.  Lord Devlin's description of the approach applies.  The overall impression on the viewer is how this court must consider what meaning a reasonable viewer would understand from what was said and shown.

[161]  Mr Somers also submitted, correctly in my view, that I should not take the comments into account in determining the meaning of the words, as it is a matter for me to determine, although they may make it easier for me to conclude that the words have the meaning for which Mr Mitchell contends.

[162]  As I have said, it would not be a correct approach for the court to take into account the comments on the video in determining for itself the meaning of the words.  So, ignoring those comments, do the words bear the meaning for which Mr Mitchell contends?  In my view, they do.  An ordinary reasonable person watching the video for the first time would link the "frivolous" and retaliatory litigation by Mr Mitchell against Apollo Legend and the alleged requirement on settlement of that litigation that Apollo Legend pay Mr Mitchell a large sum of money, with the need to find extra work and, given his health issues, a burden that became too much so that he took his own life.  In other words, the requirement, in settlement of the litigation, to pay Mr Mitchell a large sum of money was a substantial contributing factor in Apollo Legend's decision to commit suicide.  The background pictures behind the spoken words contribute to this impression, moving as they do from an image of the court claim against Apollo Legend to a picture of Mr Mitchell and Apollo Legend together

---

[115]     Defendant's written closing submissions, [71]-[72]; T7-61 – 62.
[116]     See [144] above.

at a gaming event, to Apollo Legend's announcement of the settlement, to a silent extract from Apollo Legend's final video, to an image of text messages by Mr Mitchell expressing joy at an earlier rumour of Apollo Legend's death, and finally returning to the court claim. All of those facts are linked by the words and the images.

[163] Of course, this mode of publication provided the viewer with an opportunity to review it before reaching a final understanding of it. But in my view an ordinary reasonable viewer who rewatched the video (or only the part containing the offending words), would be unlikely to change her or his understanding of the words. If anything, a review of the video would confirm an understanding that Mr Jobst was asserting that the settlement between Mr Mitchell and Apollo Legend was a significant contributing factor to the latter's decision to commit suicide.

[164] The meaning for which Mr Mitchell contends is not a strained, forced or unreasonable interpretation of the video.[117] I find that the second imputation arises from the video.

*Imputation 3 – Mr Mitchell hounded Apollo Legend to death*

[165] Mr Somers did not expand on the basis for this alleged imputation in his written submissions or his address.

[166] Mr de Waard submitted that the word "hounded" is synonymous with words like pursued, chased, harassed, pestered, hunted, badgered or dogged, which imply aggression and intention of behalf of Mr Mitchell. The ordinary reasonable viewer would not understand the offending words to have this meaning.

[167] The term does infer a substantial degree of deliberate and unjustified repetition, pestering and persistence in making demands, amounting to harassment. There is no suggestion in the offending words, either alone or in the context of the balance of the video, that Mr Mitchell, having settled his defamation case against Apollo Legend, had any further contact with him or pestered him for payment of the alleged large settlement sum. Indeed, the passage expressly says that Apollo Legend had actually paid Mr Mitchell the agreed sum, apparently leaving him in debt to somebody else. It does not suggest that Mr Mitchell knew that the Apollo Legend went into debt to pay the settlement sum. Having been paid, and Apollo Legend having removed the relevant videos from his YouTube channels, Mr Mitchell had no reason to contact Apollo Legend (and there was no suggestion that he did). However, Mr Jobst did conclude this passage by saying that the litigation itself was frivolous and Apollo Legend could not handle the ongoing stress (apparently, the stress caused by the litigation), thus inferring that the litigation itself contributed to Apollo Legend's suicide.

[168] Of course, this passage must be considered in the context of the video as a whole. The whole tenor of the complete video, insofar as it concerned Mr Mitchell, was that he persistently sued anyone who alleged that he had cheated in obtaining his world records, but additionally he had, in suing such people, recently demonstrated a new level of unjustified conduct that meant that he was "legitimately evil." The section about his dealings with Apollo Legend was produced in that context: attempting to demonstrate that Mr Mitchell was evil because he had deliberately commenced frivolous litigation that led to a young man giving in to the litigation pressure, going

---

[117]   *Jones v Skelton* [1964] NSWR 485, 491.

36

into considerable debt to settle it and then having an increased level of stress with which he could not cope, leading to his suicide.

[169] In the context of the entire video, I consider that a reasonable viewer could construe the video as meaning or seeking to convey that Mr Mitchell used frivolous litigation and his demands for settlement of that litigation in a way that constituted hounding Apollo Legend and that resulted in his decision to commit suicide. Mr Jobst was clearly intending to imply that Mr Mitchell took these steps knowing that they would cause Apollo Legend considerable stress, even though he may not have thought that Apollo Legend would ultimately commit suicide as a result. In short and colloquial terms, Mr Jobst implied that Mr Mitchell hounded Apollo Legend to death.

[170] Therefore, I find that the third imputation arises from the video.

*Imputation 4 – Mr Mitchell was the main cause, or a cause, of Apollo Legend committing suicide*

[171] This is a variation of the second imputation and, to an extent, the third imputation. Similarly to an understanding that the passage at least implied that the settlement was a major contributing factor to Apollo Legend's death, a reasonable viewer could draw the meaning that Mr Mitchell was the main cause of that result. Even if a viewer did not draw that meaning, certainly the imputation arises that he was at least a cause of Apollo Legend's suicide, for the reasons discussed above. If I had not found that the second and third imputations arose, this imputation would nevertheless arise from the video.

*Imputation 5 – Mr Mitchell's conduct was a contributing factor to Apollo Legend committing suicide*

[172] This is another variation on the other imputations. Indeed, it seems to be merely an alternative way of stating that Mr Mitchell was a cause of Apollo Legend's suicide. I find that it arises from the video.

*Conclusions on imputations alleged by Mr Mitchell*

[173] Therefore, I find that each of the imputations alleged by Mr Mitchell arises from the offending video.

**Were the publications defamatory?**

[174] A publication is defamatory if it is likely to lead an ordinary reasonable person to think less of the plaintiff. Other formulations of the test are whether a person's standing in the community, or the esteem in which people hold that person, has been diminished.[118]

[175] I shall consider each of the imputations to decide whether it was defamatory of Mr Mitchell.

---

[118]   *Radio 2UE Sydney Pty Ltd v Chesterton* (2009) 238 CLR 460, [5], [36].

37

*The first imputation*

[176] It is important, in determining whether any of the imputations is defamatory, not only to look at the imputation but to consider it in its context within the publication. Ordinarily, where parties to litigation agree to settle, an ordinary reasonable member of the community would not think less of one party simply because the settlement required the other party to pay a large sum in settlement and, in order to finance that settlement sum, that party had to borrow and to take on extra work to pay off the debt. However, if that settlement was alleged to be the result of an unjustifiable and vexatious claim that could only be settled by the other party paying an unfair and excessive amount to stop that claim proceeding further, then an ordinary reasonable person would be likely to think less of the vexatious party than might otherwise be the case.

[177] In the offending video, Mr Jobst made it clear that he considered that Mr Mitchell's claims against all the defendants mentioned, but particularly against Apollo Legend, were vexatious, having no merit at all. In that context, I consider that it would lower Mr Mitchell's estimation in the mind of the reasonable viewer that he required Apollo Legend to pay him a large sum of money to settle the claim brought by Mr Mitchell, as well as to remove his videos from the internet. This would be so whether or not Mr Mitchell knew that it would cause Apollo Legend to go into debt to pay the settlement sum.

[178] Therefore, I find that the first imputation was defamatory of Mr Mitchell.

*The second, fourth and fifth imputations*

[179] Similarly, I consider that a reasonable viewer would think less of Mr Mitchell if he had substantially contributed to another person's decision to commit suicide, whether that contribution was the sole reason or one of several reasons for the suicide and whether it was deliberate or not. This applies to each of the second, fourth and fifth imputations. Each of them was defamatory of Mr Mitchell.

*The third imputation*

[180] I have no doubt that, according to ordinary community standards, a person who has hounded another to commit suicide would be thought less of by others. That is, I have no doubt that that person's reputation would ordinarily be lowered in the eyes of ordinary reasonable people. The third imputation was clearly defamatory.

*Conclusion – the imputations were defamatory*

[181] Therefore, I find that each of the imputations was defamatory of Mr Mitchell.

[182] Having made this finding, it becomes necessary to consider whether, as Mr Jobst contends, in fact these imputations did not adversely affect Mr Mitchell's reputation because it was already so poor,[119] or because other more serious and substantially true imputations arose from the video,[120] so that it was not further harmed by any of the imputations about which Mr Mitchell complains.

---

[119]   Defence, [12].
[120]   Contextual truth: *Defamation Act* 2005, s 26; defence [17].

38

### Issues of credit

[183] To varying extents, each party challenged the credit of witnesses called by the other party.  Many of the witnesses gave evidence about Mr Mitchell's reputation at various times.  It is necessary to take their credibility and the reliability of their evidence into account in determining the nature of Mr Mitchell's reputation, both before and after the relevant publications, and the extent of any harm caused to Mr Mitchell by the publications.  Also, as some of those matters (particularly Mr Mitchell's reputation at relevant times) are relevant to the defences of a pre-existing bad reputation and contextual truth, before considering the bases for those defences it is necessary to consider the issues of credit raised by the parties.

### *General approach to issues of credit*

[184] Before considering the credibility and reliability of each witness's evidence, I propose to set out some general remarks about how a court should (and how I shall) approach such issues.  I am grateful to Muir DCJ (as Muir J then was) for setting out these principles in so clear a manner that I need only adopt what her Honour said in *Brose v Baluskas (No 6)*.[121]

> The following observations about the general approach to the assessment of the credibility of witnesses made by Lord Pearce in *Onassis and Calogeropoulos v Vergottis*[122] over 50 years ago, remain equally compelling today:
>
> > 'Credibility' involves wider problems than mere 'demeanour' which is mostly concerned with whether the witness appears to be telling the truth as he now believes it to be. Credibility covers the following problems. First, is the witness a truthful or untruthful person? Secondly, is he, though a truthful person, telling something less than the truth on this issue, or, though an untruthful person, telling the truth on this issue? Thirdly, though he is a truthful person telling the truth as he sees it, did he register the intentions of the conversation correctly and, if so, has his memory correctly retained them? <u>Also, has his recollection been subsequently altered by unconscious bias or wishful thinking or by overmuch discussion of it with others? Witnesses, especially those who are emotional, who think that they are morally in the right, tend very easily and unconsciously to conjure up a legal right that did not exist. It is a truism, often used in accident cases, that with every day that passes the memory becomes fainter and the imagination becomes more active. For that reason a witness, however honest, rarely persuades a Judge that his present recollection is preferable to that which was taken down in writing immediately after the accident occurred.</u> Therefore, contemporary documents are always of the utmost importance. And lastly, although the honest witness believes he heard or saw this or that, is it so improbable that it is on balance more likely that he was mistaken? On this point it is essential that the balance of probability is put correctly into the scales in weighing the credibility of a witness. And motive is one aspect of probability. All these problems compendiously are entailed when a Judge assesses the credibility of a witness; they are all part of one judicial process. And in the process contemporary documents and

---

[121]   [2020] QDC 15, [298]-[300], [311]-[312].

[122]   [1968] 2 Lloyds Rep 403 at 431; cited with approval in *Withyman (by his tutor Glenda Ruth Withyman) v State of New South Wales and Blackburn; Blackburn v Withyman (by his tutor Glenda Ruth Withyman)* [2013] NSWCA 10 at [65]. (Emphasis added by Muir DCJ.)

39

> admitted or incontrovertible facts and probabilities must play their proper part.

The following frequently cited dictum of McLelland CJ in Eq from *Watson v Foxman* (1995) 49 NSWLR 315 at 319 is also apposite to this case:

> Furthermore, human memory of what was said in a conversation is fallible for a variety of reasons, and ordinarily the degree of fallibility increases with the passage of time, particularly where disputes or litigation intervene, and the processes of memory are overlaid, often subconsciously, by perceptions or self-interest as well as conscious consideration of what should have been said or could have been said. <u>All too often what is actually remembered is little more than an impression from which plausible details are then, again often subconsciously, constructed. All this is a matter of ordinary human experience.</u>

I am conscious that there is some doubt of the ability of judges or anyone else to tell truth from falsehood accurately on the basis of appearances.[123] ...

Where there is a conflict or implausibility in the evidence such as in the present case, the authorities contemplate a judge making findings by reference to the objective facts; to any contemporaneous documents; to the witnesses' motives; and to the overall probabilities.[124] It follows that I have approached the question of assessing the plaintiff's evidence with a keen focus on whether it is supported by documentary evidence, otherwise corroborated by another witness whose evidence I accept as credible and reliable and whether it is objectively plausible.

In conclusion, a careful assessment of each of the parties' evidence is required in this case.[125] In carrying out such a task, their evidence has been assessed objectively having regard to the whole of the evidence before the Court and upon a consideration of where the balance of probability lies on the basis of that analysis.[126]

[185] I would add to these comments some detail about the fallibility of judges determining credit from an assessment of witnesses' demeanour while giving evidence, as described by Kirby J over 25 years ago:[127]

> There is a growing understanding, both by trial judges and appellate courts, of the fallibility of judicial evaluation of credibility from the appearance and demeanour of witnesses in the somewhat artificial and sometimes stressful circumstances of the courtroom. Scepticism about the supposed judicial capacity in deciding credibility from the appearance and demeanour of a witness is not new. In *Societe D'Avances Commerciales (Societe Anonyme Egyptienne) v Merchants' Marine Insurance Co (The "Palitana")*,[128] Atkin LJ remarked that 'an ounce of intrinsic merit or demerit in the evidence, that is to say, the value of the comparison of evidence with known facts, is worth pounds of demeanour'. To some extent, the faith in the judicial power to discern credibility

---

[123]  *Fox v Percy* (2003) 214 CLR 118, 128-129 [30]-[31], as discussed by Jackson J in *Campbell & Anor v T. L. Clacher No. 2 Pty Ltd & Ors* [2019] QSC 218, [6].

[124]  As discussed more recently by the Queensland Court of Appeal in *Guirguis Pty Ltd v Michel's Patisserie System Pty Ltd* [2018] 1 Qd R 132; [2017] QCA 83, [50]–[51], citing *Armagas Ltd v Mundogas SA ('The Ocean Frost')* [1985] 1 Lloyd's Rep 11, 57.

[125]  See *Malco Engineering Pty Ltd v Ferreira* (1994) 10 NSWCCR 117, 118; see also *Makita (Australia) Pty Ltd v Sprowles* (2001) 52 NSWLR 705, 720.

[126]  *Fox v Percy* (2003) 214 CLR 118, [31]; *Camden v McKenzie* [2008] 1 Qd R 39, [34]. See also discussion by Bowskill QC DCJ (as she then was) in *Rudd v Starbucks Coffee Company (Australia) Pty Ltd* [2015] QDC 232.

[127]  *State Rail Authority (NSW) v Earthline Constructions Pty Ltd (In Liq)* (1999) 73 ALJR 306, [88].

[128]  (1924) 20 Ll L Rep 140, 152.

40

from appearances was probably, at first, a consideration which the judiciary assumed that it inherited from juries. It was natural enough that trial judges, accustomed to presiding over jury trials, would claim, and appellate judges would accord, the same 'infallible' capacity to tell truth from falsehood as had historically been attributed to the jury. Nowadays, most judges are aware of the scientific studies which cast doubt on the correctness of this assumption.[129] Lord Devlin in *The Judge*[130] quoted with approval a remark of MacKenna J: 'I question whether the respect given to our findings of fact based on the demeanour of the witnesses is always deserved. I doubt my own ability … to discern from a witness's demeanour, or the tone of his voice, whether he is telling the truth.' It was a becoming but entirely accurate modesty.

… Fifty years ago, the Supreme Court of Canada[131] wisely declined to offer guidelines about the kinds of demeanour that would afford reliable indicators of the trustworthiness of witnesses. The studies of experimental psychologists since that time have confirmed the danger of placing undue reliance upon appearances in evaluating credibility. … Trial judges should strive, so far as they can, to decide cases without undue reliance on such fallible considerations as their assessment of witness credibility. …

[186] As did Muir DCJ, I have approached the question of assessing the witnesses' evidence, where it is challenged, with a focus on whether it is supported by documentary or other evidence, particularly where it was made reasonably contemporaneously with the relevant events, or whether it is otherwise corroborated by another witness whose evidence I accept as credible and reliable, as well as whether it is objectively plausible.

### Mr Mitchell

[187] While different descriptions of Mr Mitchell's persona are obviously open, having seen him give evidence over about 2½ days and having seen, heard and read other evidence about him, I would describe him as a showman who is self-confident, generous with his time to fans, friendly to those who support him, unfriendly to those who do not support him where he considers it appropriate, and a good self-promoter. He is very intelligent and self-controlled, but he also has a tendency to attempt to control others.

[188] Mr de Waard submitted that he was:

an unimpressive witness who was reluctant to accept obvious propositions, frequently gave evasive answers to uncomfortable questions and volunteered answers that were not responsive to questions of him and intended to advocate for his own case. His evidence was, at best, self-serving and, at worst, untruthful.[132]

[189] Mr de Waard gave some examples of occasions when Mr Mitchell became aggressive during cross-examination, or seemed to evade answering a question. Mr Somers submitted that it was not surprising that, over two days of cross-examination, Mr Mitchell occasionally became aggressive or facetious in his answers to some questions, but overall he was respectful, attempted to answer questions as best he could and appeared mostly to have a good memory of events.

---

129   *Trawl Industries v Effem Foods Pty Ltd* (1992) 27 NSWLR 326, 348.
130   Oxford University Press (1979) at p 63.
131   *White v The King* (1947) 89 CCC 148 at 151.
132   Defendant's closing written submissions, [19].

[190] As to these general observations, my impression was that Mr Mitchell attempted to answer the questions as they were asked. On occasions he appeared to be upset. At other times he became a little aggressive or facetious, but those occasions were few and, frankly, were understandable given the long time he spent under cross-examination. For most of his evidence he answered the questions asked of him.

[191] Mr de Waard raised seven matters in particular that he contended cast serious doubt on Mr Mitchell's credit generally and on the truthfulness of certain evidence he gave in particular. I do not propose to consider each of those matters in detail. Rather, I will deal with the principal assertions about Mr Mitchell's evidence in this proceeding.

[192] **First**, Mr Mitchell does not claim any special damages for loss of income in this proceeding, but he gave evidence – relevant to harm to his reputation caused by the publications – that, after the publications, the number of gaming and other events which he was invited to attend, whether paid or not, reduced substantially. One of those was the Music City Multi-Con in Nashville in October 2021. Mr Mitchell said he attended that event to say hi to some friends who were there, but he was not expected there, he did not issue any invoice for attending and he did not get paid for his attendance, although he did play some games while he was there. He reiterated that he did not get paid, although he been paid to attend the event the previous year. He was then shown an invoice from his manager claiming payment of $4,000 for his appearance at the 2021 event.[133] His response was that he was there one year when he was paid and the second year he did not get paid. He must have mixed up the years.

[193] Mr de Waard submitted that Mr Mitchell was clearly lying in saying that he did not get paid for his appearance in 2021. I do not accept that. Although often he was able to recall dates accurately, I am not surprised that he might mix up the years in which he was paid and when he was not paid for the same event. Also, it is doubtful that the event took place in 2020, at the height of the Covid-19 pandemic. It is more likely that he attended in 2021 (for which he was paid) and again in 2022 (for which he was not paid). Whichever years he did in fact attend, on this issue I consider that he was mistaken rather than deliberately giving false evidence.

[194] **Secondly**, Mr de Waard questioned Mr Mitchell about evidence that he gave in his litigation against Twin Galaxies. Mr de Waard submitted that he had given false evidence in both that proceeding and this. The first item of allegedly false evidence in the Twin Galaxies proceeding was that Mr Mitchell had lost income for appearances for which he would have been paid in 2018 and 2019, after Twin Galaxies' announcement of its conclusion that he had not used original arcade hardware to achieve his Donkey Kong records. In a "declaration"[134] made by Mr Mitchell in that proceeding, he said that he had lost income of $133,000 in 2018 and $68,000 in 2019. One item of that loss in each of those years was for the Southern Fried Gaming Expo, but in his evidence in chief in this trial he had said that he appeared there "every other year – every third year since 2012."[135] Mr Mitchell's response to Mr de Waard's contention that he had lied in the Twin Galaxies proceeding was that his manager prepared the list of losses, which he believed at the time was correct but he could not remember all the facts some six years later.

---

[133]   Exhibit 38.
[134]   Which appears to be a similar document to an affidavit in this court.
[135]   T1-51.

[195] Mr de Waard contended that this was evidence of Mr Mitchell having knowingly claimed a loss in the Twin Galaxies proceeding that he knew was false. Again, I am not satisfied that this is the case. Mr Mitchell does not appear to have been challenged on that evidence at the time. It is quite possible that, before the Twin Galaxies announcement, he had been invited to appear at two consecutive expos, even though previously it had been every second or third year. It is speculation, at this stage and without documents, to contend that that had or had not occurred. It is also difficult and somewhat unfair to cross-examine a witness about evidence that he gave four years ago, in another proceeding in another country, about events that may or may not have occurred five or six years ago, particularly without having all the relevant documents available in this proceeding. I do not accept that he gave false evidence in this respect, either in the Twin Galaxies proceeding or in this matter.

[196] **Thirdly**, Mr de Waard submitted that Mr Mitchell is a dishonest person who plotted to deceive Twin Galaxies by creating a tape of him achieving 1,062,800 points in Donkey Kong and, in effect, pretending that it was a tape of his original achievement of that score (as portrayed in "King of Kong").

[197] This issue is mostly relevant to one aspect of Mr Jobst's contextual truth defence. I shall consider it in detail in that context,[136] but for now I shall simply say that, for the reasons discussed in that context, I do not consider that it demonstrates any dishonesty on Mr Mitchell's part, nor that as a result he lacks credibility generally or in his evidence in this proceeding.

[198] **Fourthly**, Mr de Waard submitted that Mr Mitchell attributed some of the same economic and health issues to the Twin Galaxies publication in that litigation and to Mr Jobst's video in this litigation, which demonstrated a tendency to be untruthful in either or both proceedings. In economic terms, in a deposition he gave in the Twin Galaxies proceeding on 9 January 2023,[137] he said that John Weeks of the Museum of Pinball had told him that he was cancelling an appearance because of Twin Galaxies' accusations. In this proceeding, he said that Mr Weeks had cancelled his appearance at an auction scheduled for October 2021 because of Mr Jobst's allegations in the offending video.[138] When tested on this apparent inconsistency,[139] Mr Mitchell at first asserted that, in the deposition, he did not identify which publication led to the cancellation of his appearance. However, he was clearly being asked questions about cancellations due to the accusations against him (the only accusations the subject of that litigation being those by Twin Galaxies). Yet Mr Weeks' email to him cancelling his appearance clearly attributed that decision solely to Mr Jobst's accusations.

[199] It does appear that Mr Mitchell's evidence in his deposition was wrong in that respect. But again his evidence was not tested by reference to any document or otherwise. When I questioned him, he accepted that what he had said was wrong. While one might take this as an indication that his evidence should perhaps be treated with some circumspection unless supported by contemporaneous documents or other evidence, on its own it is not sufficient to persuade me that he is a generally untruthful witness rather than one who occasionally makes mistakes.

---

[136]   See [308] to [314] below.
[137]   Exhibit 45. I understand a deposition to be a form of compulsory cross-examination out of court and before trial, parts of which may become admissible in a trial.
[138]   Exhibit 35; T1-88 – 89.
[139]   T3-50 – 51.

[200] From the health perspective, in his deposition it was put to Mr Mitchell that, in some document,[140] it was stated that he had been diagnosed with a hernia and atrial fibrillation due to Twin Galaxies' publication. He responded that the atrial fibrillation was directly related to stress and no other reason. In this proceeding, in answer to a question from Mr Somers whether he had had any physical reaction to Mr Jobst's video, he said, among other things, that in September 2021 he was diagnosed with atrial fibrillation caused by stress, resulting in surgery. In cross-examination he said that the major stress in his life at that stage was because of Mr Jobst's video. Mr de Waard submitted that, in effect, Mr Mitchell attributed his atrial fibrillation to the alternative publications to suit his respective cases.

[201] Indeed, in interrogatories in the Twin Galaxies proceeding, Mr Mitchell was asked to identify each injury he attributed to the Twin Galaxies publication and the area of his body affected. His response was, "Responding party attributes atrial fibrillation and inguinal hernia as injuries from [the publication]."[141] When asked about that in this trial, Mr Mitchell said that it was an ongoing condition until surgery in 2021, but what it was caused by was a medical question.

[202] I do not consider Mr Mitchell's answers in each case to be inconsistent. In each case, while answering questions about the effect of the relevant publication, he said that he was diagnosed with atrial fibrillation due to stress. It seems that, in the Twin Galaxies deposition, he was then asked about other causes of stress at the time, but that stream of evidence is not in the tendered extract of his deposition.[142]

[203] Mr Mitchell may well attribute his stress to both publications and their aftermaths. Indeed, that may well be the case. I do not consider his references to that condition to be mutually inconsistent, nor to cast doubt on his credibility.

[204] **Fifthly**, Mr de Waard referred to Mr Mitchell's evidence in this proceeding and in the Twin Galaxies proceeding in which he appeared to compare the stress of the respective proceedings with other stressors. During cross-examination in this trial about the stress of the two proceedings, Mr Mitchell spontaneously said, "the Twin Galaxies stress is nothing compared to this" and it "does not compare to this."[143] Mr de Waard then showed and tendered a video[144] of part of Mr Mitchell's deposition in the Twin Galaxies proceeding on 9 January 2023 in which, among other things, Mr Mitchell said the Twin Galaxies publication had badly affected him, including causing him to have depression, anxiety and embarrassment that was still ongoing. When asked about alternative stressors he had in his life, he said, "Just this and what is a result of this." He was then asked about other lawsuits, leading to the following exchange:

> A: You mean like, things that resulted from this, like Karl Jobst and David Race? Yes, very much.
>
> Q: They're also causing you emotional distress?
>
> A: Well, they're not making me happy.

---

140 Not identified in the extract from the deposition that is in evidence here - exhibit 46, but it appears to be interrogatories in that proceeding.
141 Exhibit 47.
142 Although it may be that part of it, at least, is in exhibit 48.
143 T3-54; T3-58.
144 Exhibit 48.

44

> Q: No, I'm asking you, did the actions that Karl Jobst and David Race and Jeremy Young and Jeff Harrist take also cause you emotional distress?
>
> A: That's minimal compared to this.
>
> Q: Why?
>
> A: Because this is where it all began.

[205] Mr de Waard submitted that Mr Mitchell's evidence in the Twin Galaxies deposition that the pain and suffering caused by Mr Jobst and others was minimal compared to that caused by Twin Galaxies was entirely inconsistent with his evidence to this court that the Twin Galaxies stress was nothing compared to that caused by Mr Jobst's video the subject of this proceeding. I understood Mr de Waard's submission to be that this inconsistency indicates that Mr Mitchell will say whatever he thinks he needs to say to support the case in which he is, at a particular time, giving evidence. Therefore, he cannot be considered a credible witness.

[206] In re-examination in this trial, Mr Mitchell said that, in answering those questions in the deposition, he understood them to be about publications concerning game scores, which was the subject of the Twin Galaxies publication and publications by each of the others, including Mr Jobst. They were not discussing Apollo Legend. If they had been talking about Apollo Legend, he would not say it was minimal; it was monumental. What Mr Jobst and the others said about his game scores was minimal compared to Twin Galaxies' publication and "findings" about his records.[145]

[207] I consider Mr Mitchell's explanation in re-examination (which he offered to give during cross-examination but was prevented from giving) to be a reasonable explanation for what otherwise might have seemed to be an important inconsistency, indicative of someone who gives evidence to suit the day. In other words, on consideration, I do not consider that his evidence in these respects was inconsistent or not credible. The Twin Galaxies publication was the beginning of numerous allegations that he had cheated, which included videos published by Mr Jobst and others about his alleged cheating. But it was the Twin Galaxies publication of its findings that led to the others, which really just repeated and built on Twin Galaxies' allegations.

[208] In considering Mr Mitchell's credibility as a witness, obviously I take into account what he and other witnesses (and documents from the time) said. But I also take into account how Mr Mitchell gave his evidence, while conscious of the warnings about judges' fallibility in determining truthfulness or otherwise from a witness's demeanour. Overall I considered him to be attempting to answer questions, while sometimes becoming frustrated or emotional in the light of the questioning. One occasion in particular struck me as unfeigned and indicative of the effect on him of Mr Jobst's actions. In his examination in chief, Mr Somers asked him what was his reaction to seeing the video. That led to the following exchange:[146]

> ---I was absolutely angry. I mean, I was shocked. I was – I was totally lost. Quite honestly, when I heard the words and I kept watching the video, I absolutely got terrified.
>
> All right. How many times did you watch it in that initial viewing?---Probably three times immediately.

---

[145]   T3-63 – 64.
[146]   T1-79.

> And you said then you felt terrified.  Why was that?---Because Mr Jobst had opened up an entirely new spectrum of defamation.  Nobody in my life, in any part of my life, had ever accused me of something like that.
>
> When you say "something like that", what are you specifically referring to there?---Hounding another – hounding a young man to commit suicide. Nobody had ever made an accusation like that at me whatsoever.  I was totally lost.  I wasn't lost with another accusation.  I knew how to handle it.  What was I going to do here?  I couldn't even talk to him.  If – if I sent him something, all he did was post it on Twitter.  You couldn't talk to him, you couldn't write to him, you couldn't do anything.  And it was out there for the whole world to see and it wasn't true.

[209]   A little later, he was asked why he made his response video.  He said:[147]

> Again, I'm being honest with you.  I was completely lost.  I didn't know what to do and I was willing to follow family advice.  And so the idea was to create a video to rebut what Mr Jobst said, okay?  To rebut what he said that I drove – that I hounded a young man to commit suicide.  His video had heinous accusations and lies.  I wanted – I wanted everyone to know that it was premeditated, it was calculated and it was deliberate and …

[210]   He was then taken to Mr Jobst's tweet of 4 June referring to the response video,[148] the concerns notice sent to Mr Jobst by Mr Mitchell's lawyers and Mr Jobst's tweet in response to that notice.[149]  That led to the following questions and answers:[150]

> After these tweet response – these last two tweet responses we've seen [from] Mr Jobst, how did you – how did they make you feel?---There was absolutely nothing I could do.  And when you – when you're helpless and you can't do anything, it's absolutely terror.  Okay.  I couldn't talk to him.  I couldn't call him.  I couldn't write him.  I couldn't do anything.  Every tweet you read, okay, leads you to believe that, because he's in Australia, you can't get to him; because he's in Australia, you can't sue him; because he's in Australia, he feels comfortable.  And he didn't want to do anything except inflict harm.  That's all he wanted to do.  I – I felt as though – I felt as though – he wanted me to sue him. …
>
> I mean, it didn't matter what happened.  He had received a public rebuttal from us.  Okay.  He had received a phone call from a friend.  He had received a concerns notice.  And he just kept coming. …
>
> Well, sorry, let me just ask you: did you see that version put back up on or after the 9th of June?---I saw it on the 9th.
>
> Okay.  And how did you feel after you watched it again with the words put back in?---Again, like I said, I felt completely helpless.  There's – there's nothing I could do.  I mean, he just kept coming.  He just kept coming.  I said to my son – I go, "I don't understand.  What, does he want us to sue him or something?". I mean, he actually put the words back into the video – back into the video. That's incredible.  I mean, I – I get upset just talking about it.

[211]   All of this evidence about how he felt, what he thought, that he was helpless and could not see how to stop Mr Jobst was, in my view, realistic and honestly given.  It reflected

---

[147]   T1-82.
[148]   TB[19]; see [97] above.
[149]   Respectively TB[20] and exhibit 34.  See [100] above.
[150]   T1-84; T1-85.

46

his honest feelings and thoughts.  It was, in my view, reflective of his evidence as a whole: he tried to answer questions fully, honestly and candidly.

[212]   Mr de Waard's submission that Mr Mitchell was at times aggressive and mocking of the process gave two examples, the first that Mr Mitchell said:[151]

> Do you have any other questions for me?  I think I covered that subject well.

[213]   On its own, that response may seem aggressive and mocking, but it ignores all that went before in Mr Mitchell answering Mr de Waard's questions, which covered the same period and events as were dealt with in the above extract from his examination in chief.  In his evidence, Mr Mitchell said that he tried to get Mr Jobst to "stop" by the call from Keemstar, the response video and the concerns notice, but Mr Jobst simply mocked them all and continued to claim that what was in his video was true.  Mr de Waard put to him that, by the time the concerns notice was sent, Mr Jobst had removed the offending words from the video, so he did stop.  Mr Mitchell responded in quite an emotional manner:

> No, he didn't.  See, I'm a little torn here.  I'm supposed to just answer a question and shut up, and it's really hard to.  He removed the words and then he put out a tweet, "Billy Mitchell says he'll sue me for saying Apollo Legend paid him money".  I never said I would sue him for paying money.  I never said I would sue him at all.  I told him to expect me.  He said I would sue him for paying money, and I didn't say that in my response video.  I was upset because he blamed me for the death of a young man.  Basically, he said I murdered him, and I put out a video to rebut that.  And everybody who watched my video were people that watched his video, so I was aware of the fact that there were over 500,000 people that he showed his video to that didn't like me.  I was aware of it.  And after a call from a friend, and I – after my video, he took these words down.  And in his tweet, he says, "Billy Mitchell will sue me for saying that Apollo Legend paid me money, so I took the words down.  Not because they're not true, but because it's not what I want to go to court on.  I'd rather go to court on his fake video – Donkey Kong scores."  He just kept coming.  He took the words down, but he continued to proclaim that they were true.  And so he got a – sent a concerns notice on the 7th.  And what was his response?  On the 9th, he put the words back into the video.  He actually put the words back into the video.  That is incredible.  …

> So he put them up for another four days?---Yeah, so they were up for 10 or 12 days, and yes.  Well over half a million views, and that video now has about 1.3 million, and everybody who talks about that video still talks about these words, and that video and every other video he puts out because of me.  You're right.  He just kept coming.  He's in Australia.  Billy Mitchell can't sue me.  Read – go ahead and read all the tweets.  Do you have any other questions for me?  I think I covered that subject well.

[214]   I do not consider those answers to be unduly aggressive, emotional or mocking of the process.   Just as he did in his examination-in-chief, in his cross-examination Mr Mitchell also became emotional in describing how he saw Mr Jobst's video and his responses to requests to retract it.  In my view, that evidence was honestly given.

[215]   In summary, I do not accept Mr de Waard's submission that Mr Mitchell was an unimpressive, unsatisfactory or untruthful witness.

---

[151]     T2-64:9.

47

### Mr Jobst

[216]   Mr de Waard submitted that Mr Jobst was a reliable witness whose evidence should be accepted.  He was truthful even where it might be detrimental to his defence, and he made reasonable concessions and accepted obvious propositions.  Mr Somers disputed that description.

[217]   Mr Jobst impressed as a very self-confident person and one who has strong views that he rarely, if ever, changes.  He also rarely admits that he is wrong.  For example, during the trial, Mr Jobst maintained that he still considers that Mr Mitchell is trying to ruin people's lives and that he is a scumbag and insane (words he used in the video).  He confirmed that, when he published the video, he considered Mr Mitchell to be evil, although he felt that he (Mr Jobst) had matured slightly since then and would not necessarily say he is evil any more.[152]   He also said that he still believes that the settlement between Mr Mitchell and Apollo Legend contributed to Apollo Legend's decision to commit suicide,[153] although later he explained his reasoning for this view:[154]

> I just felt like the settlement agreement harmed Apollo Legend in multiple ways that would've definitely affected him negatively and I – was my opinion that that definitely wu – you know – those negative impacts wouldn't have helped his decision in the end.

[218]   Mr Jobst clearly has an obsession with or a vendetta against Mr Mitchell.  Whether that vendetta is real, or confected in order to boost his own reputation and viewers, does not really matter.  The fact is that, by the time he published this video, Mr Jobst had made very public his dislike for Mr Mitchell, his disappointment that others had settled their disputes with Mr Mitchell, his desire to be sued by Mr Mitchell and his determination not to back down if he achieved that desire.

[219]   This obsession or vendetta started no later than June 2020, when Guinness World Records announced that it had reinstated Mr Mitchell's world records.[155]   That decision was widely publicised, including on the websites of the Washington Times, kotaku.com and Cnet.com.[156]

[220]   That announcement led to Mr Jobst making a series of public tweets.  In the first, on 18 June 2020 (the day of the Guinness World Records announcement, in Australian time), in response to the Kotaku announcement of that decision he said:[157]

> I have restrained myself from talking about this.  But I think it is now time for me to step up.  Fuck Billy Mitchell.

[221]   Mr Mitchell said his son showed him this tweet and this was the first time he had heard of Mr Jobst.

[222]   Another person commented, "Watch out he might sue you for 'verbal assault,'" in response to which Mr Jobst said, "Im in Australia so good luck."  He then asked on

---

[152]   T5-40 – 41.
[153]   T5-114.
[154]   T5-119.
[155]   Exhibit 24.
[156]   Exhibits 25, 26 and 27 respectively.
[157]   Exhibit 28.

48

Twitter, "Does the fact that I am in Australia make it more difficult for Billy Mitchell to sue me?" and the next day he posted the following tweets:[158]

> Jobst:  When I get rich I cant wait to buy myself a bunch of Guinness World Records.
>
> Another tweeter:  What records are you gonna buy?
>
> Jobst:  Maybe something Donkey Kong related?

[223]  A little over a month later, Mr Jobst published a video titled "Guinness World Records Should Stay Out of Gaming" in which, I infer from the evidence about it, he criticised Guinness World Records for reinstating Mr Mitchell's records and, toward the end, made "some salacious claims" about Mr Mitchell.[159]  The video itself is not in evidence, but its contents were described in a concerns notice sent on 30 July 2020 by email from Mr Mitchell's Australian lawyers to Mr Jobst.  In that letter,[160] the lawyers described the video in these terms:

> In your video you stated that Guinness World Records were a scam, that Guinness World Records had recently made a terrible decision to reinstate world records of a cheater.  You identified our client as the person you refer to as a proven cheater.  …  You went on to state that Guinness World Records' decision to reinstatement our client's records was a slap in the face to all video gamers and that Guinness had falsified its records and that Guinness had been sufficiently paid off by our client in order to reinstate the records.

[224]  Nobody has challenged the accuracy of that description, so I infer that it is an accurate summary of things Mr Jobst said in the video.

[225]  Almost immediately after receiving that letter, Mr Jobst posted the following tweets:[161]

> Billy Mitchell has already started legal proceedings against me and is attempting to extort me for $150,000.  I have uploaded the legal documents here: [an online address].
>
> Even the notice is full of lies.  I will obviously fight whatever he attempts to …

[226]  Mr Mitchell did not, on that occasion, commence any proceedings against Mr Jobst. But, as I have already recorded, when Mr Jobst received Mr Mitchell's concerns notice about the video the subject of this proceeding, he posted a tweet with a similar reaction.[162]  Mr Jobst denied that, in posting this tweet, he was goading Mr Mitchell. He said:[163]

> this tweet was designed to – for Billy to see – to let him know that he can't bully me and I didn't want to give him the satisfaction of him thinking that he's scaring me, or hurting me.

[227]  Mr Jobst has built his own reputation, at least on YouTube, among other things for "exposing" alleged cheats and for criticising those whom he considers to be cheats. He clearly wants to protect that reputation by not backing down on his allegations

---

[158]  This series of tweets are respectively exhibits 52, 29 and 30.
[159]  Evidence of Mr Mitchell Jnr, T3-84.
[160]  Exhibit 31.
[161]  Exhibit 32.  The first is recorded as posted on 29 July 2020 at 10.09pm: clearly in a USA time zone. The second, apparently posted 19 minutes later, is incompletely reproduced in the exhibit.
[162]  See [100] above.
[163]  T5-95.

49

against Mr Mitchell.  He has told his viewers that he would not back down and, in defending this claim, he has "kept faith" with his viewers.  No doubt he has also earned income from his videos and anticipates making further income from videos about this proceeding, particularly if he were to succeed in his defence.  Indeed, he said in an online interview in February 2014 and confirmed in his evidence that he was making so many videos about Mr Mitchell because he needed to earn money to pay for his defence of this proceeding.[164]

[228]  Later in the same interview, Mr Jobst said:[165]

> Billy Mitchell needs to be destroyed in court. He … needs to be destroyed in court. Um- so these people need to be punished in a big way before they stop. They need to get taught a lesson, so I am now the last- the last chance … I am the last chance the public has to punish Billy.  …
>
> And also, the last person on YouTube you want to lose to is me.  You know there's going to be a hundred vids rubbing it in. … I will never let Billy forget this – assuming I win. …  I've got to win first but, man, if I win, oh boy, I'm not going to be a good winner.

[229]  On the whole, I considered that Mr Jobst's evidence was coloured by his obvious dislike and adverse views of Mr Mitchell and his promises to his viewers that he would not back down in this litigation.  Four particular matters in the course of his evidence demonstrated this to me.

[230]  The first was his evidence to which I have referred at [217] above.

[231]  Secondly, he published the offending words for the second time even though, by then:

(a)  he had seen Mr Mitchell's response video,

(b)  he been told by Mr Keem that his statement that Apollo Legend had paid Mr Mitchell a large sum of money was wrong as the settlement did not require any payment by Apollo Legend,

(c)  he had told Mr Keem that he would not republish the offending words unless he obtained concrete evidence to the contrary,

(d)  he had received the concerns notice from Mr Mitchell's solicitors and

(e)  he had not yet heard back from Apollo Legend's brother, nor obtained any other evidence, let alone "concrete evidence" that such a payment had been made.

When asked why he did this, he said, "I don't believe anything Billy Mitchell says."[166]

[232]  Thirdly, his "retraction" of his error in stating that Apollo Legend had paid Mr Mitchell a large amount of money was, in my view, deliberately hidden by him at the end of a long video about an irrelevant topic and without any thumbnail or mention in the description of the video that pointed to Mr Mitchell being a subject dealt with in it.  He denied that he had deliberately hidden his retraction. Mr Somers asked him questions to the effect that, if he had wanted people to know that this video partly concerned Mr Mitchell, he would have included a photo of Mr Mitchell in the thumbnail, or he would have referred to Mr Mitchell in the title or in the description of the video.  In each case, his answer was, "Not necessarily, no."  He then explained

---

[164]  Exhibit 66; T5-19.
[165]  Exhibit 77.  I take "vids" to means "videos."
[166]  T5-97.

50

that YouTube metrics include a "click through" rate and, if the video has a really good thumbnail or title that shows it as interesting, a higher percentage of people will click on it, which will result in YouTube promoting it to more people.[167]

[233] I do not doubt Mr Jobst's evidence about the YouTube metrics, but he did not explain why the inclusion of a picture or reference to Mr Mitchell in the title or thumbnail would not, in fact, increase the click through rate because it would be of interest to more people. Nor did he explain why he chose to put his retraction in (and at the end of) that video, which was otherwise irrelevant to Mr Mitchell and quite possibly of no interest to many viewers who had an interest in Mr Jobst's videos about Mr Mitchell.

[234] I found his evidence to the effect that he did not deliberately hide his retraction within an irrelevant video about another topic not credible.

[235] Fourthly, in that video[168] he said something that was wrong, about which I considered his evidence to be disingenuous and that leads me to have reservations about his credibility on occasions. He said, "nor did [Mr Mitchell] attempt to get in contact with me to clear up any misinformation I may have had." Mr Somers put to him that he had seen Mr Mitchell's response, he had spoken with Keemstar and he had received the concerns notice; Mr Mitchell was attempting to get in contact with him through Keemstar and then through his lawyers and telling him he was wrong. His answers were that Keemstar was "a third party" and he did not consider that a letter from Mr Mitchell's lawyers was Mr Mitchell getting in contact with him. He contended that, when he made that statement in his video, he was referring to Mr Mitchell himself contacting him. Relevantly, the following exchanges took place between him and Mr Somers:[169]

> But you don't accept that that's Mr Mitchell, in a way, reaching out to you to clear up any misinformation you had?---Well, I'd accept in a way, but that's not what I said in the video. I said – I didn't say "in a way." …

> That wasn't correct in light of the concerns notice, was it? "Attempt to get in contact with me to clear up any misinformation you had"?---I don't believe Mr Mitchell was attempting to get in contact with me, no.

> You don't think the concerns notice from his solicitor is an attempt to contact you about the video?---Not Mr Mitchell contacting me, no. … I didn't consider this [was] Mr Mitchell attempting to contact me. …

> I thought you'd just accepted a moment ago that you understood that his solicitor, he was – the solicitor was writing for and on behalf of Mr Mitchell?---On behalf of him, but Mr Mitchell wasn't writing it.

> I'm asking you whether you accept that that is Mr Mitchell through his lawyer, for and on his behalf, getting in contact with you to clear up misinformation that you had, wasn't it?---I agree that it was through his lawyers. Yes.

> But it was – why do you keep making this distinction, Mr Jobst?---Because that's the distinction I made in my video.

> Right. Okay. So you're saying that, when you said that, you're saying you said it because it wasn't Mr Mitchell personally - - -?---That is correct.

> - - - that contacted you?---Yeah.

---

[167]    T5-101 – 5-103.
[168]    See [107] above.
[169]    T5-105 – 110.

51

[236] Mr Jobst was not prepared to accept that Mr Mitchell had attempted to make contact with him, either through Keemstar or through his lawyers. Consequently, he did not accept that he had been told by Mr Mitchell, through his lawyers, that the assertions he had made in the video about the settlement with Apollo Legend were wrong. Nor would he accept that what he had said in his "retraction video" was wrong or disingenuous. His evidence about this, in my view, was itself disingenuous and simply attempting to excuse a disingenuous statement that he had made to his viewers.

[237] Consequently, while most of Mr Jobst's evidence was truthful, I conclude that, where the truth is inconsistent with his view of Mr Mitchell or with his understanding of his defences to the claim, he is unreasonably and, at times, untruthfully, defensive of the positions he has taken and of his own reputation, as he sees it, to the extent that, both in his videos and in his evidence, he is prepared to elide the truth and to ignore some of the relevant facts.

[238] However, given the issues raised in the pleadings, most of Mr Jobst's evidence had little bearing on the outcome of the proceeding, as (except as to aggravated damages) most of the allegations do not depend on his knowledge or beliefs, nor on what steps he did or did not take before and after the publications.

## Other witnesses

[239] Each party submitted that one or more of the other party's witnesses, most of whom gave evidence principally about Mr Mitchell's reputation, were in some respects unconvincing or biased in favour of the party calling them to give evidence.

## Mr Mitchell's witnesses

[240] Mr de Waard submitted that three of the witnesses called by Mr Mitchell were obviously close to and biased in favour of Mr Mitchell, although he conceded that none of the witnesses was not credible.

[241] Mr Somers submitted that the witnesses called by Mr Mitchell comprised a mixture of people who have known him for many years and people who are not friends, but who were independent in their assessment of him – and, in fact, who assessed his reputation in choosing to invite him to appear at events in order to bring in attendees. All of Mr Mitchell's witnesses have directly observed him interacting with people and had first hand insight to how he has been perceived by society generally.

[242] Mr Mitchell Jnr is, of course, his son, who has been involved in the preparation of claims by Mr Mitchell against Mr Jobst and others, in each of which the same or similar damage to Mr Mitchell's reputation has been alleged as in this case. He described the interactions he observed at gaming and other conventions between his father and other attendees at those conventions, both before and after the offending publications. He compared the numbers of such appearances at such gatherings that his father was invited to both before and after the publications. He also gave evidence of Mr Mitchell's reputation, so far as he had heard of it. For example, he said that, when Twin Galaxies published its decision to remove Mr Mitchell's records, people he knew would ask him about it and most told him they thought it was rubbish. He also negotiated the settlement agreement between his father and Apollo Legend. He described the effects he observed that Mr Jobst's publications had on his father, both

immediately after they were published and after later appearances were cancelled.[170] He also described the effects on his father, as he observed them, of the Twin Galaxies decision and publication of it, as well as the effects (or lack of them) of publications by other people whom his father had sued.[171]

[243]   Mr Mitchell Jnr struck me as an honest witness giving credible evidence.  He was responsive to the questions asked of him.  He did not appear to exaggerate any part of his evidence.  I have no reason to doubt any of it, notwithstanding his relationship to his father.

[244]   Walter Day was the creator of Twin Galaxies and its owner when Mr Mitchell set his records.[172]  He is clearly a good friend of Mr Mitchell and, since Mr Mitchell became famous, he has frequently attended gaming conventions as a guest along with Mr Mitchell (in his own words, as a side bar and riding on the coat-tails of Mr Mitchell).  As Mr de Waard submitted, he has benefitted greatly from his long-term and ongoing association with Mr Mitchell.  He gave evidence about Mr Mitchell's interactions with attendees at gaming conventions, both before and after the offending publications.  He also described his observations of Mr Mitchell's reactions to the publications.[173]

[245]   I have no reason to doubt Mr Day's evidence simply because he is a good friend of, and has benefitted from his association with, Mr Mitchell, although I do take into account his obvious enthusiasm for Mr Mitchell by treating some of his evidence as overly enthusiastic and perhaps unconsciously exaggerated.  But he was particularly well-placed to see Mr Mitchell's interactions with members of the public at conventions and other events and his evidence is supported by evidence of other witnesses and by some of the documentary exhibits, such as photographs.[174]

[246]   Isaiah Johnson gave evidence by video link from Jamaica.  He is clearly another enthusiastic supporter of Mr Mitchell.  Mr de Waard submitted that he makes money from Mr Mitchell and gets employment deals as a package with Mr Mitchell, so I should not treat him as an unbiased witness.  Mr Johnson said that, between 2008 and 2020, he would go to conventions with Mr Mitchell about four or five times a year. He gave evidence about other attendees' reactions to Mr Mitchell at those conventions.   He also gave evidence of his observations of Mr Mitchell after Mr Jobst's videos were published.

[247]   Again, while taking account of the enthusiasm with which he gave his evidence, I do not consider there to be any reason for me to doubt any part of Mr Johnson's evidence.

[248]   Mr de Waard submitted that there is no reason to doubt the credibility of the other witnesses called by Mr Mitchell, so it is unnecessary to discuss them at this stage.

---

[170]   For immediate effects of the first publication: T3-95 – 96.  On the effects of the second publication: T3-102.  On the effects of cancellations: T3-104 – 105.
[171]   T4-29 – 36.
[172]   He subsequently sold it to Mr Hall, in 2014.
[173]   T4-8 – 9.
[174]   For example, exhibit 49.

53

*Mr Jobst's witnesses*

[249]   Mr Somers submitted that the witnesses called by Mr Jobst had one or more of the following characteristics:

(a)   they were persons who, for whatever reason, disliked Mr Mitchell or had an "axe to grind" in respect of him;

(b)   they had no personal contact or relationship with Mr Mitchell - many of them had never met him in person or had not had any such contact or relationship for some considerable time, particularly in the periods shortly before and after the publication of Mr Jobst's video;

(c)   they had no personal observations or knowledge of how Mr Mitchell interacted with people, particularly those who attend gaming conventions or who otherwise interact personally with him in the community;

(d)   they derived their understanding of Mr Mitchell's "settled reputation" from rumour and material they read or viewed over the internet and made broad and unsupported statements without identifying the sources of the information they relied on; and

(e)   they gave no evidence of any conduct or reputation on the part of Mr Mitchell to the effect that he ostracised anyone he considered a threat to his Donkey Kong records, or was a threat to or had a propensity to cause harm to the health and well-being of others.

[250]   Mr de Waard submitted that all the witnesses called by Mr Jobst were credible and had no business or close personal connection with Mr Jobst:  in that sense, they were independent of him.

[251]   As with Mr Mitchell's witnesses, some of them require particular consideration.

*David Race*

[252]   David Race first met Mr Mitchell in about 2010.  When Mr Mitchell was first accused of having cheated (and then was found by Twin Galaxies to have used MAME software), Mr Race did not believe the allegations.  He spent a lot of time defending Mr Mitchell and testing the hardware given to him by Mr Mitchell, who told him that it was the hardware on which he had achieved his first two record scores for Donkey Kong, which led him to believe – and to promote the view publicly – that Mr Mitchell had achieved his scores on original unmodified arcade hardware.  He then saw further material that led him to change his mind and to believe that Mr Mitchell had in fact cheated in obtaining those scores.  Since then, he has felt that Mr Mitchell deceived him, he has felt embarrassed and that he had been used by Mr Mitchell as a "useful idiot" to support his narrative and he felt hurt by Mr Mitchell's deceit.  In his evidence, he described Mr Mitchell as "someone who is a proven cheater, who has been shown to be a compulsive liar and will basically perpetrate a fraud in front of witnesses and still claim that he did something that he didn't."[175]  Mr Race has also been sued by Mr Mitchell in a case that was ongoing at the time of the trial, in respect of which Mr Jobst has assisted in raising over $55,000 to help pay Mr Race's legal costs.

---

[175]   T5-66.

54

[253] Since changing his mind about Mr Mitchell, Mr Race has taken multiple steps to attack him and to affect his interests adversely.  He contacted the organiser of a gaming convention which Mr Mitchell had been invited to attend, saying such things as that Mr Mitchell is a cheater, a liar and a fraud.[176]  He has made more than 70 posts on Facebook criticising Mr Mitchell since September 2019.  He has contacted others accusing Mr Mitchell of lying, cheating and victimizing people.[177]  He accused Mr Mitchell of suing Apollo Legend for $1,000,000, Donkey Kong Forum and Jeremy Young for $2,000,000 and Twin Galaxies for $1,000,000.  He said that he was giving evidence to help Mr Jobst against Mr Mitchell's attempt to extort and silence him and for justice to be done.

[254] Mr Somers submitted that the Court ought to assess Mr Race's evidence from the point of view that he is intending to hurt Mr Mitchell.  It is obvious to me that Mr Race now hates Mr Mitchell and would like Mr Jobst to succeed in defending this action.  He strongly believes that Mr Mitchell cheated and that he victimises people who challenge him (including Mr Race himself).  He is clearly not an unbiased witness.  His evidence about Mr Mitchell's reputation (which I shall describe below) is certainly coloured by his attitude toward him.  I consider that I should be careful before accepting his evidence without corroboration.

*Charles White*

[255] Mr White described himself as a full-time content creator.  He publishes videos about various types of entertainment, including video games, films, skits and reviews, on his own YouTube channels, predominantly one called "penguinz0".  He has over 16,000,000 viewers on that channel and more on other channels, as well as publishing on Twitch (which he described as "a platform where people go to stream video game content").  He also owns an e-sports organisation that engages (and pays) "professional" players of various video games.

[256] Mr White gave evidence of his own impressions of Mr Mitchell, which is irrelevant to the issues in this proceeding, but is relevant to my assessment of his evidence.  He said that he first came across Mr Mitchell when he learned of a lawsuit taken by Mr Mitchell against a body called Cartoon Network.  His impression was, "This is a very silly person here."  After watching King of Kong, his impression was that Mr Mitchell was "a narcissist, a bully and just kind of an all-round bad guy."[178]

[257] Mr White produced and published a video called "He's A Cheater" after he learned that Mr Mitchell had settled his proceeding against Twin Galaxies.  A short extract from that video was tendered.[179]  Mr White agreed that, before he published that video, he had seen messages on Twitter from a few people suggesting that he apologise to Mr Mitchell given that settlement.  In the extract he said, "This is my official response to all of you" and farted into the microphone.  He continued:

> Billy Mitchell does not deserve an apology because Billy Mitchell is not innocent.  You are letting him manipulate and lie to you as he has done for his entire career.  I don't think he is even able to accidentally tell the truth about anything. … His whole core, being, his soul is entwined with his lies.

---

176    Exhibit 69.
177    Exhibits 72 and 73.
178    T6-8.
179    Exhibit 79.  The extract was 40 seconds of a video that was 9 minutes 11 seconds long (as exhibit 80 shows).

55

[258] Three extracts of another video published by Mr White were also tendered.[180]  In the first he said to the effect that Mr Mitchell sues everybody who accuses him of cheating, apart from Mr White himself.

[259] It is obvious that Mr White has a very low opinion of Mr Mitchell.  But it is also obvious from his videos that, at least on videos, he is prepared to exaggerate statements he makes about Mr Mitchell.  It is difficult to separate his own opinion of Mr Mitchell from any knowledge he might have about Mr Mitchell's reputation at various times.  As with Mr Race, I cannot accept his evidence (to the extent that he purported to report on Mr Mitchell's reputation) without corroboration from reliable sources.

*Carlos Piñeiro*

[260] Mr Piñeiro is an information technology engineer.  A few years ago he helped in an investigation to attempt to determine whether Mr Mitchell had played two Donkey Kong games, the videos of which Twin Galaxies had accepted as showing him make record scores, on original arcade hardware.  Mr Piñeiro had worked for an arcade gaming company repairing circuit boards and screens in arcade cabinets.

[261] Mr Somers submitted that Mr Piñeiro was not credible as a witness, because he has made inconsistent statements in the past.  In September 2019, after conducting his investigation, Mr Piñeiro signed two statements at Mr Mitchell's request.  In the first, presented to him by Mr Mitchell at a dinner they had together and signed by him at that dinner on 8 September 2019, he said relevantly:[181]

> I have been presented with Billy Mitchell's evidence.  After seeing the evidence, I retract my conclusions from the dispute case.  Billy Mitchell did not cheat.

[262] Apparently he told Mr Mitchell he was not comfortable with that paragraph, but he signed the statement anyway.

[263] On 10 September 2019, he discussed the statement further with Mr Mitchell, leading to the preparation of another statement in which he replaced that paragraph with the following:[182]

> After reviewing the evidence, I cannot conclude that Billy Mitchell did play, or did not play on an original unmodified Donkey Kong PCB.  I cannot confirm what platform the game was played on.  To me, this in inconclusive.  I never saw Billy play the games, and with the entire body of evidence against the technical assertions, I believe there is too much doubt.

[264] Both of those statements contained a declaration "under penalty of perjury" that it was true.  They appear to be similar to a statutory declaration in Queensland, although the first was not witnessed, while the second was witnessed by a Notary Public.

[265] In his evidence, Mr Piñeiro said that the first of these statements was not correct, but the second was.  He also agreed that he had given a sworn declaration in the litigation by Mr Mitchell against Twin Galaxies.  He agreed that, in that declaration, he had said that his conclusion after testing the video tape recordings of the two games by

---

[180]    Exhibit 81.
[181]    Exhibit 83.
[182]    Exhibit 84.

Mr Mitchell was that they "cannot have come from an original Donkey Kong arcade PCB." He did not accept that that was inconsistent with his statement in exhibit 84.

[266] I do not consider that these inconsistencies necessarily damage Mr Piñeiro's evidence in this proceeding. The first statement was not, in fact, sworn and it seems that he felt under some pressure from Mr Mitchell to sign it even though he expressed discomfort in doing so and they later met to discuss and create a version with which he was comfortable. The fact that he gave inconsistent evidence in the Twin Galaxies litigation does not necessarily discredit him, as he may have changed his mind by then. That possibility and the reasons for it were not explored in his evidence.

[267] In any event, Mr Piñeiro's evidence about Mr Mitchell's reputation was minimal and of little assistance.

*James Angliss*

[268] Mr Angliss, generally known as "Jimmy Nails," owns a pinball and arcade themed bar called "Netherworld", in Fortitude Valley, Queensland and conducts competitive pinball tournaments there. He also organises the Australian Kong Off, held annually since 2017. He invited and paid for Mr Mitchell to attend the Australian Kong Off in 2019, which he said was very successful.

[269] Mr Somers submitted that I should doubt Mr Angliss' evidence to the effect that Mr Mitchell had a bad reputation at that time; first, because he was happy to have Mr Mitchell attend at his event and, secondly, because he now appears to be a supporter of Mr Jobst, including by putting on an event to raise money to assist Mr Jobst in the defence of this proceeding.

[270] Mr Angliss did not strike me as giving evidence with any form of bias, notwithstanding his business association with Mr Jobst and fund raising for his defence of this proceeding.

**The absent witness – Mrs Mitchell**

[271] Mr Mitchell's wife did not give evidence. She was mentioned, in text messages that Mr Mitchell sent to Mr Hall and Mr Piñeiro in March 2018, as having found two online sources to the effect that Apollo Legend had died.[183] Mr Mitchell Jnr said she mostly controlled Mr Mitchell's social media accounts. Mr Mitchell and other witnesses also gave other evidence about her involvement in some of the relevant events.

[272] In answer to a question from me, Mr de Waard submitted that, as she was not called to give evidence and no explanation was given for her absence, the court should infer that any evidence she might have given would not have assisted Mr Mitchell's case.[184]

[273] Mr Somers, unsurprisingly, submitted that I should not draw any adverse inference from Mrs Mitchell's absence. He submitted that Mr de Waard did not put any questions to Mr Mitchell or Mr Mitchell Jnr about whether or not she could give

---

[183]   TB[2] and [3].

[184]   *Jones v Dunkel* (1959) 101 CLR 298, 308, 313, 320-321. As summarised in J D Heydon, *Cross on Evidence* (LexisNexis Australia), [1215], unexplained failure by a party to call a witness may (not must), in appropriate circumstances, lead to an inference that the uncalled evidence would not have assisted that party's case.

57

evidence, so such an inference is not open to be drawn but, when I challenged that proposition as a matter of law, he conceded that an inference could arise.

[274] It seems to me that Mrs Mitchell, if called to give evidence, is likely to have been able to give useful evidence on at least two topics. One would be what her sources were for the rumour of Apollo Legend's death and perhaps Mr Mitchell's reaction when she told him about the rumour. A second - and the more important - would be about her observations of Mr Mitchell's reactions to the video, to Mr Jobst's subsequent conduct and to comments on the video. While Mr Mitchell Jnr gave evidence about his observations, I would expect her observations to be closer and her evidence perhaps more detailed. Indeed, Mr Mitchell himself said that she had insisted on him going to see a doctor due to his condition[185] and also said that his behaviour as a consequence was affecting her and their children.[186]

[275] It would be natural – and to be expected – that Mr Mitchell would call Mrs Mitchell to give evidence, at least on the second issue that I have described. Her evidence would not merely be cumulative on the evidence given by Mr Mitchell and his son, but would likely have resulted in additional observations about the effects on him and the family and could have resulted in better evidence of his appearances at events and whether or not he was paid for them.

[276] The closeness in the relationship of Mrs Mitchell and Mr Mitchell results in the failure to call her being more significant and more open to an adverse inference being drawn than might have been the case with a different witness.[187] The relationship of husband and wife is obviously *prima facie* close and no explanation has been given for her absence.

[277] Ultimately, to the extent that Mrs Mitchell's evidence, if called, may have been relevant to the determination of some issues (particularly concerning the effect of the video on Mr Mitchell personally and on his invitations to attend events), I am prepared to infer that her evidence would not have assisted Mr Mitchell's case. Of course, that does not rise to an inference that it would have been adverse to his case. But I may take it into account in deciding whether to accept any particular evidence relating to a matter on which she could have given evidence. I may also more readily draw any inference unfavourable to Mr Mitchell where Mr de Waard may have been able to prove a relevant fact in cross-examination of Mrs Mitchell, if she had been called, because she seems have been in a position to cast light on that subject.[188]

---

[185]  T1-80.

[186]  T1-86. One witness – Mr Johnson – said that Mr Mitchell had told him that he was afraid he might lose his wife as a result of Mr Jobst's allegations. Although hearsay and obviously not proof of Mr Mitchell's state of mind, it indicates one potential aspect of evidence about which Mrs Mitchell might have spoken: the overall effects on Mr Mitchell, his behaviour and their relationship.

[187]  Heydon, *Cross on Evidence*, [1215], 1092; *Hospitality Group Pty Ltd v Australian Rugby Union Ltd* (2001) 110 FCR 157, [64]; *Australian Securities and Investments Commission v Australian Lending Centre Pty Ltd (No 3)* (2012) 213 FCR 380, [153].

[188]  Heydon, *Cross on Evidence*, [1215], 1092; *Jones v Dunkel*, 312; *Manly Council v Byrne* [2004] NSWCA 123, [51], [54]; *Australian Securities and Investments Commission v Fortescue Metals Group Ltd (No 5)* (2009) 264 ALR 201, [102].

58

**Contextual truth defence**

[278]   At the time of each publication, s 26 of the *Defamation Act* 2005 provided:[189]

> It is a defence to the publication of defamatory matter if the defendant proves that—
>
> (a)   the matter carried, in addition to the defamatory imputations of which the plaintiff complains, one or more other imputations (***contextual imputations***) that are substantially true, and
>
> (b)   the defamatory imputations do not further harm the reputation of the plaintiff because of the substantial truth of the contextual imputations.

[279]   Mr Jobst contends that the offending video contained the following alternative imputations, each of which was substantially true and as a result of which Mr Mitchell's reputation was not further harmed by the imputations that he alleges:

(a)   Mr Mitchell was publicly exposed as having cheated to achieve his record scores in Donkey Kong;

(b)   Mr Mitchell was banned from submitting scores to Twin Galaxies for cheating;

(c)   Mr Mitchell had planned to create a video that he could fraudulently use as evidence that he had achieved a score of 1,062,800 in Donkey Kong;

(d)   Mr Mitchell had callously expressed joy at the thought of Apollo Legend's death; and

(e)   Mr Mitchell used litigation to force third parties to recognise his achievements in video gaming.

[280]   Mr Mitchell contends that this defence fails because:

(a)   some of the imputations alleged do not arise from the video or, if they do arise, some are not defamatory and some are not true;

(b)   in any event, none of them has a more powerful effect on Mr Mitchell's reputation, nor is any more serious, than the imputations alleged by Mr Mitchell; and

(c)   at least the first four imputations relate to a different sector of Mr Mitchell's reputation to the sector affected by the imputations alleged by Mr Mitchell and therefore they cannot relevantly affect his reputation in the way it has been damaged by the imputations he alleges.

*The components of contextual truth*

[281]   The following principles concerning the defence of contextual truth derive from the reasons of Applegarth J (with whom Fraser JA and Douglas J agreed) in *Nationwide News Pty Ltd v Weatherup*.[190]

---

[189]   The section was substituted with different wording, with effect from 1 July 2021, when the amending Act commenced: *Defamation (Model Provisions) and Other Legislation Amendment Act* 2021, s 15, s 2.  The amendment was not retrospective.  The change in wording was intended only to clarify the operation of the section, not to alter the law: *Defamation (Model Provisions) and Other Legislation Amendment Bill 2021 Explanatory Note*, pp 3, 9.  Therefore, court decisions concerning both the original and the amended section are relevant to the construction of the applicable section.

[190]   [2018] 1 Qd R 19, [44]-[51].

(a) The defence allows a defendant to prove that the substantial truth of more serious contextual imputations resulted in no further harm being done to the plaintiff's reputation by the imputations upon which the plaintiff succeeds. The rationale for the defence is to deny a plaintiff an entitlement to recover damages where the plaintiff has selected, and succeeded in establishing, a less serious imputation than the more serious imputations which the defendant selects and is able to prove are substantially true. In such a case, the defendant's justification of the more serious imputation may establish that the plaintiff's reputation was not actually harmed, as the plaintiff alleges, by the less serious imputation.

(b) Section 26(b) requires the court to weigh and measure holistically the relative worth or value of the several imputations contended for by both parties. The matters which establish the truth of the contextual imputations must have a powerful effect on the plaintiff's reputation compared to the effect of the imputations on which the plaintiff succeeds. In practice, this requires the defendant to plead and prove the substantial truth of contextual imputations which are clearly more serious than the plaintiff's proved imputations.

(c) The defence will fail if one or more of the plaintiff's imputations would still have some effect on the plaintiff's reputation, notwithstanding the effect of the substantial truth of one or more of the defendant's contextual imputations.

[282] A defendant does not have to establish the substantial truth of all the contextual imputations pleaded in order to succeed.[191]

[283] In raising these alternative imputations, Mr Jobst effectively seeks to establish that Mr Mitchell already had (or was given by the contextual imputations) such a bad reputation that, even if the imputations that he pleads arise, he was not further harmed by them. Similarly, in defence of Mr Mitchell's plea that the video (particularly the offending words) injured his reputation, Mr Jobst has pleaded that Mr Mitchell already had a settled bad reputation, as a cheat in obtaining his records in Donkey Kong, as a person who used litigation to coerce others into recognising his records or to refrain from identifying him as a cheat, and as someone who would ostracise anyone whom he considered a threat to his Donkey Kong records.[192] These allegations are so close to some of the alleged contextual imputations, that they all merit consideration together.

[284] In seeking to prove that the plaintiff already had a bad reputation (whether as a defence to an allegation of harm to reputation or because of substantially true contextual imputations), the allegedly bad reputation must be relevant to that "sector" of the plaintiff's reputation that is, or may be, harmed by the imputations proved by the plaintiff.

[285] A plaintiff may have different reputations in different areas, or sectors, of the plaintiff's life.[193] For example, a doctor may have a good reputation as caring for her or his patients in the course of the doctor's practice. In defending defamatory comments about the doctor in that capacity, it is irrelevant that the doctor also has a reputation as having falsified the results of scientific experiments not conducted in the

---

[191] *Trad v Harbour Radio Pty Ltd (No 2)* [2013] NSWCA 477, [32].
[192] Defence [12], responding to statement of claim [13].
[193] *O'Hagan v Nationwide News Pty Ltd* (2001) 53 NSWLR 89, [5], [26]-[31], [36]; *Australian Broadcasting Corporation v McBride* (2001) 53 NSWLR 430, [16]-[30]; *Plato Films Ltd v Speidel* [1961] AC 1090, 1130, 1140; *Goody v Odhams Press Ltd* [1967] 1 QB 333, 341.

course of that practice.[194]  Another notorious example is where a libel imputes theft: the relevant sector is the person's reputation for honesty, not his reputation as a good motorist.[195]

[286]  Perhaps of particular relevance to this proceeding, although not relied on by Mr Somers, is an example given by Levine J:[196]

> Another extreme example was that if it was said of a person that that person murdered someone, the only evidence of reputation that could be led … would be in the sector of that plaintiff's respect for human life.

[287]  However, as Meagher JA has since said:[197]

> It is not easy to ascertain exactly what is "the relevant sector" of a plaintiff's reputation in the case of any libel; nor do the decided cases provide any help in answering that question, although they furnish many examples of extreme cases.

[288]  Ipp JA stated the essential question concerning damage to a particular sector of a person's reputation:[198]

> The essential question in determining the relevant sector remains:  what is the scope of the plaintiff's reputation capable of being harmed by the defamatory material?

[289]  I shall consider later Mr Somers' submission that the imputations arising from the offending video concern a different sector to Mr Mitchell's reputation as a video gamer.

### Did the contextual imputations arise and were they substantially true?

[290]  As I did with the imputations alleged by Mr Mitchell, I shall consider individually whether the video raised the imputations alleged by Mr Jobst and, if so, whether they were substantially true.  Of course, as in the case of Mr Mitchell's alleged imputations, the question is whether the imputations alleged by Mr Jobst were made in the context of the entire video, not just the offending words selected by Mr Mitchell or by Mr Jobst.

[291]  The parties, in essence, addressed together the questions raised by s 26(a) about contextual imputations: whether they arose from the video and whether they were substantially true.  I propose to do the same.

*First contextual imputation – publicly exposed as having cheated*

[292]  Mr de Waard submitted that, from the very beginning of the video, Mr Jobst asserted that Mr Mitchell had been exposed for cheating in obtaining his records.[199]  Indeed, Mr Jobst went on during the video to say:

> (12:04)  It was originally David [Race]'s intent to prove Mitchell's innocence, but alas, the more he investigated, the more he realised that Mitchell's story

---

[194]   *Australian Broadcasting Corporation v McBride* (2001) 53 NSWLR 430.
[195]   *Plato Films Ltd v Speidel*, 1140
[196]   *Marsden v Amalgamated Television Services Pty Ltd* [1999] NSWSC 1119, [23].
[197]   *O'Hagan v Nationwide News Ltd*, [7].
[198]   *Australian Broadcasting Corporation v McBride*, [30].
[199]   Relying on the passage set out at [84] above.

61

couldn't be true. There is just no way the footage of the scores could ever be replicated on original arcade hardware.

(12:48) In the end, David couldn't help but agree with the assertions that had already been made: Mitchell's performances were not produced from an original arcade …

(13:27) In his sworn testimony, [David Race] states clearly, "It is my opinion that the video game recordings of the disputed score performances cannot have come from an original unmodified Donkey Kong PCB."

(13:48) As is always the case, Mitchell paints anyone who thinks he cheated as just having a vendetta against him. It can never simply be that they examined evidence and came to the only reasonable conclusion.

(16:05) He is suing Twin Galaxies in California for $1,000,000 for removing his high scores and saying they weren't achieved on original hardware.

(16:36) They [Jeff Harrist and the Donkey Kong Forum] are being sued for removing his scores and allowing posts outlining the evidence that Mitchell cheated.

[293] I consider that any reasonable viewer of the video would conclude that it made the imputation that Mr Mitchell had been publicly exposed as cheating in obtaining his Donkey Kong scores. Indeed, it actually asserted that he had cheated. The imputation is therefore made in the video.

[294] In determining whether the imputation is substantially true, Mr Somers submits that Mr Jobst is limited to relying on two things, as pleaded in the particulars to paragraph 17(a) of the defence: the statement made on 12 April 2018 by Twin Galaxies[200] and a statement published on the internet by Jeremy Young on 2 February 2018, in which (Mr Jobst pleads) he was "confirming that … the plaintiff had cheated to attain his scores in the video arcade game, *Donkey Kong*."

[295] Mr Somers correctly stated that Mr Young's statement is not in evidence, so in fact Mr Jobst cannot rely on it. The only evidence about it was secondary (although no objection was made to the admission into evidence of that secondary material). Mr Mitchell said that, on that date, Mr Young posted a challenge to his records on the Twin Galaxies website, in which he alleged that Mr Mitchell had not used original Donkey Kong hardware in obtaining his world record scores. Mr Race said that, on that date, Donkey Kong Forum removed Mr Mitchell's scores from its website and its evidence was added to the Twin Galaxies dispute thread, which generated a fair bit of attention in the classic gaming "niche community." Mr Race went on to say that the MAME allegation began to come out on that date on the Donkey Kong Forum and was added to the Twin Galaxies dispute thread.[201] Given the absence of any objection to the secondary evidence of Mr Young's statement, I consider that I can act on that evidence.

[296] Mr Jobst also relies on some of Mr Mitchell's evidence, in which he agreed that in 2018 he had been publicly exposed as having cheated, although he also asserted that the allegations were false and have subsequently been proved to have been false.[202] He also relies on evidence from Mr Burt,[203] that "it was made aware on the internet

---

[200]    TB[5].
[201]    T1-54 and T2-97; T5-47 and T5-56 respectively.
[202]    T3-13, T3-21.
[203]    To whom I refer later, at [365].

forums that, um, Twin Galaxies, um, alleged that Mr Mitchell was cheating in the high score of the Donkey Kong,"[204] as well as other evidence from witnesses that the community viewed him as a liar or cheater and many articles reported the allegations.[205]

[297] Mr Somers submitted that Twin Galaxies' statement did not expressly identify Mr Mitchell as a cheater, but only that, in its view, on two occasions he had not used original unmodified Donkey Kong hardware to achieve his scores, while the third was unclear.  Mr Somers submitted that to cheat means to gain an unfair advantage by deception or breaking rules and Twin Galaxies did not contend that Mr Mitchell had submitted his scores with the intention to trick or deceive it into recognising them.

[298] It is correct that Twin Galaxies did not expressly say that Mr Mitchell had cheated.  But, in addition to its findings that he had not used original Donkey Kong hardware to achieve two of his scores, its statement said:

> The Rules for submitting scores for the original arcade Donkey Kong competitive leaderboards requires the use of original arcade hardware only. The use of MAME or any other emulation software for submission to these leaderboards is strictly forbidden.

[299] Any reasonable reader of that statement and Twin Galaxies' findings would conclude that its effect was that Mr Mitchell had broken that rule and consequently had cheated to achieve his scores using MAME.  That statement alone publicly exposed him as having cheated.

[300] Finally, Mr Somers submitted that Mr Mitchell did not in fact have a reputation as a cheater and therefore this imputation was not substantially true.  But whether or not he had a reputation as a cheater, he certainly had a reputation as someone whom Twin Galaxies and Jeremy Young had alleged was a cheater. Also, for the reasons discussed below in considering his reputation at the time of Mr Jobst's videos, it is clear that, consequent on those allegations, he had a reputation as a cheater in that respect.

[301] In my view, the imputation that he had been exposed as a cheater at the time of the video is substantially true, whether or not that reputation was based on fact (which I need not decide).[206]

*Second contextual imputation – banned from submitting scores to Twin Galaxies for cheating*

[302] Mr Jobst relies, for this imputation on the words I have set out at [84] above and on the following sentence during the section of the offending video concerning Mr Rogers:[207]

> Over the years, many of his [Rogers'] scores were proven to be physically impossible.  Alongside Mitchell, Rogers was also banned from Twin Galaxies after an extensive investigation into his scores.

---

[204]   T4-64.
[205]   For example, exhibit 42.
[206]   Mr de Waard expressly disclaimed any suggestion that he was setting out to prove that Mr Mitchell had in fact cheated.
[207]   TB[16], 01:35.

[303] Mr Somers dealt with this allegation and that concerning the first contextual imputation together.

[304] I doubt whether most viewers of the video would have noticed this aside about Mr Mitchell, but any who did would have understood from it that Mr Mitchell had been banned from submitting scores to Twin Galaxies. In the context where Mr Jobst asserted that Mr Mitchell had cheated and had been exposed publicly by Twin Galaxies as having cheated to obtain those scores, any reasonable viewer would have understood that Mr Jobst was imputing that he had been banned from submitting scores because he had been exposed as a cheater. Therefore, the imputation was made.

[305] There is no doubt that Twin Galaxies did ban Mr Mitchell from submitting scores to it, as a consequence of its finding that he had not used original unmodified Donkey Kong hardware to achieve at least two of his scores. Its announcement said that the rules for submitting scores for the original arcade Donkey Kong competitive leaderboards required the use of original arcade hardware only; it had concluded that Mr Mitchell's scores of 1,047,200 and 1,050,200 "were not produced by the direct feed output of an original unmodified Donkey Kong Arcade PCB;" and:

> Twin Galaxies administrative staff has unanimously decided to remove all of Billy Mitchell's scores as well as ban him from participating in our competitive leaderboards.

[306] Although the announcement did not say expressly that Mr Mitchell had cheated to obtain those scores, Twin Galaxies' conclusion that he had breached the relevant rule and achieved the scores using something other than original unmodified Donkey Kong arcade hardware was clearly a conclusion that he had cheated to obtain those scores. That was the basis for removing his scores and banning him from participating in its competitive leaderboards. (The way to participate in those leaderboards was to submit scores to Twin Galaxies.)

[307] Therefore, this imputation was made and it was substantially true. It is beside the point that subsequently Twin Galaxies and Mr Mitchell settled their dispute, with Twin Galaxies making the statement to which I have referred and reinstating Mr Mitchell's scores to its historical database.[208]

*Third contextual imputation – Mr Mitchell planned a fraudulent video*

[308] For this imputation, Mr Jobst relies on this passage from the video, in which he was speaking about the proceeding by Mr Mitchell against Mr Race:[209]

> This epic side battle is far too involved for me to break down in complete detail, but the crux of the matter is that David ended up releasing a recording of a phone conversation between him and Mitchell. In this conversation Mitchell explains to Race a scheme to create a new video tape and claim it as the recording of one of his disputed scores. More specifically the score of 1,062,800 which to date does not have a full public video. This conversation was entered into evidence to both show the deceiving nature of Mitchell ....

[309] Mr Somers submitted that the imputation alleged does not arise from this passage. With respect, I disagree. This passage, but particularly the second sentence, would

---

[208]  Exhibit 37. See [48] above.
[209]  At 14:00. The words relied on by Mr Jobst are underlined. I have added additional words, in order to give the passage some context.

clearly be understood by the ordinary reasonable viewer of the video as having that imputation.

[310] The real issue is whether this imputation was substantially true.  Mr de Waard relies on a transcript of the relevant telephone call as demonstrating its truth.[210]  Mr Somers contends that the transcript clearly shows what Mr Mitchell was proposing.  That was also explained by Mr Mitchell in his evidence.

[311] Essentially, the substantial truth or otherwise of this imputation depends on an unbiased reading of the transcript, aided by Mr Mitchell's evidence about it.

[312] Mr Mitchell said in evidence[211] that he was, at the time, convinced that the Twin Galaxies investigation was not being conducted properly.  He decided to demonstrate that he could still play a Donkey Kong game on unmodified arcade hardware and score 1,062,800 and, at the same time, he would demonstrate that the investigation was shoddy.  So he planned to play a game to that score and record it in two different ways.  The first would be in the way it was recorded at the time that he first obtained the record scores, by a direct feed from the electronic components of the board, so showing only the gameplay.  The second would be a video taken of him playing the game, in which he would show what date he was playing it and that he was playing the exact game that was recorded electronically.  He would anonymously send the direct feed tape to Twin Galaxies, which would believe it was of his original game played in 2010.[212]  He thought Twin Galaxies and others would criticise it as not having been played on original hardware.  He would allow them some time to deal with it and would then release the video online, showing that he was playing the game in 2018 and on original hardware.  He hoped by this method to show up Twin Galaxies as biased against him and as fools.  In the end he did not execute that plan.

[313] Mr Mitchell's evidence about his intention and what he was explaining to Mr Race in that telephone conversation was not challenged in his cross-examination.[213]  It is entirely consistent with what he is recorded in the transcript as having said in the telephone conversation.  I accept it as true, not only because I have found him to be a credible witness, but also because it accords with my reading of the transcript.  It was clear from that transcript that Mr Mitchell was not proposing to attempt to pass off the tape of the gameplay as that of his 2010 record, because he was proposing to say, in the video of him playing it, that he was playing that game in April 2018.  The contention that he was attempting fraudulently to use the tape as evidence of his record gameplay is the product of an overly suspicious mind.

[314] Therefore, this imputation, although made, was not substantially true.

*Fourth contextual imputation – callously expressed joy at reported death of Apollo Legend*

[315] Mr Jobst relies for this imputation on this passage from the offending words:

---

[210]  TB[4].  The part of the transcript in evidence records only 11 minutes of a 63 minute conversation that occurred on 1 April 2018.

[211]  T1-67 – 68.

[212]  I understand that the original tape of that record-scoring game, which Mr Mitchell had sent to Twin Galaxies and which had led to it recognising the record in 2010, had gone missing.

[213]  The only reference to the conversation is at T3-25, where Mr de Waard suggested that it would have been impossible for Mr Mitchell to stop the game at the same score as the original world record, which Mr Mitchell denied.

Not that Billy Mitchell would ever care though.  In fact, when Billy Mitchell thought Apollo died earlier, he expressed joy at the thought.

[316] While saying those words, Mr Jobst put up on his video a screen shot of the following text messages, in which Mr Mitchell was identified but his interlocutor was not:[214]

WM:  My wife found online … Apollo Legend is dead  No joke

CP:  What? OMG

WM:  If it is true I will not shed a tear
       I will try my very hardest not to smile or giggle

[317] Mr de Waard submitted that a reasonable viewer would draw the imputation from Mr Jobst's words.  He submitted that Mr Mitchell accepted that proposition in his evidence.  With respect, that was not so:  Mr Mitchell simply accepted that Mr Jobst had said those words.[215]

[318] Mr Mitchell denies that the imputation that he had expressed joy at the thought of Apollo Legend's death arises from these matters.  Nor, if it is made, is it defamatory of Mr Mitchell.  It is clear, from the words shown on the screen at the same time as Mr Jobst was speaking the words pleaded, that Mr Mitchell was being facetious, or engaging in what Mr Mitchell, in his evidence, described as "dark humour," rather than genuinely expressing joy at the thought of Apollo Legend's death.

[319] Alternatively, Mr Mitchell contends, the imputation is not substantially true, essentially for the same reason:  Mr Mitchell was not expressing joy at the thought, but being facetious.

[320] I consider that any reasonable viewer of the video would understand Mr Jobst's statement as meaning that Mr Mitchell had, some time before Apollo Legend's death, expressed joy at the thought of his death.  Even with the actual words of Mr Mitchell's messages shown on the screen, a reasonable viewer who read them quickly while listening to Mr Jobst may well consider them to be a genuine expression of Mr Mitchell's thoughts about Apollo Legend's death, rather than simply being facetious.  If a genuine expression, they would ordinarily be seen as very callous.  Therefore, I do consider that the imputation arose from the video.  It is also defamatory, as the fact (if true) that Mr Mitchell had expressed joy at the thought of another person's death would, in my view, lower him in the estimation of ordinary reasonable people.

[321] Mr Jobst contends that the imputation is substantially true.  Particularly in the context of the full exchange of text messages between Mr Mitchell and Mr Piñeiro, together with earlier text messages that Mr Mitchell had exchanged with Mr Hall on the subject of Apollo Legend,[216] Mr Mitchell was expressing joy, whether or not facetiously, at the thought of Apollo Legend's death.  It was callous of him to do so.

[322] Mr Mitchell contends that the imputation is not substantially true.  To demonstrate that proposition, Mr Mitchell pleaded and gave evidence about, and Mr Somers

---

[214]   TB[3].  The messages were in fact exchanged on 21 March 2018 between Mr Mitchell and Mr Piñeiro.
[215]   T3-25:39-42.
[216]   TB[2].

66

referred to, the background to these comments being made by Mr Mitchell.  In short compass:

(a)     on 17 February 2018, Apollo Legend published his first video about Mr Mitchell;[217]

(b)     on 24 February 2018, Mr Mitchell attended an event called Retro Arcade Night in Fort Lauderdale, Florida, his attendance having been previously advertised by the organiser of the event;

(c)     Apollo Legend attended the event in a costume designed to make him look like a cartoonish version of Mr Mitchell;[218]

(d)     Mr Mitchell and Apollo Legend met and had a discussion, in which Apollo Legend asked a lot of questions and then left, without introducing himself to Mr Mitchell;

(e)     Mr Mitchell later found out that Apollo Legend was that person;

(f)     the organiser then had solicitors write to Apollo Legend and showed Mr Mitchell the letter, because it appeared that Apollo Legend himself or someone on his behalf had recorded his actions at the event without anybody's consent, which is apparently prohibited under Florida law;

(g)     Mr Mitchell heard and saw (online or elsewhere) nothing further from or about Apollo Legend for some weeks;

(h)     that led Mr Mitchell to send this message to Mr Hall on 19 March 2018, in response to which Mr Hall said he did not know Apollo Legend and his opinion was irrelevant to the Twin Galaxies investigation:

> What happened to your buddy Apollo Legend… Did he die…???
> He is completely missing in action…
> Of course everything I am stating is in a facetious manner…
> However we did seem to silence him completely…
> Couldn't happen to a nicer jackass.

(i)     on 21 March 2018, Mr Mitchell sent to Mr Hall (who did not respond) and later that evening to Mr Piñeiro, the text messages that I have set out at [316] above, although ending the latter message to Mr Hall with, "No promises."

[323]   Mr Somers also referred to later text messages between Mr Mitchell and Mr Piñeiro that evening, in which Mr Piñeiro said that he had found a report online that Apollo Legend had died from a spider bite, which he said seemed like a post by a "troll". They commented that Mr Rogers (about whom Apollo Legend had also made a video) collected spiders, as to which they said:

> CP:    Todd collects spiders.  And Apollo death by spider.
>
> WM:   Yeah I'm going to buy Todd a pizza when I see him.
>
> CP:    Hahaha.

[324]   Mr Mitchell said that, at the times he sent these messages, he did not believe that Apollo Legend was dead.  One of the sources of the information was Reddit, which

---

[217]    See [63] above.

[218]    A photograph of Mr Mitchell and Apollo Legend is shown by Mr Jobst during his video.  Mr Jobst said that that photograph had been published by Apollo Legend on another video published after the event.

67

he considered to be an unreliable source.  He could not remember the other source. That was why he felt it appropriate to use his black humour.  Had he really thought Apollo Legend was dead, he would not have done this, but his reaction would have been closer to his reaction when he was told about Apollo Legend's goodbye video: he tried (through Mr Mitchell Jnr) to reach out to Apollo Legend and, when he found out that he had died, he was shocked and upset.

[325] I have no doubt that Mr Mitchell was being facetious in making his comments on the possibility of Apollo Legend's death:  that is, he intended his remarks to be amusing or, as he termed it, black humour.  He did not make the comments publicly, but they were still inappropriate, as he acknowledged during his evidence, saying that he regretted having said it.

[326] But even if the reasonable viewer were to recognise that Mr Mitchell's words were facetious, they were still facetiously expressing pleasure or joy at Apollo Legend's reported death.  Although an attempt at a joke, the comments do, in my view, express a form of joy at the thought of Apollo Legend's death and they do so callously, even though facetiously.  Therefore I consider that the imputation was substantially true.

*Fifth contextual imputation – using litigation to force others to recognise his achievements*

[327] Mr Jobst relies for this imputation on six statements made by him in his videos. Mr Mitchell denies that the imputation arises.  Alternatively, he contends, if it arises from the video, it is not defamatory or, if it is, it is not substantially true.

[328] Of the six statements relied on by Mr Jobst, five in particular seem most likely to be capable of making this imputation:

   (a)   "the biggest conmen in video game history have filed even more lawsuits in retaliation for their fake scores being removed;"

   (b)   "the list of victims that have been attacked by Mitchell through the legal system continues to grow;"

   (c)   "I'm guessing this is just another attempt at strong-arming them [Guinness World Records] into giving him back his record, which is exactly what happened when Billy Mitchell threatened to sue them back in 2019;"

   (d)   "I am personally of the opinion that this new lawsuit is just another attack on someone that Mitchell wants to hurt for speaking out against him;" and

   (e)   "Now let's do a quick rundown of the current legal action Mitchell is taking," followed by references to his claims against Twin Galaxies, Jeremy Young, Jeff Harrist and Apollo Legend.

[329] The third of these, although actually talking about Mr Rogers suing Guinness World Records for removing one of his records, clearly raises the imputation that Mr Rogers was suing it to force it to reinstate his record.  Mr Jobst then applies that imputation directly to Mr Mitchell.  That alone raises the imputation.  As to the others, I consider that an ordinary reasonable viewer would take from the video as a whole, including those statements, that Mr Mitchell had a tendency to sue anyone of potential influence who said publicly that he did not achieve his record scores legitimately.  Therefore, this imputation does arise from the video.

68

[330] Mr Jobst contends that the imputation is substantially true.  He relies on Mr Mitchell's court proceedings against Twin Galaxies in both California and Florida, his proceeding against Jeremy Young, Jeff Harrist and DonkeyKongForum.com in Florida and his proceeding against Apollo Legend in Florida, as well as his threat to sue Guinness World Records.

[331] Mr Mitchell contends that the imputation is not true, because the litigation was, in each case, for defamation, not for an order or other resolution to force the defendants to recognise his scores.  That is true, in one sense, but even the outcome of the Twin Galaxies litigation (and, indeed, the threat to sue Guinness World Records) was that those two bodies reinstated his scores as part of their settlements with him.[219]

[332] Although not seeking orders for reinstatement, simply suing (or, in the case of Guinness World Records, threatening to sue) a person for defamation for having alleged that his scores were the product of cheating clearly has the intention of reinstating public recognition of his achievements, at least by a court judgment to the effect that he had been defamed by allegations that he had cheated to obtain them.  One of the principal purposes of a proceeding for defamation is to obtain damages and a court judgment that will restore, as best a court can, the plaintiff's reputation by declaring, effectively, that the harm to that reputation caused by the defamatory statement was unjustifiable.  The result of such a judgment is, at the least, to attempt to persuade others that his records were achieved legitimately.  By May 2021, Mr Mitchell had commenced legal action against a number of people and corporations who had accused him of cheating (or of not using original unmodified arcade hardware) to obtain his world record scores.  I am therefore satisfied that the imputation is substantially true.

[333] As I record later,[220] this allegation is relied on by Mr Jobst not only as a substantially true contextual imputation, but also as a pre-existing bad reputation of Mr Mitchell.  I am satisfied that Mr Mitchell actually had that reputation before Mr Jobst published the video (in which he made the allegation that Mr Mitchell and Mr Rogers were suing everyone in unmeritorious lawsuits).  A number of witnesses gave evidence that they became aware of the proceedings at about the times that Mr Mitchell commenced them, as there were publications about them on electronic media websites, such as Reddit.  They referred to online discussions and debate about the proceedings – particularly about the Twin Galaxies litigation – and several witnesses gave evidence to the effect that the general consensus was that the litigation had no merit.

[334] Mr Somers submitted that the imputation is not defamatory of Mr Mitchell, nor was Mr Mitchell's reputation to that effect an existing "bad reputation."  A reasonable viewer would not think less of him because he sued people who called him a cheat or who had removed their recognition of his scores on that basis.  In doing so, he was entitled to pursue his legal rights and to seek to restore his reputation by that method.

[335] This submission would be correct if the reputation were simply that he sued people to enforce his legal rights in the face of false and defamatory statements.  However, in

---

[219]   Mr Jobst contended that they did not reinstate his scores because Twin Galaxies only agreed to record his scores in its newly created historical database, not on its competitive leader board, where they had originally been recorded.  But the fact is that they are records achieved many years earlier, but they are now recognised by each body as having been world records by Mr Mitchell.  I consider that both bodies reinstated the records that Mr Mitchell had achieved.

[220]   At [341].

my view the imputation raised by Mr Jobst contains within it an implied assertion that the litigation was without merit and was for illegitimate purposes (just as Mr Jobst expressly asserted).  I have no doubt that an ordinary reasonable person who understood that Mr Mitchell sued people who accused him of being a cheat, even though he was in fact (according to his reputation) a cheat, would conclude that his litigation was unmeritorious and would think less of Mr Mitchell as a result.

*Conclusions on contextual imputations*

[336]  In summary, I have found that:

(a)  the imputation that Mr Mitchell had been publicly exposed as a cheater was made in the video and was substantially true;[221]

(b)  the imputation that Mr Mitchell had been banned from submitting scores to Twin Galaxies for cheating was made and was substantially true;

(c)  the imputation that Mr Mitchell had planned to create a fraudulent video was made, but it was not substantially true;

(d)  the imputation that Mr Mitchell had callously expressed joy at the thought of Apollo Legend's death was made and was substantially true; and

(e)  the imputation that Mr Mitchell used litigation to force others to recognise his achievements in video gaming was made and was substantially true.

**Effects of imputations and contextual imputations on Mr Mitchell's reputation**

[337]  I shall now consider whether the imputations that I have found arose from the publications have adversely affected Mr Mitchell's reputation, taking into account both his existing reputation at the time of the publications and the contextual imputations that I have found to have been made.

*Evidence of reputation generally*

[338]  Reputation is a person's standing in the community:  that is, what other people think of the person.  It is distinct from the person's character, which describes what the person is, rather than what others think of her or him.  A plaintiff is presumed to have a good reputation, but may still call evidence about his or her good reputation.  Similarly, a defendant may call evidence of the plaintiff's bad reputation.  In both cases, the evidence must be of the plaintiff's general reputation, not what individuals think of her or him, nor of specific events that may contribute to that general reputation.  However, evidence may be called of specific events that are sufficiently notorious that they contribute to the general reputation.[222]

[339]  As the author of *Defamation Law in Queensland* usefully summarises:[223]

---

[221]  To make it clear, I do not find that it was substantially true that he was a cheat, just that he had been exposed publicly as a cheat, regardless of whether that exposure was correct.  I was not asked to determine – and it is not relevant to the issues raised by the pleadings in this proceeding – whether he had in fact cheated in any way to achieve his record scores.

[222]  This paragraph is substantially based on *Amalgamated Television Services v Marsden* [2002] NSWCA 419, [1371], which usefully refers to the relevant principles and cases.  See also P George, *Defamation Law in Queensland* (LexisNexis, 4th ed, 2023), 103-104 [4.2].

[223]  P George (note 222), 104 [4.2].  Citations omitted.

70

> A witness as to reputation need not know the plaintiff personally and evidence can be given by those who have heard of the reputation and can say what people generally think of the plaintiff. This may particularly apply in the case of a public figure where defamatory matter may do the plaintiff more harm amongst those who do not know the plaintiff personally than amongst those who do. However, the best evidence is from a witness who knows the plaintiff well, who has had the opportunity of becoming aware of the opinion of the person's reputation held generally by the members of the … relevant group of persons, and is able to state from that knowledge what the person's general reputation is.

### The alleged pre-existing bad reputation

[340]  Mr Mitchell pleads that the imputations made in the video injured him in his personal and professional reputation, have caused his peers to shun and avoid him, and have caused him hurt, embarrassment and a sense of ridicule, leading to a sense of social shame and isolation.[224]

[341]  Among other things, Mr Jobst has denied those allegations because, he alleges, before the publication of the video, Mr Mitchell already had a settled reputation as a person who:

    (a)  had cheated to gain recognition as the highest, or one of the highest, scorers in Donkey Kong;

    (b)  used litigation processes to coerce others to recognise him as a world record holder in Donkey Kong and to refrain from identifying him as a person who had been found to have cheated at video arcade games; and

    (c)  would ostracise anyone he considered a threat to his world records in Donkey Kong.

[342]  The particulars of the first allegation refer only to five online articles, only one of which was tendered in evidence.[225] That was an article published on Variety.com on 13 April 2018 that reported on Guinness World Records' decision to remove his world records in both Donkey Kong and Pac-Man.

[343]  In fact, as Mr Somers submitted, media articles reporting on matters concerning a plaintiff are not admissible as evidence of the plaintiff's pre-existing bad reputation, in an effort to reduce damages on the basis that the plaintiff's reputation was not further harmed by the relevant defamatory publication.[226] Such evidence must be that of people who know facts concerning that reputation.

[344]  The particulars of the second allegation refer to Mr Mitchell's proceedings against Twin Galaxies, Mr Young, Mr Harrist, Donkey Kong Forum, Mr Race and Apollo Legend. I have discussed those already. They also refer to an article allegedly published by Sky News on 13 September 2019 entitled, "Billy Mitchell: former Donkey Kong world record holder threatens to sue Guinness." Mr de Waard did not seek to tender that article and, in any event, for the reasons discussed above, it would not be admissible.

---

224    Statement of claim, [13].
225    Exhibit 42.
226    *Associated Newspapers v Dingle* [1964] AC 371; *Chappell v Mirror Newspapers Ltd* (1986) Aust Torts Rep 80,691 at 68,951 - 68,955; *Peros v Nationwide News Pty Ltd (No 3)* [2024] QSC 192, [112] – [118], [127]; *Gatley on Libel and Slander* (Sweet & Maxwell, 13th ed, 2022), [34-081], [34-082], [34-086].

[345] The particulars of the third allegation simply say "As shown in the film *The King of Kong: A Fistful of Quarters*" and go on to list the amounts that that production earned in the USA and Canada and the number of times it had been viewed on two YouTube channels.  Mr de Waard did not attempt to prove any of the facts pleaded in the particulars, apart from the film itself.

[346] In this trial, there was evidence from a number of witnesses concerning Mr Mitchell's pre-existing reputation, whether it be good or bad.  I turn now to consider that evidence.

### Mr Mitchell's reputation, before and after publication

*Witnesses*

[347] I preface my consideration of the witnesses' evidence about Mr Mitchell's reputation by noting that, as is probably the fact in many cases:[227]

> there are obvious difficulties in getting witnesses to say that they read the words and thought badly of the claimant … This is because the claimant will have an understandable desire not to spread the contents of the article complained of by asking persons if they have read it and what they think of the claimant, and because persons who think badly of the claimant are not likely to co-operate in providing evidence …

[348] Mr Mitchell has clearly generated a substantial reputation, since he emerged on the arcade and video gaming scene in the 1980s, as a highly skilled player of Donkey Kong and Pac-Man.  He has had a large number of fans and supporters based on that reputation.  He clearly enjoys his fame, saying to the reporter who wrote "The Perfect Man", "If I get recognized six times in a seven-day week, I call that a slow week."  The reporter also quoted him as saying that, when arcade and video games first came to prominence when he was about 16 years old, "Everyone was standing around the Donkey Kong machine and I wanted that attention."[228]  He was also reported as having compared himself to the astronaut Neil Armstrong, having said in 2016:[229]

> Who was the first one to the moon?  Neil Armstrong.  Who was the first person to get a perfect score on Pac-Man? Billy Mitchell.  I was the first one.  No one cares who was the second.

[349] It seems to be uncontroversial that, at least since the challenge to his scores by Jeremy Young and the result of the Twin Galaxies investigation and announcement, he also has had a large number of detractors, most of whom consider him to have cheated in order to secure his records in Donkey Kong (although not Pac-Man).

[350] It is necessary now to traverse the evidence about Mr Mitchell's reputation, both before and after the publication of Mr Jobst's video.

[351] In an annexure to his written submissions, Mr de Waard very helpfully set out extracts from the transcript of evidence by both plaintiff and defendant witnesses about Mr Mitchell's reputation.  He divided that reputation evidence into four time periods: after "King of Kong: A Fistful of Quarters," after the Twin Galaxies dispute and

---

227     *Sobrinho v Impresa Publishing SA* [2016] EMLR 12, [47]; also *Ames v Spamhaus Project Ltd* [2015] 1 WLR 3409, [48].

228     Exhibit 12.

229     Exhibit 13: "Meet the 'Neil Armstrong' of Pac-Man", www.cnn.com, 2 May 2016.

72

[351] decision, after other litigation by Mr Mitchell became public and after Mr Jobst's video. While useful, and without disrespect to Mr de Waard or to the witnesses, I do not propose to set out or refer to all that (or other) evidence. I shall, however, describe what I consider to be the most relevant.

[352] Clearly the effect of the film "King of Kong: A Fistful of Quarters"[230] on Mr Mitchell's reputation depends on one's perception of him as shown in it. It was a film (or a "docudrama"), so it is likely that an ordinary reasonable person would realise that Mr Mitchell's true character may not have been correctly portrayed in it.

[353] His portrayal in the film was described by David Race:[231]

> In the film he is viewed as a cocky, arrogant personality; a character. He could be viewed as like a heel or a – or as portrayed as the bad guy. It's like a pro and con. It's like a – you know, the underdog Steven Wiebe against somebody who won't play in public like Billy Mitchell, or at least that's how it's portrayed.

[354] Mr Angliss said he was:[232]

> pretty notorious, I guess. That character from the documentary is – is pretty robust and – um – an interesting charac – character. I don't know if – especially the Australian community, I don't know if we understood how much of that character was real or how much of that character was porpray – portrayed for the documentary – ah – but what you take from the documentary is a pretty notorious and intense character.

[355] Mr White said:[233]

> After watching the film – uh – my impression of Mr Mitchell was a narcissist, a bully and just kind of an all-around bad guy.

[356] These comments appeared not so much to give evidence of Mr Mitchell's reputation, but rather the witnesses' personal views about the effect of the film on their individual perceptions of him. However, personal views are not, of course, evidence of reputation, being simply that: personal to the witness.

[357] The portrayal of Mr Mitchell in the film, as I perceive it from watching the film, appears partly to reflect his character and is partly a dramatised and probably exaggerated portrayal of a person who does not like to be challenged. However, I do not consider that his portrayal in that film equates to or necessarily contributed to his reputation, as opposed to his fame. An ordinary reasonable viewer, while perhaps perceiving his portrayal as having the characteristics described by Mr Race, would not conclude that it was necessarily accurate, recognising that it was not a straight documentary, but had clearly been dramatised to make it more likely to attract audiences (as it did). Of course, as I have said above, character and reputation are, in any event, two different things.

[358] Of more relevance in determining his reputation at the time of the offending video, it seems to me, is evidence of Mr Mitchell's interactions with people at conventions or other events that he attended at the invitation of the organisers. While most of the witnesses called in the trial gave evidence of Mr Mitchell's reputation as they

---

[230]   Briefly described at [28] above.
[231]   T5-47.
[232]   T6-91.
[233]   T6-8.

perceived it, Mr Mitchell's witnesses all knew him personally and their evidence was mostly about their direct observations of his reception by attendees at gaming conventions, both before and since the publication of Mr Jobst's video.

[359] Mr Mitchell Jnr said that he has attended several events with his father. He described Mr Mitchell's reception in this way:[234]

> Attendees would recognise him and approach him, and they were very much excited to see him and in awe, just because the person that they'd seen on film and in the public eye was there, kind of, in the flesh for them. They would approach him, want to talk to him about films and such and ask them to sign – ask him to sign merchandise that they brought. They would buy merchandise from him and ask him to sign it, overall very just – normal sort of – conversational and people purchasing stuff and signatures and very – lot of positive interactions.

[360] He produced several photographs taken at one event that Mr Mitchell had attended in July 2019. He was asked and answered:[235]

> And the way that people are gathering around and holding up their phones and those sort of matters; are they regular things that occurred at appearances that your father attended at with you?---Yes.

[361] Mr Mitchell Jnr also gave some evidence of the apparent effect of Guinness World Records' announcement on 17 June 2020 that it had reinstated Mr Mitchell's world records. He said that, shortly after it was made and widely reported, Mr Mitchell received two new offers of paid appearances.[236]

[362] Walter Day said he has attended gaming events with Mr Mitchell on many occasions. On such occasions, he said:[237]

> The level of fame that Billy has enjoyed, especially at events, is tremendous. He would be just – people would just be surrounding him. He was such – he was such – so much the centre of attention it was quite amazing. Very, very popular, very, very loved, very appreciated, and – and then some people went on because he was a – a larger than life personality. He was highly revered. And this went on event after event after event.

[363] Mr Day said that, after the Twin Galaxies announcement that it was removing Mr Mitchell's records, he continued to go to events with Mr Mitchell and observed that he was still very popular, he was asked for his autograph quite a lot and he was approached by a lot of people wanting to be photographed with him.[238]

[364] Michael McNutt was the founder of a convention called "All Star Comic Con." It was a pop culture and comic book convention with a video game element to it. It was held in Virginia in 2018 and 2019 and had about 5,000 attendees each time. Mr McNutt invited Mr Mitchell to attend the 2019 convention as a "celebrity guest," flying him to Virginia and paying him an appearance fee of $5,000. The reactions to Mr McNutt's advertising that Mr Mitchell would appear then was generally very

---

234    T3-69.
235    Exhibit 49; T3-70.
236    T3-79.  Mr Mitchell himself gave similar evidence and said two of them were from organisations that had never contacted him before: T1-72 – 73.
237    T4-6.
238    T4-8.

positive, with people expressing excitement at the prospect.  He said the effect of Mr Mitchell's attendance and his considerable participation in the event were very positive and attendees mentioned his presence as a highlight of the event.[239]

[365]   Preston Burt is a founder and organiser of an annual convention called "Southern-Fried Gaming Expo," which has been an annual event since 2014 and celebrates video gaming, arcade machines and pinball machine culture.  He first came to know of Mr Mitchell when he saw the "King of Kong" film, which led him to invite Mr Mitchell to attend the first of these events in 2014.  Mr Mitchell agreed, leading to Mr Burt advertising widely that he would be attending.  Mr Burt said that Mr Mitchell was very approachable and mingled with the attendees throughout the opening hours.  Apart from mingling, he signed autographs, engaged in a panel interview and undertook a "Battle Billy Mitchell" competition with other people.  Mr Burt described attendees' interactions with Mr Mitchell as being very excited, taking pictures with him, joking with him and, in feedback from attendees, they were excited and very pleased to have met him and commented that he was totally against the type that he appeared to be in "King of Kong."  Mr Mitchell subsequently attended the expo in 2015, 2017, 2018 or 2019 and 2020 (the last virtually) and Mr Burt said he would welcome him there any time and had recommended him to others as a celebrity guest at events.[240]

[366]   Mr Burt said Mr Mitchell:[241]

> interacted with fans, um, and a – and played the part that they wanted him to play, whether that was posing for pictures with the – an angry face and his fist up or just smiling with a big thumbs up.  …

> Now, you just said before that he'd play the part they wanted him to play.  What did you mean by that?---Uh, well, the – most people who were already familiar with, uh, Billy Mitchell were probably from the King of Kong.  And in that film, he was sort of the bad guy, um, and so people perceived him to – to be the bad guy and they wanted that bad guy persona for the pictures.  Um, so that's what he gave them.

[367]   Steven Grunberger is from Melbourne and is a fan of video gaming.  He went to the Australian Kong Off in 2019, particularly in order to see Mr Mitchell.  He described Mr Mitchell's involvement and his perception of the attendees' reactions as he observed them, as:[242]

> … he does everywhere.  Um, you know, meets and greets people, shakes hands, photos, uh, autographs, everything.  …

> … very well.  Uh, everyone was happy to meet him.  Um, I guess a lot of people knew of him and actually getting to meet him was – was good.

[368]   Isaiah Johnson, when asked if he knows Mr Mitchell, responded enthusiastically, "Everybody knows Billy Mitchell."[243]  He first met him in 2008 and between then and about 2020 annually attended four or five events also attended by Mr Mitchell.  He described his observations of other attendees' interactions with Mr Mitchell:[244]

---

[239]   T4-16 – 18.
[240]   T4-62 - 67.
[241]   T4-64.
[242]   T4-70 -71.
[243]   T4-78.  One might say, without criticism, that all Mr Johnson's evidence was given enthusiastically.
[244]   T4-79.

People crowd around him.  They love to – everything that he's done in gaming they know about and he has a rich history because the conventions he goes to lionises all of the stuff that he's done then till now, and it just keeps building up.  So when you go around there's this one machine that they put in front of him, whether maybe Pac-Man or Donkey Kong, and he's sitting there and people crowd around him to watch it.  And with today's technology, or technology at that time they can hook it up to a screen and you have an audience that watches it and everything.

[369] He was asked about Mr Mitchell's reputation after the Twin Galaxies dispute and decision became public.  He said:

In terms of the audience though, the audience really didn't care like that – that – it's a – a beef between them.  So you have your nay sayers, but the lion's share of the audience still come out, still support Mitchell, still watches, um [indistinct]  Still goes to his Twitch.  Still watching 17 million point record.  Still watches that Guinness reinstate his records and all that other stuff.  Still talks about him.

[370] James Angliss (apparently better known as Jimmy Nails), who was called by Mr Jobst, gave evidence of Mr Mitchell's reputation after the publication of "King of Kong."  He accepted that people did not know whether the character portrayed by Mr Mitchell in that film was real or a film character.

[371] In 2018, Mr Angliss became aware of the Twin Galaxies allegations and followed the debate about it closely.  Subsequently, he became aware of Mr Mitchell's litigation against Twin Galaxies.  He was asked to describe Mr Mitchell's reputation in the gaming community at the time that he became aware of that litigation, responding that it was "very shook" because he, and he believed others, put a lot of weight on the Twin Galaxies "submission" (by which I assume he meant, conclusion).  He went on to say that, when Mr Mitchell's litigation against Twin Galaxies, Mr Young, Donkey Kong Forum and Apollo Legend were on foot, Mr Mitchell's reputation had "tanked … about as far as it could go" because most of the gaming community believed the Twin Galaxies assertions and believed he was a cheat.  He said that Mr Mitchell's reputation has not changed since then, including in the wake of Mr Jobst's video.[245]

[372] Notwithstanding the Twin Galaxies dispute and what he said about Mr Mitchell's reputation as a consequence, Mr Angliss tried to secure Mr Mitchell's (and Mr Day's) attendance at his Australian Kong Off in 2018 and in 2019.  In emails that he sent to Mr Mitchell in each of those years, he described Mr Mitchell's (and Mr Day's) potential and (in 2020) actual appearance in 2019:[246]

[2018]  Mostly we want to create events that people walk away from with massive smiles on their faces shaking their heads going what on earth just happened in there:)  I trust you guys will bring that exact vibe to this event …

[2019]  Going to be an incredible event and with you and Walter in the house it is going to send it into the stratosphere.

[2020]  Firstly thank you both so much for making the very long flight to Brisbane last year.  Without a doubt you both made it the most memorable Kong Off to date and truly made many peoples dreams come true.  …  Everyone has commented on how easy both of you were to talk with and what a positive

---

[245]   T6-91 – 93.
[246]   Exhibits 14 (4 May 2018), 15 (29 March 2019) and 16 (9 January 2020) respectively.

> experience it was having you competing and cheering people on. … Everyone would love to see you guys again …

[373] This shows that, notwithstanding any reputation he had, he remained a popular drawcard at gaming events.

[374] After the Twin Galaxies announcement of its finding was published, in essence Mr Mitchell's witnesses said that his reputation was not affected, as he was still in demand and his attendance at events was still sought and attendees sought him out and appeared pleased to see him. Mr Jobst's witnesses, on the other hand, mostly described his reputation in the gaming community as "shot," that of a cheater, not trustworthy, using illegitimate means to obtain his high scores and dishonest.

[375] Some of the defence witnesses also said that, particularly by the time of Mr Jobst's video, Mr Mitchell had a reputation as a spiteful person who sued people who alleged in well-viewed public forums that he was a cheat. For example, Mr Piñeiro said his reputation went from being a cheat to being a person who will go after you with lies. Mr Race said he had a reputation as a vindictive person who would take out lawsuits against people who called him out on cheating.[247]

[376] None of Mr Mitchell's witnesses was specifically asked about this alleged aspect of his reputation.

[377] The final aspect of the relevant evidence concerned Mr Mitchell's reputation after Mr Jobst's video was published.

[378] Mr Mitchell said that he saw a number of the comments made on Mr Jobst's YouTube channel about the video. He said every one was negative, in that they conveyed how correct Mr Jobst was or how wrong Mr Mitchell was. He went on:[248]

> But the worst were those that zeroed in or focused on the suicide allegation, the allegation that I pushed or hounded Apollo Legend to kill himself. …
>
> … the thing is every time he puts out a video – every single time he puts out a video, people talk about the allegations in the comments of the original video from May 26th. So what they do is they repeat the allegations from May 26th that he did … in the comments section of whatever video he is doing. … I've looked at every one of his videos and virtually every single one has comments, "Oh, yeah, don't forget about Billy. He's the guy that drove Apollo Legend to his death", "Oh, don't forget about Billy. He's a killer," … and they multiply on and on and on and people who are too ignorant to the truth sit there and repeat it over and over and over again because of the original video …

[379] Finally, Mr Mitchell gave this evidence:[249]

> It's been three years and people, whether I'm at an interview, or whether I go to a convention, or even common people – I'm not going to tell you they attack me because they don't. It's rather neutral, but they'll say, "How you doing?" And I'll say, "Good," or, you know, "I have my humour." They said, "How you doing?" I say, "Not as good as you, but I'm doing good." And they go, "Well, what's going on? I – I – I heard you are – you're suing some guy or something." Or they'll say, "Oh, I heard you – you caused some guy to commit

---

247    T6-36 and T5-54 respectively.
248    T1-86 – 87.
249    T1-93.

77

suicide, and so now you're suing somebody." And they have half facts, stupid facts, no facts, wrong facts and I have to explain it to them all the way through. I can't get upset at them. They're just asking me a question.

[380] Mr Mitchell Jnr said that, in May 2021, he noticed a sudden appearance of responses to tweets on Mr Mitchell's Twitter account along the lines of, "You drove Apollo Legend to suicide. You killed Apollo Legend. You murdered Apollo Legend." He had not seen any such tweets before.[250]

[381] Mr de Waard set out, in his annexure, evidence from several of the witnesses called by Mr Mitchell, who said that they and others still consider Mr Mitchell to be a friend, or that they would still invite him to events and recommend his appearances to others. I understand him to rely on that evidence as supporting the proposition that Mr Mitchell's reputation has not changed since the video was published.

[382] Mr de Waard also relies on evidence from all the defence witnesses to the effect that, since the video, Mr Mitchell's reputation has not changed. He continued to have a reputation as a cheater and as a narcissistic and vindictive person who would sue others who disagreed with or criticised him. Apollo Legend was simply one of those people whom he had sued. Each of the defence witnesses gave evidence to that effect, including Mr Watkins.[251] However, he also said, in a stream of consciousness answer and again shortly after, that Mr Mitchell's text messages with Mr Piñeiro that Mr Jobst showed in the video made his reputation more serious and introduced a new level of evil and genuine malice. In cross-examination, he appeared to say that that reputation also arose in part from the particular words about which Mr Mitchell complains.[252] I must say, though, that his evidence was often difficult to understand.

*Other evidence*

[383] In addition to the oral evidence, a number of documents were tendered that concern Mr Mitchell's reputation at various times.

[384] In a deposition taken from Mr Young on 21 September 2023 in Mr Mitchell's case against Twin Galaxies, Mr Young is recorded as having been asked what Mr Mitchell's reputation was in the Donkey Kong community in 2017. He said (and confirmed in his oral evidence in this trial):[253]

> To the best of my knowledge, it was kind of riding on that King of Kong sort of fake villain kind of energy. … And so – I mentioned earlier that undercurrent of suspicion amongst his scores, plus him kind of having that sort of, you know, whether it was true or not, the bad guy vibe from King of Kong. So on the whole, I would say his reputation wasn't great, but I don't think he was certainly seen as this evil, horrible person.

[385] A number of exhibits are of comments made in various online forums about Mr Mitchell. None of them appears to have been made before Mr Jobst's video was published.

---

[250]   T3-87, 94.
[251]   See [117].
[252]   T6-109, 111, 117.
[253]   Exhibit 86; T6-64 – 67.

78

[386]  Exhibit 88 is a bundle of comments on Mr White's video, "He's So Desperate Now". That video appears to have been published in about late 2023.  Most of the comments are irrelevant, some concern allegations that Mr Mitchell is a cheater (eg, at pp 26, 30, 31, 33, 82), some that he is a prolific litigator (eg at pp 28, 32-33) and some refer to Apollo Legend.  Some of the latter comments (a total of 7) are extracted in exhibit 80, but exhibit 88 has more, including responses to some of the comments.  They appear to have been made in about November 2023.[254]

[387]  The relevant comments on this video, taken from both exhibits, were:[255]

> [p 15] This may be common knowledge, but the same guy that played a big part in bringing Billy Mitchell's cheating to the limelight (Karl Jobst) is … an absolute legend.
>
>> [p 17] Speaking of "legends", don't forget about Apollo Legend, the guy who first exposed Billy Mitchell and was driven to suicide shortly there after.  This situation has been going on for a while now.
>
> [p 75] I'll never forgive Billy for what happened to Apollo Legend.  Everything with the lawsuits pushed this poor guy to his limits.
>
>> Yeah and then went on to gloat about it afterwards. People don't realize the toll Lawsuits can take, frivolous or not.  Both financially and mentally.  Apollo already had mental health trouble, something like that would easily push somebody over the …
>
> [p 76] Never forget what he said about Apollo.  Rest in peace King.
>
> [p 96] Amazing he's still going after Legally bullying Apollo down the sewer slide.
>
> [p 127] It's not about defamation or his feelings, it's bullying, hence why he got satisfaction and amusement when he hear Apollo ended his own life partially due to the financial stresses he was dealing with.

[388]  Exhibit 89 comprises comments on Mr White's video, "He's A Cheater," which he published after the Twin Galaxies settlement with Mr Mitchell was announced (on 16 January 2024).  The comments appear to have been made from January to May 2024.  The relevant comments on this video, taken from exhibits 80 and 89, were:

> [pp 78, 85, 88] RIP Apollo Legend.
>
> [p104] Billy Mitchel IMO[256] was responsible for Apollo Legend's death. (He essentially destabilized Apollo by suing him.)  Rest in peace Apollo Legend.
>
> [p 115] everyone forgets that he literally pushed a man to suicide. This man is a killer.
>
>> [ex 80] Silly Bitchell.  Look up who Apollo Legend was, may he Rest In Peace.
>
> [p 120] What was your opinion on Apollo Legend? Yes, he was writing speedrunner hit pieces towards the end, but I remember his videos on Billy Mitchell before got sued and committed suicide.

---

[254]  Exhibit 80 comprises screenshots of comments on both this video and "He's a Cheater".  The screenshots for the former are dated 27 June 2024 and the comments are recorded as having been made "7 months ago" and "6 months ago", thus probably having been made in November and December 2023.

[255]  Comments that are responsive to other comments are indented. Page numbers are from exhibit 88, except as noted.

[256]  Which I understand is a modern acronym for "in my opinion".

> [p 122] And Apollo legend. Taken out by a billy shill. Wasn't suicide.
>
> [ 144] Apollo legend game ended himself over this right? He's a terrible person.
>
> [ex 80] friendly reminder that billy Mitchell is responsible for the death of youtuber apollo legend fuck that guy.
>
> [ex 80] Don't let them forget that Billy Vanilly is at least partially responsible for the death of Apollo Legend, who took his own life after getting sued by him and that fat fuck who also lied about an impossible record in an old racing game.

[389] I have also referred earlier to TB[23] and exhibit 7,[257] in which a large number of comments were made on Mr Jobst's video, including some that mentioned the death of Apollo Legend and appeared to blame Mr Mitchell for it.

[390] Finally, it is necessary to mention again, the film *The King of Kong: A Fistful of Quarters*. Mr Jobst relied on the film as giving rise to a bad reputation of Mr Mitchell, as a person who ostracises others whom he considers to be a threat to his world record scores.

[391] In cross-examining Mr Mitchell, Mr de Waard showed him two extracts from the film.[258] The first extract shows Mr Wiebe playing Donkey Kong at an arcade (which Mr Mitchell described as having been created in an empty warehouse to look like a Guinness arcade), being watched by a crowd and achieving what a spectator (describing what happens by telephone to Mr Mitchell, who is shown somewhere else) describes as "the first million point game of Donkey Kong" and Mr Day is shown describing Mr Wiebe's final score as "1,047,200 points is the highest I've ever seen."

[392] The second extract shows Mr Wiebe again playing Donkey Kong at an unspecified location. Mr Mitchell enters the game area with his wife, sees Mr Wiebe playing and approaches behind him. Mr Wiebe notices him and says, "Hey Billy." Mr Mitchell does not respond but, after stopping very briefly, walks away. As he leaves, he says to his wife, "There are certain people I don't want to spend too much time with."

[393] Mr Mitchell did not accept that the first extract represented him as shunning Mr Wiebe. He said the scenes, as with other scenes, were cut and edited. Both scenes were part of the narrative of the film, which was to show him as not being prepared to play against Mr Wiebe and demonstrating in public that he could achieve higher scores. He did, however, accept that the film portrayed him as ostracising Mr Wiebe.[259] In his evidence in chief he had said that he did not, in fact, ignore Mr Wiebe, but he stopped and asked him how he was going. What he meant by his comment to his wife was (as I understood his evidence) that, as Mr Wiebe was playing, he did not want to talk to him for too long, which would distract him from his game.[260]

### Conclusions on Mr Mitchell's reputation

[394] I have found that all the imputations alleged by Mr Mitchell were made by Mr Jobst in his video.

---

257  See [122] to [124] above.
258  Exhibit 44.
259  T3-17 – 18.
260  T1-44 – 45.

[395] I have also found that the first and second contextual imputations, that Mr Mitchell had been publicly exposed as a cheater and had been banned from submitting scores to Twin Galaxies, were made in Mr Jobst's video and are substantially true. I am satisfied that a consequence of the truth of those imputations, together with evidence of the defence witnesses and of the comments made since the video was published, is that, when Mr Jobst published his videos, Mr Mitchell already had a reputation, not only as a person who had been publicly exposed as a cheater, but also (if it is different) as a person who had in fact cheated in order to obtain at least some of his record scores, probably by using MAME software instead of original unmodified arcade hardware. That was certainly his reputation after the Twin Galaxies decision and, notwithstanding Mr Mitchell's witnesses' evidence to the effect that he remained a popular attraction at video and arcade gaming events, his reputation in that regard continued to exist at the time of Mr Jobst's video.

[396] Therefore, the first allegation of Mr Mitchell's bad reputation is also proved.

[397] As to the third contextual imputation - that Mr Mitchell had planned to create a fraudulent video – while I have found that it was made, I have not seen (nor has my attention been drawn to) any earlier or later comments or other evidence about it. I am not satisfied that it led to Mr Mitchell having a reputation to that effect, either at the time of Mr Jobst's video or since.

[398] I have found that the fourth contextual imputation - that Mr Mitchell had callously expressed joy at the thought of Apollo Legend's death – was made and was substantially true. However, there is no evidence that, before the publication of Mr Jobst's video, Mr Mitchell had a reputation to that effect. Since his video, the only evidence that anyone was aware of this imputation or the facts on which it is based (the text messages) was the evidence of Mr Watkins to which I referred at [382] above, the comment at page 127 of exhibit 88 and possibly the response to the comment at page 75, both of which I have set out above. I find that he did not have such a reputation at the time of, or after, publication of the video, although no doubt this litigation has led some people in the online gaming community to think of him in this way.

[399] The fifth contextual imputation, concerning Mr Mitchell's alleged use of litigation, was made and was substantially true. I am satisfied that, in the gaming community, he had such a reputation (whether or not it was fair), which has continued since the publication of the video. Indeed, the reputation he had may have been greater than the alleged imputation itself, as it may have been a reputation (however undeserved) for bringing unmeritorious litigation for the purpose alleged.[261]

[400] This reputation is similar to the second allegation of a pre-existing bad reputation. I find that that reputation has also been proved.

[401] Mr Jobst contends that the third alleged bad reputation – that Mr Mitchell ostracised people whom he considered a threat to his world records – arises from the film "King of Kong," particularly the extracts comprising exhibit 44. While the film does, at least in the second extract in that exhibit, portray him as apparently ostracising Mr Wiebe, I am not satisfied that thereafter he had a reputation to the effect alleged. As I have

---

[261]    See [335] above.

81

said above,[262] the effect of the film on Mr Mitchell's reputation depends on one's perception of him as shown in it. It was a film (or a "docudrama"), so I consider that most ordinary reasonable people would realise that Mr Mitchell's true character may not have been correctly portrayed in it. There was no other evidence that this was his reputation after the film (let alone at the time of the offending video); just personal opinions such as those set out at [353] to [355] above.

### The sectors of Mr Mitchell's reputation

[402] In his reply, responding to Mr Jobst's allegations of the contextual imputations, Mr Mitchell pleads that any substantially true contextual imputations relate to different, less serious, sectors of his reputation to that to which Mr Mitchell's pleaded imputations relate. He does not plead similarly to the allegations that he had a settled bad reputation, but Mr Somers submitted nonetheless that those allegations (apart from the alleged reputation of using litigation to coerce others into recognising his gaming achievements) also concerned a different sector of his reputation from that the subject of the imputations on which Mr Mitchell relies.

[403] Mr Somers submitted that the relevant sector of Mr Mitchell's reputation affected by the imputations that he pleads is his general reputation and, as a result of the imputation, whether he had a propensity to harm other persons' health and well-being, or whether he exerted such pressure on people that they hurt, injured or killed themselves. It is too narrow a characterisation to say simply that the imputations related to his conduct as, or in the context of him being, a video gamer. The alleged imputations have nothing, or very little, to do with whether he was a video gamer. He could just as well have been a celebrity sportsperson, academic or scientist: the propensity to do harm to others has nothing to do with his occupation as a video gamer. Whether or not he is a video gamer has no impact on the effect of an imputation that he had hounded someone, or he was a major factor in someone's decision, to commit suicide. Mr Somers did accept, however, that the allegation that he had a settled reputation as someone who used litigation to coerce others into recognising his achievements in video games may relate to the same sector of his reputation as the imputations of which Mr Mitchell complains.

[404] Mr de Waard submitted that these propositions are too restrictive and ignore the circumstances in which the imputations were made. The relevant sector of Mr Mitchell's reputation was his conduct in protecting his reputation as a video gamer. As he put it in his address:[263]

> The litigation between Mr Mitchell and Apollo Legend was about Mr Mitchell protecting his reputation as a video gamer. The death of Apollo Legend has a causal connection between Mr Mitchell protecting his reputation as a video gamer. The contextual truth implication – imputations also relate to him protecting his reputation as a video gamer. So it's the propensity to do harm as the result of trying to protect his reputation as a video gamer. …
>
> [Mr Somers' written submission] talks about the imputation that the plaintiff had hounded a person so as to cause them to take their own life. That misstates the entirety of it because it's – in doing so, it's protecting his video game reputation. And therein lies the importance of not only the entirety of the words but the entirety of the video, because the video is about him going to great

---

262    [352].
263    T7-36 – 37.

82

lengths, having been a cheat, going to great lengths to protect his reputation as a video gamer. The imputation itself doesn't even suggest that Mr Mitchell has physically killed him. It's about the stressors … of putting this gentleman to – with the litigation, because Mr Mitchell has gone to those lengths to protect his reputation as a video gamer.

[405] Mr Somers submitted that Mr de Waard's description of the relevant sector is too narrow, in restricting the propensity to cause harm to the purpose of protecting Mr Mitchell's reputation as a gamer. As he put it:[264]

> There's some similarities with how both sides put the relevant sector and that's a propensity to harm or cause harm to other persons. Now, we say it more broadly in that it's the propensity to harm the person's health and wellbeing, and my friend has put it on the basis that it's directed, the propensity to harm, to protect his reputation as a video gamer. We would say that's too narrow.

> …the essence of the imputation is that because of the fact that we required him to pay so much money, that was a factor in taking his death. It – it's not, to use the *O'Hagan* analysis, because we were a gamer and we settled a gaming proceeding, I'm using my children's language here, a gamer – a video game player, that we caused him to pay so much money. It wouldn't matter. It wouldn't matter if it was a doctor or anyone like that, through a medical negligence case. The sting of the imputation we sue on is no greater because of the fact that we are a video game player.

[406] Mr Somers went on to say that the contextual imputations are in different sectors of Mr Mitchell's life to any propensity to harm other persons' health and well-being. The first and second concern alleged cheating, the third involves fraud or dishonesty. The fourth concerns his callousness. The fifth, though, he accepts is in the same sector as the offending imputations.[265]

[407] I put to Mr Somers that perhaps his description ignores the genesis of the dealings between Mr Mitchell and Apollo Legend: namely, Apollo Legend's critical videos leading to a settlement that, according to Mr Jobst, required Apollo Legend to pay Mr Mitchell a substantial sum of money, which at least contributed to his decision to commit suicide. All of it arose from and concerned Mr Mitchell's desire to protect his reputation as an arcade game record holder and it was in that context – that sector of Mr Mitchell's life - that Mr Jobst made the imputations.

[408] Mr Somers submitted that that was the wrong approach. The correct approach is to look at the nature of the relevant imputation and the sector of the plaintiff's life that is affected by that imputation. He compared this case with that of *O'Hagan v Nationwide News Pty Ltd*,[266] in which the allegation that the plaintiff had arranged to have someone murdered was particularly grave because the plaintiff was a police officer: it went to the essence of, and seriously affected, his reputation as a police officer. But in this case, it would too broad for the court to find that the relevant sector of Mr Mitchell's reputation was his status as a video gamer, as it does not go to the essence of that reputation and has no greater "sting" because of that reputation. The distinguishing factor is whether or not that sting is greater because of the plaintiff's occupation: it was to the policeman because it went to the essence of a policeman's

---

264   T7-108, 110 - 111. The case referred to is *O'Hagan v Nationwide News Pty Ltd* (2001) 53 NSWLR 89.

265   T7-111 – 113.

266   (2001) 53 NSWLR 89.

duties. In contrast, in *Australian Broadcasting Corporation v McBride*[267] the allegation that Dr McBride had a bad reputation as a scientific fraudster was irrelevant to his reputation as a doctor, which was the reputation, or the sector of his life, that was affected by the imputation that he had endangered the lives of his female patients. In Mr Mitchell's case the imputation that he had hounded a person to commit suicide is irrelevant to his occupation as a video gamer and the allegation that he had planned a fraudulent video went to his honesty, not his ability as a gamer.

[409] With respect, I disagree with Mr Somers' submissions. The allegation that Mr Mitchell had contributed to Apollo Legend's decision to commit suicide was in the context of the allegation (indeed, the principal subject matter of the video) that he used litigation to coerce others to recognise his achievements in arcade gaming. His litigation against Apollo Legend was dealt with in Mr Jobst's video as a particularly egregious example of that alleged conduct, which allegedly resulted in Apollo Legend's death. Both Mr Mitchell's and Mr Jobst's imputations concern Mr Mitchell's reputation as an arcade game record holder and his conduct in attempting to defend that reputation. Similarly, the alleged bad reputation (or contextual reputation) as having planned to produce a false video was in the context of him attempting to protect his reputation as such a gamer. Those allegations are irrelevant, for example, to Mr Mitchell's reputation as a hot sauce manufacturer, but they are directly relevant to, and in the context of, his reputation as a gamer. On the other hand, if it had been alleged that his sauces contained poisonous substances or were so hot that they caused physical harm to consumers, those allegations would be relevant to that sector of his reputation but irrelevant to his gaming reputation. Here, one imputation was that, in order to protect his reputation as a gamer, he would litigate against people who claimed he was a cheat at video gaming to the extent of contributing to a person's decision to commit suicide. The other imputation was that he planned a false video as part of his attempting to protect his reputation as a gamer. In both cases, the imputation concerned his reputation as a gamer and affected that reputation. That distinguishes this case from the example of being a murderer given by Levine J.[268]

[410] Therefore, I find that the bad reputation and the contextual imputations that I have found to exist all concern the one sector of Mr Mitchell's life and reputation: that as an arcade gamer with a number of world records.

### *Did the publications harm Mr Mitchell's reputation?*

[411] To reprise the court's task in assessing the respective effects of a contextual imputation found to be substantially true and an imputation proved by the plaintiff and found not to be true, the court must "weigh and measure holistically the relative worth or value of the several imputations contended for by both parties. The defence will fail if the plaintiff's imputations would still have some effect on the plaintiff's reputation, notwithstanding the effect of the substantial truth of the defendant's contextual imputations."[269]

[412] Mr Jobst contends that Mr Mitchell's reputation was not further harmed by the imputations because he already had such a bad reputation, or because of the contextual

---

[267]  (2001) 53 NSWLR 430.
[268]  See [286] above.
[269]  *Nationwide News Pty Ltd v Weatherup* [2018] 1 Qd R 19, [47], [49]; *Trad v Harbour Radio Pty Ltd (No 2)* [2013] NSWCA 477, [30].

84

imputations raised in the video, that these imputations could not and did not harm it further. The imputations pleaded by the plaintiff are no worse than the characteristics of his pre-existing bad reputation, nor are they worse than the contextual imputations that Mr Jobst contends arose from the publications.

[413] Given that I have found that Mr Mitchell had a prior reputation as having been exposed as a cheat and for using litigation against his detractors, the contextual imputations and the bad reputation to those effects would not have further harmed his reputation. Furthermore, Mr de Waard did not contend with any vigour that these imputations would outweigh (and not cause further harm than) any of the imputations of which Mr Mitchell complains. Regardless of his prior reputation, I cannot see that these imputations would be considered by a reasonable viewer (nor do I consider them) to be equally as serious as, or more serious than, the imputations that I have found to have been made by the publications.

[414] I have found that the contextual imputation that Mr Mitchell planned a fraudulent video was made and was not true, so I need not consider that imputation further.

[415] That leaves the contextual imputation that Mr Mitchell had callously expressed joy at the thought of Apollo Legend's death.

[416] In his submissions, Mr de Waard concentrated on this imputation because, he submitted, this was the most damning and is worse than any of the imputations on which Mr Mitchell relies, especially as Mr Mitchell made these comments twice, to two different people. He submitted that this imputation outweighs even the imputations that Mr Mitchell contributed to Apollo Legend's death, as a person might unintentionally contribute to someone else's stress that leads that person to decide to commit suicide; but to take pleasure and express joy at the thought of a young man's death is intentional and evil. To take joy in another person's death is worse even than if Mr Jobst had asserted that Mr Mitchell had deliberately tried to cause Apollo Legend to commit suicide, or that he was a paedophile.

[417] Mr Somers submitted that none of the contextual imputations "swamped" or "overwhelmed" the effect of the imputations arising from the offending words. The latter imputations still negatively impact and affect Mr Mitchell's reputation. An objective assessment of the nature of the competing imputations supports this view. The offending imputations focus on the plaintiff's conduct in causing Apollo Legend to take his own life as a result of the significant amount the plaintiff allegedly forced Apollo Legend to pay to settle their court proceedings, which is a serious assertion. In comparison, the contextual imputations concern rather trivial matters in the grand scheme of life: whether video game scores were achieved properly or by cheating; the means Mr Mitchell used to substantiate his scores; his thoughts conveyed privately to two individuals; and his proclivity for litigation. The sting of the offending imputations is far more significant than the sting of the contextual imputations.[270]

[418] Considering the two principal imputations, I disagree with Mr de Waard's submission that the imputation that Mr Mitchell expressed joy at the thought of Apollo Legend's death is more serious, and would cause more harm to Mr Mitchell's reputation, than the imputation that Mr Mitchell hounded Apollo Legend to death. The former imports

---

[270] If it were necessary, this view is supported by some of the comments on the offending video to which I have referred: for example, comments 63, 382 and 393 set out at [123] above.

a momentary or short-term emotion, while the latter imports a deliberate course of action intended to cause harm to the other person and that itself is callous. While the former is certainly not honourable, the latter is far worse.

[419]   I find that the imputation that Mr Mitchell hounded Apollo Legend to death by itself would harm – and has harmed – his reputation far more than the imputation that he expressed joy at the thought of Apollo Legend's death. I also consider that the imputations that his actions were the main cause or a cause of, or a contributing factor in, Apollo Legend's decision to commit suicide, particularly in the context of the imputation of hounding Apollo Legend, would also cause – and have caused - more harm to his reputation than that contextual imputation. The essence of the harmful imputations is the first of these: that Mr Mitchell hounded Apollo Legend to death. Not only is harm presumed to flow from a false imputation,[271] but in this case there is clear evidence that Mr Mitchell's reputation has been substantially harmed by the publication of Mr Jobst's video.

[420]   If confirmation were needed, one need only look to the comments that were made on Mr Jobst's video and on the videos by Mr White. Although the latter were only tendered in relation to the grapevine effect,[272] they indicate that the contention that Mr Mitchell was a substantial contributor to Apollo Legend's decision to commit suicide has persisted for some years. No such assertions were ever made and Mr Mitchell did not have such a reputation before the offending video was published.

**Conclusions – Mr Jobst defamed Mr Mitchell and caused him harm**

[421]   I have therefore found that:

(a)   Mr Jobst defamed Mr Mitchell by making the imputations alleged by Mr Mitchell;

(b)   four of the five contextual imputations were also made and were substantially true;

(c)   Mr Mitchell did have a reputation as a person who had cheated and had used litigation in the manner alleged by Mr Jobst; but

(d)   the imputations about which Mr Mitchell complains have in fact caused significant harm to him personally and to his reputation – harm that outweighs his pre-existing reputation and the contextual imputations; and

(e)   therefore Mr Jobst has not succeeded on any of his defences on liability.

**Damages**

[422]   Having found that Mr Jobst defamed Mr Mitchell and no defence applies, I turn now to consider what damages I should award.

---

[271]   *Readers Digest Services Pty Ltd v Lamb* (1982) 150 CLR 500, 507; *Cerutti v Crestside Pty Ltd* [2014] QCA 33, [30]-[31], [59].
[272]   T6-16.

86

### *General damages*

*Principles*

[423] As I have said above, damage is presumed when a person has been defamed.  But that does not preclude a plaintiff from calling evidence relevant to the extent of damages that might be awarded.  The fact that witnesses may say that the defamation did not alter their opinions (or the plaintiff's reputation, so far as they can tell) does not preclude a court from awarding damages.  But the recovery of more than nominal or moderate damages may require proof of harm to reputation.

[424] Factors relevant to the determination of the appropriate amount of damages include the nature of the defamation and the extent of harm to the plaintiff's reputation, as well as the personal effects on the plaintiff.  In determining the amount of damages to be awarded, the court must ensure that there is an appropriate and rational relationship between the harm sustained by the plaintiff and the amount of damages awarded.[273] The maximum amount of damages for non-economic loss that may be awarded at present is $478,500.[274]  That amount is to be awarded only in a most serious case, but that maximum does not limit the court's power to award aggravated damages if they are warranted and any such award must be made separately to general damages that are subject to the maximum.[275]

[425] Here, Mr Mitchell seeks damages under the maximum, as he claims $400,000 in general damages plus $50,000 in aggravated damages.

[426] Only a single amount of general damages (that is, to use the phrase used in the Act, damages for non-economic loss) can be awarded in respect of a publication even though the court finds that more than one imputation was carried by the publication, as there is only one cause of action arising out of any one publication.[276]  But where, as here, there is more than one publication, resulting in more than one cause of action for defamation, the court may nevertheless assess one amount of damages for all the publications.[277]

[427] An award of general damages for defamation serves three overlapping purposes:[278]

(a)   consolation for the personal hurt and distress to the plaintiff;

(b)   reparation for the harm done to the plaintiff's reputation; and

(c)   vindication of the plaintiff's reputation.

[428] Damages for personal hurt and distress to the plaintiff are, in essence, to assuage the plaintiff's personal feelings, including the hurt, anxiety, loss of self-esteem, the sense of indignity and the sense of outrage felt by the plaintiff.[279]  A solatium for injured feelings forms a large part of general damages.[280]

---

273   *Defamation Act* 2005, s 34.
274   Section 35(1), (3); Queensland Government Gazette Vol 396, No 36, p 373, 21 June 2024.
275   Section 35(2), (2A).
276   Section 8.
277   Section 39.
278   *Carson v John Fairfax & Sons Ltd* (1993) 178 CLR 44, 60-61.
279   *Cerutti v Crestside Pty Ltd* [2016] 1 Qd R 89, [33], citing Brennan J in *Carson v John Fairfax & Sons Ltd* (1993) 178 CLR 44, 60.
280   *Cassell & Co Ltd v Broome* [1972] AC 1027, 1124; *Carson v John Fairfax & Sons Ltd*, 71.

[429]  Section 34 of the *Defamation Act*, in speaking of the harm sustained by the plaintiff, comprehends the range of harms to a plaintiff for which, at common law, those three purposes seek to compensate.[281]

[430]  The effects of a defamatory publication on a person's reputation can only be reflected, in an action for defamation, by the amount of an award of damages.[282]  The damages must be sufficient to demonstrate to the public that the plaintiff's reputation has been vindicated.  Particularly if the defendant has not apologised and withdrawn the defamatory allegations, the award must show that the defendant has been publicly proclaimed to have inflicted a serious injury on the plaintiff.[283]

*Personal effects on Mr Mitchell*

[431]  Mr Mitchell was forthright in telling the court how the publications affected him.  He said that his son alerted him to the video and they watched it together on 28 May 2021.  His evidence about his reaction was telling.[284]  He was also contacted about the video by friends in England and Australia, which led him to realise that the video was all over the world and there was nothing he could do about it.

[432]  He also said that he had physical reactions to the video.  He felt nauseous, he vomited a number of times.  For two weeks he could not hold down food and he lost about 25 pounds (11 kg).  For a month he could not sleep properly.  Eventually he saw a doctor.

[433]  Mr Mitchell said that he did not know what to do.  He arranged to contact Keemstar (Mr Keem) to ask him to tell Mr Jobst that his allegations were wrong.  He also took advice from his family and decided to make and publish his own YouTube video to rebut Mr Jobst's allegations, which was put online on 4 June 2021.  (I have set out earlier the circumstances surrounding the publication of the second video, in which the offending words were removed.[285])  Mr Mitchell said he was told that the offending words had been removed and he watched to confirm that they had.

[434]  Mr Mitchell saw Mr Jobst's tweet that responded to Mr Mitchell's video and his tweet[286] in response to the concerns notice sent by Mr Mitchell's Australian lawyers on 7 June 2021.  Mr Somers asked him how he felt on seeing these tweets.  His answer, given with clear emotion and convincingly, was striking.[287]

[435]  Mr Mitchell said that he became aware that, on 9 June 2021, Mr Jobst had altered the video again to reinstate the offending portion.  Mr Mitchell watched that video.  Again, he described in his evidence how helpless he felt on seeing that video.[288]

[436]  Mr Mitchell went to see the pastor of his church on about 9 June 2021.  Again, he described the emotions that led him to seek help from his pastor:[289]

---

[281]  *Roberts v Prendergast* [2014] 1 Qd R 357, [23].
[282]  Apart, of course, from a court's findings about the plaintiff's reputation in reasons for judgment.
[283]  *The Gleaner Co Ltd v Abrahams* [2004] 1 AC 628, [55], cited by Applegarth J in *Wagner v Nine Network Australia Pty Ltd* [2019] QSC 284, [174].
[284]  T1-79: see [208] above.
[285]  [94] - [98].
[286]  TB[19] and exhibit 34 respectively.
[287]  T1-85: see [210] above.
[288]  T1-84; T1-85: see [210] above.
[289]  T1-86.

> I went to go see him because, as I keep saying, I was completely lost.  I was trying to gain a little direction, you know?  I was trying to focus, I was trying to get back on task.  I mean, I have a business, I have a family, I have kids.  You know, I have – I have – I – at the time, I had kids in college.  You – I mean, I had responsibilities and I am just sitting there, spinning and being so upset and obsessed with what somebody is trying to do to me.  I mean, everything seemed fine up until May of 2021.  …
>
> I mean, I was either depressed, which obviously happens, or, you know, you're not sleeping or you're sleeping two hours a night, so you tend to lash out at people.  I mean, I was – the problems that I was having wasn't affecting me, it was affecting my wife and my children and my business and Pastor John is familiar with all of that – them and the business.  And I was in fear that if I didn't focus the way I should, that I would further damage the rest of me, meaning family and business and home and, like I said, he's a good person to help you with that.

[437]  He continued regularly seeing the pastor until about August 2021.

[438]  Mr Mitchell said that he read some of the comments on the video that appeared on Mr Jobst's YouTube site.  He felt that they were all negative, conveying how correct Mr Jobst was or how wrong Mr Mitchell was.  But the worst, he said, were those "that zeroed in or focused in on the suicide allegation, the allegation that I pushed or hounded Apollo Legend to kill himself."[290]  He described how the comments made him feel:[291]

> … that's exactly what it was that made me sicker and sicker and sicker and, again, more angry and more angry and more angry.  … it was early in June and he had over 500,000 views and it was still going.  I mean, there was nothing I could do to stop it.  Nothing.  I – I think – think the video, today, has, like, 1.3 million, but – well, I mean, within a week, it was over 500,000.

[439]  Mr Mitchell appears, not surprisingly, still to be affected by comments that are made online about him.  He said that virtually every time Mr Jobst puts out a video, comments are made that include references to Mr Mitchell and saying words to the effect that he drove Apollo Legend to his death, Mr Mitchell is a killer – [292]

> the comments sit there … and they multiply on and on and on and people who are too ignorant to the truth sit there and repeat it over and over and over again because of the original video and the heinous lies that he put out.

[440]  I have set out above Mr Mitchell's evidence that people still raise the allegation with him.[293]   Mr Somers asked him how he feels when that happens, to which he responded:[294]

> It brings back the same anxiety, although I'm okay now.  It brings back the same anxiety and the same unhappiness that I had as I – I would say in early June 2021.  …  I'm just – when is it ever going to end?

[441]  Mr Mitchell Jnr confirmed much of Mr Mitchell's evidence about his reactions to the video and to Mr Jobst's other conduct.  He described Mr Mitchell's reaction to seeing

---

290   T1-86 – 87; see [378] above.
291   T1-87.
292   T1-87.
293   See [379].
294   T1-93.

the video as shocked, he was very angry to start, followed by sadness and becoming socially withdrawn. He heard him vomit twice. He noticed that Mr Mitchell developed an irregular sleep schedule. He was confused at how it came about and lost about what to do about it. Then he started going to see the pastor, which Mr Mitchell Jnr described as very unusual.

[442] Mr Mitchell Jnr described Mr Mitchell's reaction to seeing Mr Jobst's tweet in response to the rebuttal video (he was baffled and then angry) and to seeing that the original video had been re-posted on 9 June 2021 (primarily anger).

[443] Mr Johnson also observed some of Mr Mitchell's reaction to the video. He said his emotions were "erratic, like paranoid" and he was not his usual joyful, confident self.

[444] Of course, Mrs Mitchell did not give evidence and it would have been natural for Mr Mitchell to call her to do so, particularly about her observations of Mr Mitchell after the publication of the video and Mr Jobst's tweets. As I have discussed earlier,[295] the unexplained absence of Mrs Mitchell permits me to infer that her evidence, if called, would not have assisted Mr Mitchell's case, but any inference cannot operate to infer that her evidence would have damaged his case.

[445] It is surprising that she was not called to give evidence about his reactions to the video. I am prepared to infer that her evidence on that subject would not have assisted his case, but I cannot speculate about what she may have said. Notwithstanding her absence, though, I accept both Mr Mitchell's evidence and that of his son about his reactions to the video and Mr Jobst's later behaviour.

[446] I am satisfied that Mr Mitchell was greatly affected adversely by the publication of the video. Furthermore, as he said, even when Mr Jobst took down the words, he still maintained in a tweet that they were not wrong. Mr Mitchell underwent many emotions, including anger, sadness, helplessness and fear. He felt a loss of any ability to control what was happening or to do anything to stop Mr Jobst's attacks on him. The obvious pleasure that Mr Jobst took in attacking him and his gleeful anticipation of litigation simply added to Mr Mitchell's emotions. He also suffered adverse physical effects in the short term.

[447] While Mr Mitchell gave evidence that he was later diagnosed with atrial fibrillation, for which he underwent surgery, I do not attribute that condition to this video and Mr Jobst's subsequent behaviour. There is no medical evidence about Mr Mitchell's health generally or the causes of his condition.

[448] I find that Mr Mitchell continues to be adversely affected by the results of the video, as he is conscious that people still comment adversely about him and accuse or suspect him of being the cause of Apollo Legend's suicide. It is clear that the ongoing comments upset and anger him and contribute to a feeling of helplessness in being unable to stop them. The necessity of attending and giving evidence at the trial, including listening to Mr Jobst and his witnesses, was also clearly emotionally hard for him.

---

[295] [271] - [277].

90

*Extent of harm to reputation*

[449] A plaintiff may lead evidence of occurrences after publication of defamatory matter that are relevant to damages, including aggravated damages, such as evidence of statements made about, and conduct directed toward, the plaintiff as a consequence of the publication.[296]

[450] Although he is not claiming any special damages for loss of income, Mr Mitchell gave evidence about the loss of offers of paid appearances as a direct or indirect result of the controversy generated by Mr Jobst's video. That evidence goes to the harm to his reputation generally caused by the video.

[451] Mr Mitchell said that John Weeks was the organiser of an auction of the world's largest collection of pinball and arcade gaming machines. Mr Mitchell had an agreement with him to host the auction for a fee of $50,000. After the publication of the video, Mr Weeks cancelled the agreement, apparently because of the negativity surrounding Mr Mitchell as a result of the video. Mr Mitchell later received an email from Mr Weeks confirming that cancellation, in which he said:[297]

> As per our previous conversation, I apologize for our decision to withdraw our agreement with you to host you at our auction due to the allegations from Karl Jobst that you played a significant role in Apollo Legend's decision to take his own life. We made the decision strictly for business reasons and I do not feel personal discontent with you, but the negativity brought by the claims presented too large a risk to us strictly from a business perspective.

[452] Mr Mitchell recalled that another person, Ryan Burger, who had booked him for three separate events, cancelled all three and has not since booked him to appear at any events. Mr Burger also sent him an email cancelling the third event, saying:[298]

> Due to the toxicity and negativity brought by Karl Jobst's claim that you played a role in Apollo Legend's decision to take his own life, Old School Gamer Magazine feels compelled to withdraw its $5,000 per weekend paid appearance offer also for the Midwest Gaming Classic.

> I had hoped that this would have faded by now so we didn't have to cancel this event similar to Des Moines Gaming Classic and Planet Comicon appearances that we had withdrawn earlier this summer, but I think it's best that we allow some time to pass given the current climate.

[453] Whether or not the reasons given in those emails were true, the withdrawal of the offers demonstrated a harmful effect of the video on Mr Mitchell's reputation and the receipt of the emails affected Mr Mitchell's personal reactions to the video.

[454] Mr Mitchell said that, since June 2021, he had had the opportunity to appear as a paid guest at fewer than half a dozen events, in comparison with 15 or 20 paid appearances before then.

---

296   *Channel Seven Sydney Pty Ltd v Mahommed* (2010) 278 ALR 232, [215]; *Barilaro v Google LLC* [2022] FCA 650, [298].

297   Exhibit 35, 28 September 2021. The email was tendered on the basis that it is not evidence of the truth of its contents, but only of the fact that Mr Mitchell received it and of what Mr Weeks said. Mr Mitchell's evidence is at T1-88 – 93. In fact, Mr Mitchell did attend the auction, but not as an invited guest:  Mr Mitchell Jnr, T4-57; exhibit 58 (admitted in evidence only as going to Mr Mitchell's credit).

298   Exhibit 36, 2 October 2021, tendered on the same basis as exhibit 35.

[455] Mr Mitchell Jnr also gave evidence about the effect of Mr Jobst's video on the number of invitations Mr Mitchell received to appear at gaming or other events.  He said they decreased, from about 10 to 12 per year in 2018 and 2019 and 9 or 10 in 2020, to two to three after publication of the video, with some pre-booked invitations cancelled.

[456] I accept this evidence.  Although there were some discrepancies in the evidence about exactly how many paid and unpaid appearances Mr Mitchell had, both before and after the video, I find that the number of times he was invited to appear at events (whether paid or not) decreased substantially following its publication.  I infer that, in cancelling invitations to Mr Mitchell to attend events, Mr Weeks and Mr Burger (and the organisers of other events) were clearly concerned about the possible effects on the popularity and success of their events if they invited such a controversial figure as Mr Mitchell to attend as a guest.

[457] The withdrawal and reduction of invitations to appear at such events is clear evidence of damage to Mr Mitchell's reputation as a consequence of the video.  So too is the evidence of the substantial number of adverse comments published online about him (both on Mr Jobst's YouTube channel and on other sources), referring to his having caused or contributed to Apollo Legend's death, both shortly after the video was published and in the years since then.  The nature of online comments about him changed after the publication of the video, in that not only did they refer to him as a cheater and an unjustified litigator, but many also referred to him as having driven Apollo Legend to commit suicide and urged others not to forget that.  Even recently, a number of comments on YouTube videos concerning Mr Mitchell, or gaming more widely, have raised this allegation.

[458] Mr de Waard submitted that the evidence does not demonstrate any additional harm to Mr Mitchell's reputation having been caused by the video.  He supported that submission by his analysis of the evidence of his reputation before and after the video and by a submission that Mr Mitchell appears to have attended just as many exhibitions or other appearances before as after the video.

[459] With respect, I disagree.  While Mr Mitchell did continue to be invited to attend some events, the number of invitations dropped considerably.  That he continued to receive some invitations is simply representative that not everybody considered him *persona non grata* thereafter.  He was also no doubt of continued interest to members of the public who attended these events, given both his history and the controversy about him, but also because of his pre-existing fame.  But that does not mean his reputation was not harmed by the video.

[460] I have already discussed the evidence of witnesses about his reputation.  I have also discussed the online comments about him.  I am satisfied that Mr Mitchell's reputation has been substantially harmed by the video.

*Vindication*

[461] The gravity of the imputations and the extent of their publication are the most relevant factors to the harm to the plaintiff's reputation.  The amount of damages awarded must be sufficient to serve as vindication of the plaintiff's reputation, both up to the time of judgment and in the future.  That is, it must be enough to convince any reasonable person who has heard or hears of the defamatory allegations (whether they be the

public at large, or those who have heard it through media reports of the proceeding, or by the grapevine) that the allegation is untrue.[299]

[462]   Vindication to some extent may be established by the court's reasons for judgment, which demonstrate the falsity of the defamatory publications.[300]  But the court must not assume that a member of the public, either now or later, will read the detailed reasons for judgment.  The "headline judgment" constituted by the amount of damages awarded is more likely to demonstrate to the ordinary member of the public the vindication of the plaintiff's reputation, both now and in the future.[301]

[463]   I mentioned above that members of the public may have heard of the defamatory imputations only through media reports or other publicity about the trial of the proceeding.  This trial generated substantial interest and publicity.  The public gallery was full and the proceeding was relayed to an overflow court room for several days of the trial.  Several media representatives were present throughout the evidence and the trial was widely reported, not only in Brisbane, but Australia-wide.  I am also aware that people from other States and several countries (not just the USA) connected to the courtroom to hear the final addresses.[302]  I expect that similar wide publicity will attend the occasion of the delivery of this judgment.

[464]   This wide publicity of and interest in the trial, as well as the large number of comments on the videos of both Mr Jobst and Mr White, demonstrate the breadth of the audience to whom vindication of Mr Mitchell's reputation needs to be made.  It is likely that my judgment will also receive substantial publicity:  at least the result and the damages awarded, if not my reasons.  Although counsel did not make any submissions about the effect of a potentially widely publicised judgment, I consider it appropriate to record my respectful agreement with White J of the Federal Court of Australia, that it should not affect the amount of an award by reducing the sum to account for that likely publicity.[303]  Nor do I consider that it should increase the amount awarded by way of vindication.  Wide publicity of the judgment amount and possibly of a summary of the court's reasons for judgment will simply serve better to vindicate the plaintiff's reputation in the eyes of more people than might otherwise be the case.

*The grapevine effect*

[465]   The harm to a plaintiff caused by a defamatory publication does not stop with the publication.  As long as its withdrawal is not communicated to everyone who has seen the publication, the harm may continue to spread.[304]  As Lord Atkin said as long ago as 1935 (which others have repeated many times since):[305]

> It is precisely because the 'real' damage cannot be ascertained and established that the damages are at large.  It is impossible to track the scandal, to know what quarters the poison may reach: it is impossible to weigh at all closely the compensation which will recompense a man or a woman for the insult offered

---

[299]   P George, *Defamation Law in Australia* (4th ed), 652-653; *Carson v John Fairfax & Sons Ltd* (1993) 178 CLR 44, 61; *Ali v Nationwide News Pty Ltd* [2008] NSWCA 183, [76], [82].

[300]   *Wagner v Nine Network Australia Pty Ltd*, [364].

[301]   *Hockey v Fairfax Media Publications Pty Ltd* (2015) 237 FCR 33, [501]; applied in *O'Reilly v Edgar* [2019] QSC 24, [208].

[302]   That facility was not made available by the court during the evidence.

[303]   *Hockey v Fairfax Media Publications Pty Ltd*, [498]-[499].

[304]   *Cassell & Co Ltd v Broome* [1972] AC 1027, 1125.

[305]   *Ley v Hamilton* (1935) LT 384, 386.  The other Law Lords agreed with his Lordship.

93

or the pain of a false accusation.  No doubt in newspaper libels juries take into account the vast circulations which are justly claimed in present times.

[466] More recently (although now more than 50 years ago), Lord Hailsham LC recorded that:[306]

Not merely can [the plaintiff] recover the estimated sum of his past and future losses, but, in case the libel, driven underground, emerges from its lurking place at some future date, he must be able to point to a sum awarded by a jury sufficient to convince a bystander of the baselessness of the charge.

[467] This principle has since become known, in defamation law in Australia, as the "grapevine effect."[307]  This expression "is used metaphorically to describe circumstances of repetition of the defamatory statement by the person who published it originally or by those to whom that person has published it, to others who themselves repeat it."[308]  It is no more than the realistic recognition by the law that, by the ordinary function of human nature, the dissemination of defamatory material is rarely confined to those to whom the matter is immediately published.[309]  The principle is connected with the vindicatory purpose of an award of damages.  It seeks to identify, as far as possible, the true extent of the defamatory publication in order to reflect this in the award of damages.[310]  But it does not automatically arise in all cases so as to establish that any republication of the defamatory imputation is the "natural and probable" result of the original publication. There must be some evidentiary basis for its existence before a court can take it into account in the assessment of damages.[311]

[468] The last sentence in the passage quoted above from Lord Atkin's reasons acknowledged the "vast circulations" of newspapers 90 years ago.  YouTube videos can (and in the case of the offending video, clearly did) also have equally vast (or even greater) circulations.[312]  As with defamatory statements made by other forms of social media:[313]

when defamatory publications are made on social media it is common knowledge that they spread.  They are spread easily by the simple manipulation of mobile phones and computers.  Their evil lies in the grapevine effect that stems from the use of this type of communication.

[469] The same can be said of many types of publication on the internet, including on such platforms as YouTube.[314]

[470] The obvious effects of the publication have continued, even up to the year of the trial, in which not only were comments made on Mr White's videos attributing Mr Mitchell as the cause of, or a reason for, Apollo Legend's death, but Mr Mitchell Jnr gave evidence that the video containing the offending words is still accessible on the

---

[306]  *Cassell & Co Ltd v Broome* [1972] AC 1027, 1071.

[307]  In the United Kingdom, it is known by that term or as "percolation": *Banks v Cadwalladr* [2022] 1 WLR 5236.

[308]  *Roberts v Prendergast* [2014] 1 Qd R 357, [32].

[309]  *Belbin v Lower Murray Urban and Rural Water Corporation* [2012] VSC 535, [217].

[310]  D Rolph, *Rolph on Defamation* (Lawbook Co, 2nd ed, 2024), 469 [16.70].

[311]  *Palmer Bruyn & Parker Pty Ltd v Parsons* (2001) 208 CLR 388, [89].

[312]  The offending video has been viewed by over 500,000 people in at least 14 countries, including over 20,000 in Australia.  See [119] and [129] above.

[313]  *Mickle v Farley* [2013] NSWDC 295, [21]; also *Banks v Cadwalladr* [2022] 1 WLR 5236, [51(xii)].

[314]  For example, *Barilaro v Google LLC* [2022] FCA 650.

94

internet, having found it during the trial on the website of another person.[315]   The comments on Mr White's videos are indicative of the extent and longevity of ongoing references to, and repeated publication of, the defamatory meanings and, together with the original comments made mostly in the period immediately after the publication,[316] are clear evidence of the substantial and ongoing operation of the grapevine effect in this case.

[471]   Mr de Waard submitted that I should find that the comments on Mr White's videos derive, not from Mr Jobst's videos as originally published, but from Mr Mitchell's own video in which he republished the offending words and which is still available on the internet.  I understood his submission to be that some of the comments refer to Mr Mitchell as a murderer: a term that was not used in Mr Jobst's videos, but was used by Mr Mitchell in his response.

[472]   I do not accept that submission.  While Mr Jobst did not use the word "murderer" and Mr Mitchell did, even in the comments made on the day that Mr Jobst's first video was published, many of the comments were that he killed or murdered Apollo Legend. Furthermore, the extent of publication of Mr Jobst's videos (and the comments on them) was vastly greater than the publication of Mr Mitchell's response video.  I am satisfied that the recent comments about Mr Mitchell being the cause of Apollo Legend's suicide stem from Mr Jobst's original publications.[317]

[473]   I find that the grapevine effect has had – and continues to have – significant and substantial consequences on the extent of publication of the defamatory imputations and on the harm caused to Mr Mitchell's reputation.  This ongoing publication of the imputations was a natural and probable consequence of Mr Jobst's publication.  The amount of damages that I shall award must take into account the consequential effects on Mr Mitchell's reputation and on him personally and must be sufficient to operate as vindication of him and his reputation in this regard, both immediately and for the future.

*Mitigating factors*

[474]   Mr de Waard submitted that there are two particular factors that mitigate the extent of any harm caused by the video and consequently should reduce any damages I award.

*Mr Mitchell's response video: self-harm?*

[475]   The first and more significant factor, in Mr de Waard's submission, is the publication by Mr Mitchell of his response video, in which he shows and plays the entire part of Mr Jobst's video to which Mr Mitchell objects: that is, the offending words and the associated images.  By doing so, Mr Mitchell has himself republished the defamatory words and continues to make them publicly available, given that his response video remains accessible on the internet.  This, Mr de Waard submitted, is not the action of a man who has suffered harm from the defamatory words.  Alternatively, by doing this, he has exacerbated any damage to his reputation, which should lead to a significant reduction in any damages awarded to him.  The comments to the effect that

---

[315]   Although I give only little weight to this evidence, as Mr Mitchell did not identify how many views that video had had, nor whether there were any comments on it.

[316]   Exhibit 7.

[317]   Similar comments also continue to be made, apparently, on later videos about Mr Mitchell made by Mr Jobst:  see [439] to [440] above.

he killed or murdered Apollo Legend derive from Mr Mitchell's own words, not from Mr Jobst's videos.

[476] One might describe this submission as to the alleged effect of the response video, as asserting that Mr Mitchell "called in an airstrike on his own position" by publishing the response video.[318]

[477] Mr Mitchell Jnr said that he controls the response video and he has kept it online because "it goes to show that that claim that has been put out and circulated is false."[319]

[478] Mr Somers submitted that much of the damage caused by Mr Jobst's video was done by the time Mr Mitchell published his response video: by 4 June 2021, there had been 519,800 unique views of Mr Jobst's video, the vast majority of which occurred on 26 May.

[479] As for the response video, Mr Somers submitted that anyone watching it would be under no misapprehension that Mr Mitchell disputed the allegations made by Mr Jobst. Both before and after showing the extract of the video containing the offending words, Mr Mitchell strenuously denied the allegations, calling them "heinous lies" and "demonstrably false." No reasonable person watching this video would conclude that Mr Mitchell damaged his own reputation by publishing the relevant extract and responding to it.

[480] It would have been open to Mr Mitchell to make his response video without showing the extract from Mr Jobst's video. He could, for example, have asserted that Mr Jobst had alleged that Apollo Legend had been obliged to pay Mr Mitchell a large sum of money, which had led to Apollo Legend committing suicide, and then denied those allegations in the manner he did. However, clearly the most accurate way to refer to the allegations that he disputed was to replay the offending words.

[481] Similarly, one might say that, in conducting this very proceeding, Mr Mitchell has caused there to be far wider publication of the defamatory words than would otherwise have been the case. But one cannot effectively refute allegations without referring to them. Far from calling in an airstrike on his own position, it was necessary to identify the enemy's position clearly in order to call in an airstrike on it. These observations of Applegarth J are apposite:[320]

> One aspect of vindication by way of a damages award is that the plaintiff, in pursuing a remedy through the justice system, takes what may have been a publication to a limited number into the public domain. In such a case, the plaintiff in pleading and litigating the defamation necessarily engages in self-publication of what ultimately proves to be an indefensible defamation. In the meantime, the defamatory allegation is the subject of open court proceedings, which may be reported in the media or otherwise become known by word of mouth. This is in addition to the ordinary grapevine effect in which the defamation is republished along the "grapevine" in circumstances where that is the natural and probable consequence of the original publication. The fact of a defamation action may become known, particularly in a provincial city or town,

---

[318] *Smith v Lucht* [2015] QDC 289, [52]; a phrase referred to in *Brose v Baluskas (No 6)* [2020] QDC 15, [409].

[319] T4-48.

[320] *Cerutti v Crestside Pty Ltd* [2016] 1 Qd R 89, [35]; McMurdo P and Gotterson JA agreed with his Honour.

96

and the substance of the defamatory imputations circulate in sections of the community.  An award by way of vindication should be effective to convince persons who have heard of the allegation, through media reports of the proceedings or otherwise, that the defamatory imputation is untrue.

[482] I do not consider that the publication of the response video was unreasonable conduct or itself added to the harm caused by Mr Jobst's videos.  The response video was, in one sense, a preliminary strike made in a reasonable attempt to minimise the harm caused by Mr Jobst pending commencement of this defamation proceeding, which would hopefully serve at least partially to vitiate that harm.  The response video did not increase the harm to Mr Mitchell and does not reduce the damages properly awarded to him to mitigate that harm.

*The "retraction" video*

[483] Section 38 of the *Defamation Act* relevantly provides:

> (1)    Evidence is admissible on behalf of the defendant, in mitigation of damages for the publication of defamatory matter, that—
>
>    (a)    the defendant has made an apology to the plaintiff about the publication of the defamatory matter; or
>
>    (b)    the defendant has published a correction of the defamatory matter …
>
> (2)    Nothing in subsection (1) operates to limit the matters that can be taken into account by a court in mitigation of damage.

[484] Section 18 concerns offers to make amends, of which none was made in this matter.  However, subsection (2) provides that, in determining whether an offer was reasonable, a court:

> must have regard to any correction or apology published before any trial arising out of the matter in question, including the extent to which the correction or apology is brought to the attention of the audience of the matter in question taking into account—
>
>    (i)    the prominence given to the correction or apology as published in comparison to the prominence given to the matter in question as published; and
>
>    (ii)    the period that elapses between publication of the matter in question and publication of the correction or apology.

[485] In my view, the mitigatory effect of a correction and (where relevant) an apology, even where it is not part of an offer to make amends, substantially depends on the extent to which the correction or apology is brought to the attention of the audience of the defamatory statements and, perhaps to a lesser extent, the promptness with which the apology or correction is published.  In determining the effect of a correction or apology, the factors referred to in subs 18(2) are obviously relevant.  What constitutes a correction turns on substance rather than form and involves two elements:  acknowledging that an error has been made and stating what the correct position is.[321]

---

[321]    *Massoud v Nationwide News Pty Ltd* (2022) 109 NSWLR 468, [230].

[486] Mr Jobst relies, in mitigation of damages, on the so-called retraction video.[322]  Mr de Waard submitted that it constituted a correction and apology that would provide a mechanism to vindicate Mr Mitchell's reputation.  He submitted that the video was effective to reduce any harm to Mr Mitchell from the offending video.  In it, Mr Jobst acknowledged and corrected an error that he had made in the original video and this video was viewed by more than twice as many people as the offending video.[323]

[487] Mr Somers submitted that the retraction video had no mitigatory effect.  It was published in the final 44 seconds of a 30 minute video that otherwise had nothing to do with arcade games or Mr Mitchell.  Neither the thumbnail nor the description of the video showed or mentioned Mr Mitchell or Apollo Legend, whereas when Mr Jobst wanted his audience to know that a video concerned Mr Mitchell, he would include an image of Mr Mitchell in the thumbnail, as he did in 19 videos that he did publish concerning him.[324]  Critically, Mr Jobst did not apologise to Mr Mitchell himself, but only to his viewers for providing incorrect information to them[325] and he even again provided false information to his viewers in stating that Mr Mitchell had not attempted to contact him to clear up any misinformation.  In fact Mr Mitchell had attempted to contact him through Mr Keem and by his solicitors.  Finally, Mr Jobst still insinuated that he maintained the view that Mr Mitchell had been a cause of Apollo Legend's decision, saying:

> I do have my opinion regarding the impact of the settlement on Apollo's decision, but ultimately it was no-one's responsibility but his own.

[488] I agree with Mr Somers' submissions.  The retraction video was not published until 29 July 2021:  two months after the initial publication of the offending video and 6½ weeks after Mr Grevelle told Mr Jobst that Apollo Legend had not been required to pay anything to Mr Mitchell.  Neither the content nor the placement of the correction in the video would have had any substantial effect (if any at all) on the harm caused to Mr Mitchell by the offending video.  Mr Jobst gave the correction no prominence at all, it was not clearly addressed to the same audience as had seen the offending video, he corrected only one aspect of the offending video and he did not apologise to Mr Mitchell.  For these and the other reasons referred to by Mr Somers, it did not mitigate the harm caused by the offending video, nor can it be relied on to reduce the appropriate sum of general damages.  Indeed, if anything it might aggravate them, as I shall discuss below.

### *Aggravated damages*

[489] At common law, aggravated damages were a component of general compensatory damages.  Aggravation of the hurt to a plaintiff by the defendant's conduct can increase the appropriate damages award, but historically that increase has not been a separate component of the damages.[326]  For this reason, one amount of damages, constituting both general and any aggravated damages, was traditionally awarded for one or more defamatory publications.[327]

---

[322]   I have described this video at [105] to [107] above.

[323]   See [129] and [135] above.  I note that it was seen by somewhat fewer viewers than the offending video in the one week after its publication:  compare [119](a)(i) and [135](a).

[324]   T5-39; exhibit 68.

[325]   As he accepted in answer to questions by me: T5-113.

[326]   *Wagner v Nine Network Australia Pty Ltd* [2019] QSC 284, [185] – [187].

[327]   Ordinarily expressed in a judgment for "damages, including aggravated damages, in the sum of $X".

98

[490]  However, the latter rule at least was altered by amendments made to s 35 of the *Defamation Act* in 2021.  By those amendments, subsection (1) was amended to remove a court's discretion to award general damages above the prescribed maximum amount.[328]  Subsection (2) was amended to make clear that the maximum amount was to be awarded only in the most serious of cases.  Subsection (2A) was inserted and provides that subsection (1) does not limit the court's power to award aggravated damages if such an award is warranted in the circumstances.  However, subsection (2B) requires that an award of aggravated damages be made separately to any award of damages for non-economic loss to which subsection (1) applies.[329]

[491]  The same amendments were made in some other States at around the same time.  The explanatory note to the Queensland Bill identified that the amendment to subsection (1) was intended "to clarify that the cap on damages for non-economic loss sets the upper limit on a scale or range of damages and applies regardless of whether aggravated damages apply."  It went on to say that the introduction of subsection (2B) was intended "to ensure the scale or range for damages for non-economic loss continues to apply for non-economic loss even if aggravated damages are awarded."[330]

[492]  The explanatory note to the equivalent Bill in New South Wales made clearer the intentions behind the amendments.  Relevantly, it said:[331]

> … there have been inconsistent approaches concerning [the] effect [of s 35].

> One approach (which reflects the original purpose behind the provision) is that the section sets a scale or range of damages, with the maximum amount reserved for the worst kinds of damage even if the publication does not warrant an award of aggravated damages. See *Murray v Raynor* [2019] NSWCA 274 at [92] and [93].

> The other view is that the maximum amount operates as a cap (rather than setting a scale or range) that can be set aside in circumstances where aggravated damages are warranted. See *Bauer Media Pty Ltd v Wilson (No 2)* (2018) 56 VR 674.

> The purpose behind specifying a maximum amount for non-economic loss was to ensure a level of parity with the award of other damages (for example, for personal injury) while still providing for appropriate compensation for this intangible loss.  The purpose behind allowing aggravated damages was to enable additional compensation to be awarded if the conduct of the defendant exacerbated the plaintiff's loss.  …

> [The amendments]—

> (a) confirm that the maximum amount sets a scale or range rather than a cap, with the maximum amount to be awarded only in a most serious case, and

> (b) require awards of aggravated damages to be made separately to awards of damages for non-economic loss so that the scale or range for damages for non-

---

[328]  Subsection (1) provides for the maximum amount of damages for non-economic loss that may be awarded in defamation proceedings.  Until the amendment, it provided expressly that it applied, "Unless the court orders otherwise under subs (2)."  As I have recorded earlier, the current maximum damages for non-economic loss under this subsection is $478,500.

[329]  The section in its present form was enacted, with effect from 1 July 2021, by the *Defamation (Model Provisions) and Other Legislation Amendment Act* 2021, s 21.

[330]  *Defamation (Model Provisions) and Other Legislation Amendment Bill* 2021 (Qld), Explanatory Notes, 10.

[331]  *Defamation Amendment Bill* 2020 (NSW)**,** Explanatory Note, 11.

economic loss continues to apply for non-economic loss even if aggravated damages are awarded.

[493] The effects of these amendments, insofar as they affect aggravated damages, appears to be that:

(a)  aggravated damages are now a separate category of damages from general damages, whereas formerly they were a component of general damages; and

(b)  aggravated damages are not subject to the scale and cap on general damages imposed under subsection (1).

[494] Professor Rolph has recently expressed the view that subsection (2A):[332]

appears to mandate a more restrictive approach to aggravated damages than that at common law, which can take into account any factors from the time of publication down to the date of judgment, such as the conduct of the defamation trial itself. Thus far, courts have held that, so long as the statutory cap has not been exceeded, the full range of relevant factors can be considered when assessing damages under the national, uniform defamation laws. It will only be when a court proposes to award aggravated damages in excess of the statutory cap that this restriction may be enlivened.

[495] However, with respect, his opinion, although referring to subsection (2A), appears to be based on the pre-amendment version of subsection (2).[333]  Although referring to subsection (2A) in Queensland and other States that have legislated the amendments, he records that "aggravated damages may be awarded if the court is satisfied that they are warranted in 'the circumstances of publication.'"  Subsection (2A), though, in Queensland and most other States, no longer restricts the relevant factors to "the circumstances **of publication**," but now only refers to "the circumstances."  In any event, in *Rayney v State of Western Australia (No 9)*,[334] Chaney J held that the reference to the "circumstances of publication" did not imply a temporal limit on the circumstances to be considered, but referred to circumstances in which, at common law, aggravated damages might be awarded.  That appears to have been confirmed by amended wording in subsection (2A).

[496] Therefore, there being no legislative restriction on the circumstances which the court may take into account in considering whether aggravated damages are appropriate, the common law factors remain relevant.

[497] Accordingly, I do not consider that these amendments have effected any real change to the factors relevant to the determination of aggravated damages.  I am fortified in this conclusion by decisions of other courts that have briefly discussed the relatively new provisions.[335]

[498] It is therefore necessary to consider, separately from general damages, what if any factors may justify an award of aggravated damages in this case.

---

[332]   D Rolph, *Rolph on Defamation* (Lawbook Co, 2nd ed, 2024), 500, [16.240].
[333]   Which remains the law in some jurisdictions but not in Queensland or New South Wales.
[334]   [2017] WASC 367, [856].  In doing so, his Honour agreed with that construction given to the subsection by Newnes J in *Forrest v Askew* [2007] WASC 161, [71].
[335]   *Doak v Birks* [2022] NSWDC 625, [116] – [118] (Gibson DCJ); *Greenwich v Latham* [2024] FCA 1050, [264] – [266] (O'Callaghan J).

100

[499] Speaking generally, damages may be increased if there is "a lack of *bona fides* in the defendant's conduct or it is improper or unjustifiable"[336] and if the plaintiff is aware of that conduct, which increases his personal hurt and distress or the damage to his reputation.  Relevant aggravating conduct can occur at any time up to judgment in the proceeding.

[500] In this case, Mr Mitchell contends that a number of aspects in Mr Jobst's conduct lacked *bona fides* and were improper and unjustifiable, aggravating the personal and reputational damage to Mr Mitchell.  In paragraph 16 of the statement of claim, Mr Mitchell pleads, among other things, that the publications were made in circumstances where Mr Mitchell apprehended malice or other unjustifiable or improper conduct by Mr Jobst.  The statement of claim goes on to plead a number of facts comprising that improper conduct and demonstrating that malice.  I shall consider each in turn.

[501] Before I do, I should record that, in my view (which I indicated during the trial[337]), Mr Jobst's defence to the allegations in paragraph 16 of the statement of claim did not give a direct explanation of his denial of the allegations.  Therefore, he is deemed to have admitted those allegations.[338]  However, Mr Somers submitted that, even if that were not the case, the evidence demonstrates the aggravating circumstances alleged in the statement of claim.  It is apposite to review that evidence, in case I am wrong in my view of the defence and also to determine the extent of any conduct that I find to be aggravating and the appropriate amount of any aggravated damages.

*Reckless indifference to the facts*

[502] The imputations arising from the video were based on a fallacy: that Mr Mitchell had obliged Apollo Legend to pay him a substantial sum of money as part of the settlement with him.  Mr Jobst published that fallacy as fact; in Mr Somers' submission, without checking its truth.  That fallacy led to the defamatory imputations being made, none of which Mr Jobst has since sought to prove as true.

[503] In his defence, Mr Jobst did not admit that the settlement with Apollo Legend did not contribute to him committing suicide, because "that allegation is not within his present means of knowledge and he is unsure of the truth or otherwise of that allegation."[339]  With respect, that is an astonishing non-admission because, if he presently has no means of such knowledge, how did he have the means of knowledge to the contrary at the time he published the video in which that imputation was made?

[504] Mr Jobst went on to plead that the settlement nonetheless had a negative financial impact on Apollo Legend because he agreed to remove from his YouTube channel, and otherwise not to publish, anything concerning Mr Mitchell or his family, which affected the income he received from YouTube.

[505] Mr Jobst maintained this position during the trial, contending that the settlement had had a negative financial impact on Apollo Legend and saying that he still believed that it was a contributing factor to his decision to commit suicide.[340]

---

[336]   *Triggell v Pheeney* (1951) 82 CLR 497, 514.
[337]   T4-105 – 107.
[338]   *Uniform Civil Procedure Rules* 1999, r 166(5).
[339]   Defence, [13(b)].
[340]   T5-114.

[506]  Mr Jobst did not plead any facts or explanation for his denial of Mr Mitchell's allegation that he had not made any, or any proper, pre-publication enquiry as to the true position.  He did give some evidence, however, as to a source of his assertion that Apollo Legend had been obliged to pay a large sum to Mr Mitchell, namely a comment on Reddit to the effect that Mr Mitchell had made Apollo Legend pay him $50,000.  I have described that evidence at [87] above.  As I said then, Mr de Waard sought to tender a copy of that message, but Mr Somers successfully objected to it.

[507]  Even if I were to have regard to this evidence and to accept that such a message was the source of his belief that Apollo Legend had been obliged to pay Mr Mitchell a large sum of money, it would not assist Mr Jobst's defence.  One person's comment or message, without any proof of the assertion, would not be a reasonable and sufficient basis for the assertion in the video.   Mr Jobst made no enquiry of Mr Mitchell or anyone associated with him or with Apollo Legend before first publishing the offending video.  He had no reasonable basis for the assertions he made in the offending words.  He was, indeed, recklessly indifferent to whether or not those assertions were true.

*Repeated publication*

[508]  Mr Jobst did remove the offending words after Mr Keem contacted him and told him that no money had been paid by Apollo Legend to Mr Mitchell.  At that time, Mr Jobst made a reasonable enquiry of Apollo Legend's brother to ascertain whether any money had been paid.  He told Mr Keem that, if that assertion was not confirmed, he would leave the video online without the offending words.

[509]  Mr de Waard submitted that Mr Jobst's willingness to change his video in the light of what Mr Keem had told him was evidence of his *bona fides*, rather than any conduct that should give rise to aggravated damages.  That may be so, if that were as much as he did.  But it is contradicted by the fact that, notwithstanding his assurance to Mr Keem, after seeing Mr Mitchell's video and after receiving the concerns notice from Mr Mitchell's lawyers, both asserting the falsity of the offending words, and before receiving any response from Apollo Legend's brother, Mr Jobst re-posted the full video containing the offending words.

[510]  When asked in his evidence why he did that, Mr Jobst said that Mr Mitchell had a reputation for suing people and had threatened to sue Mr Jobst in the past so, on seeing Mr Mitchell's video, in which Mr Mitchell said he would respond to Mr Jobst in the way everyone expected him to do, and after receiving the concerns notice, he felt that there was nothing he could do to stop whatever action Mr Mitchell was about to take.  At that time, he still believed what he had said to be true and, if taking down the offending words would not stop Mr Mitchell suing him, he may as well put the video back up until he obtained concrete information whether or not it was true.[341]

[511]  Mr Jobst later said that he thought it was appropriate to put the offending words back into the video because he does not believe anything Mr Mitchell says.  In particular, he did not believe Mr Mitchell's video, he did not believe the message from Mr Mitchell that he had received from Mr Keem and he did not believe what Mr Mitchell's solicitors had said in the concerns notice.[342]

---

[341]   T4-111.  Although the transcript records a word or words in Mr Jobst's evidence as indistinct, I have checked the recording, in which he appears to say "concrete information."

[342]   T5-97 – 98.

[512] Mr de Waard also relied on the fact that, when he did get confirmation from Apollo Legend's brother that he had not been required to pay Mr Mitchell any money, Mr Jobst took out the offending words again. He has not republished them since (although he left the remainder online). This was further evidence of his *bona fides* and the reasonableness of his actions.

[513] I disagree with Mr de Waard's submissions. Notwithstanding that he ultimately removed the offending words, Mr Jobst twice asserted online that he had removed the words, not because they were wrong or he didn't believe them, but because he did not want to be sued by Mr Mitchell over that assertion rather than his allegations that Mr Mitchell had cheated at Donkey Kong.[343] That demonstrates a complete lack of *bona fides*, in my view.

[514] All of this conduct was even more reckless and in contumelious disregard of the truth than his first publication given that, by the time of his republication, he had been told three times (by Mr Keem, by Mr Mitchell's video and by Mr Mitchell's lawyers) that what he had said in the first publication was false and he had not received any information from Apollo Legend's brother.

[515] It was not until Apollo Legend's brother confirmed that the settlement did not require any payment by Apollo Legend that Mr Jobst again edited out the offending words, but he still implied that he thought they were true anyway.

[516] Mr Jobst's attitude seems to me to have been one of, "Well, if I'm going to be sued, I may as well go for broke and damn the consequences." Far from being evidence of his *bona fides*, I consider his conduct to be reckless and to show no regard for the truth or for the effect of his video on Mr Mitchell and his reputation.

*Sensationalised and extravagant video*

[517] Mr Somers submitted that Mr Jobst used extravagant and sensationalised language in the video that exacerbated the hurt to Mr Mitchell and to his reputation. It is not necessary to set out the examples given in Mr Somers' written submissions, but I agree that the whole video reflected Mr Jobst's *modus operandi* as he described it in a deposition he gave in the Twin Galaxies litigation:[344]

> My YouTube videos often contain hyperbole, sarcasm, parody and humour to make them interesting to viewers.

[518] Mr Jobst accepted that he may have used these methods in the offending video, although he did not accept that saying that Mr Mitchell ruined lives, he's legitimately evil, he's a scumbag and he's insane constituted him using those methods to make it more interesting.[345] That answer in an example of evidence by MrJobst that I consider to be disingenuous.

[519] I find that Mr Jobst was deliberately using these methods in the offending video to sensationalise his allegations in order to obtain more viewers and to entertain them. Of course, the more viewers of his video, the more damage to Mr Mitchell's reputation.

---

[343] See [97] and [99] above.

[344] Not directly tendered in evidence before me, but read out and agreed to by Mr Jobst: T5-41.

[345] T5-41 - 42.

*Malice toward Mr Mitchell*

[520] Mr Somers submitted that the above behaviour and other evidence demonstrated that Mr Jobst published the video and, since then, has continued to act, with clear malice toward Mr Mitchell.

[521] First, he submitted that Mr Jobst has sustained a continued attack on Mr Mitchell, both before and during this proceeding, including by the above conduct and by describing Mr Mitchell, in the video itself, as ruining lives, legitimately evil, a scumbag and insane. In his evidence, he said that he believed those statement to be true at the time he made them and he still believed all except that Mr Mitchell is legitimately evil.[346]

[522] I have earlier set out Mr Mitchell's evidence that Mr Jobst's behaviour in publishing and republishing the video and in publishing his tweets mocking Mr Mitchell's complaints, caused Mr Mitchell additional distress over that caused by the video itself.[347]

[523] I find that Mr Jobst certainly has malice toward Mr Mitchell. Not only the matters relied on by Mr Somers demonstrate that, but other conduct concerning the retraction video and other online videos or streamed interviews in which he was involved are clear demonstrations of his malice, not only at the time of the offending video, but continuing up to and during the trial. I refer to that other behaviour below.

*Obtaining pecuniary benefits*

[524] Mr Somers submitted that Mr Jobst earns substantial money from publishing videos about and critical of Mr Mitchell: not only the offending video, but multiple other videos that he has published, including during the progress of this proceeding.[348]

[525] In an interview podcast published on Twitter and played in evidence,[349] Mr Jobst said he made the offending video as part of trying to build his YouTube channel and described Mr Mitchell as a "content creating machine." When asked about that in his evidence, he agreed that he meant that Mr Mitchell generates a significant amount of content that he sees as beneficial to his channel.[350] In tweets he published in September 2023, he said about this proceeding itself, "I get a lot of content out of it … after the trial there will be a lot more content … content feeds my family etc."[351] He also participated in another interview online, in which he said that he made multiple videos about Mr Mitchell to earn the money to afford to defend this claim.[352]

[526] Mr Jobst was open about the fact that his principal sources of income are generated, directly or indirectly, from videos he makes. The more views he gets, the more income he receives and the more followers he has, the more likelihood that he will be paid, not only by YouTube, but also by advertisers and by "Patreon" donations.[353]

---

346   T5-40 – 41.
347   See [210] above.
348   Exhibit 68 shows 19 videos, including the offending video.
349   Exhibit 64.
350   T5-15.
351   Exhibit 65.
352   Exhibit 66, published on 15 February 2024. I have paraphrased what he said in far more words.
353   Which, as I understand his evidence, are simply viewers who donate small amounts to him after viewing a video. He listed his "patreons" at the end of the offending video and, I infer, at the end of all his videos.

[527] While obviously Mr Jobst relies on substantial numbers of viewers of his videos and, for that purpose, makes them as interesting and, in some cases, as sensational as he considers appropriate, I do not consider that that is an aggravating feature of his conduct. It is just his "business" and, of course, he uses Mr Mitchell – an already controversial character – as a ready source of revenue. But he has not repeated the relevant defamatory statements in order to generate that revenue.

*The "retraction"*

[528] A defendant's failure to apologise for and to withdraw a defamatory publication is not always a feature of a proceeding that aggravates the hurt to the plaintiff and consequently can increase damages. However, in some cases, a failure to retract and apologise can be aggravating conduct that justifies an increase in damages. This is especially so where that failure is accompanied by other aggravating conduct (such as maintaining the truth of an allegation without justification). Even where a defendant (as in this case) defends on the basis that the imputations alleged by the plaintiff did not arise from the publication, in some cases the absence of a qualified apology (such as, "If that is how my words were understood, then I apologise") can be an aggravating circumstance.[354]

[529] Mr Jobst made no apology to Mr Mitchell, even in such a qualified way. His retraction video did not retract the imputations at all. It simply retracted the statement that Apollo Legend had paid Mr Mitchell a large sum of money. He did not apologise to Mr Mitchell in any way, rather apologising to his viewers for having made an incorrect statement in the offending video. Furthermore, as I have said earlier, this retraction was not directed to people who were likely to have seen the original video, nor did Mr Jobst in any way draw the attention of people with an interest in videos about Mr Mitchell to the last 45 seconds or so of this video that contained his correction.

[530] Far from retracting any of the imputations and apologising to Mr Mitchell, in that very video Mr Jobst insinuated that he still believed that Mr Mitchell was responsible for Apollo Legend's decision. He also made similar insinuations in his tweet of 4 June 2021 and in his comment of 6 June 2021. In his evidence he accepted that, in the former, he was intending it to be understood by a reader that he still believed what he had said to be true.[355] He also said that, even now, he still believes that the settlement contributed to Apollo Legend's decision.[356] Mr Somers also pointed out that Mr Jobst's solicitors' response to the concerns notice was, in effect, to dismiss the assertions made in that notice; to assert that, even if they were made, they would not have caused any harm to his reputation; and to rely on the retraction video. They said Mr Jobst would not make any offer of amends.

[531] All of this conduct was far from demonstrating a genuine retraction or apology. For the above reasons, I agree with Mr Somers' submission that the conduct was of such a nature as to justify aggravated damages.

---

[354] See the detailed discussion by Jackson J (with whom Morrison and Mullins JJA agreed) of aggravation arising from a failure to apologise in *Nine Network Australia Pty Ltd v Wagner* (2020) 6 QR 64, [108] – [134] and the discussion by Applegarth J at first instance in *Wagner v Nine Network Australia Pty Ltd* [2019] QSC 284, [185] – [195].

[355] T5-90.

[356] T5-114.

*Conduct of litigation*

[532]   Mr Somers also submitted that Mr Jobst's reasons for defending this proceeding, as expressed publicly by him, were an aggravating circumstance.  Mr Jobst clearly defended the claim with an agenda of destroying Mr Mitchell's reputation and punishing him.  This was made clear in another video, published by Mr Jobst on 15 February 2024, entitled "Billy Mitchell Is Coming For Me," in which he had a discussion with a person identified as Camelot331.  Mr Jobst made the comments that I have set out above at [228],[357] on which Mr Somers relied as showing his lack of *bona fides* and his crusade against Mr Mitchell.

[533]   I agree that Mr Jobst appears to consider himself a crusader:  the last of the defendants who have been sued by Mr Mitchell and the only one (apart from Mr Race) who will not back down.  He dislikes Mr Mitchell intensely and has indicated his intention to "destroy" him and, if he successfully defends the claim, to obtain a large costs award against him.  He sees his role as demonstrating to Mr Mitchell that he should not sue others, as punishing Mr Mitchell for his many alleged sins and as demonstrating to his audience that he is the knight who slew the Mitchell dragon.  And, if he succeeds, he will publish widely and often about his success (thereby continuing to punish Mr Mitchell – and earning additional revenue).

[534]   Since publishing the offending video, Mr Jobst has repeatedly made his crusade known, apparently by his videos about Mr Mitchell and in such online publications as the interview referred to above.  He has publicly stated, including in his evidence in court, that he believes that Mr Mitchell's settlement with Apollo Legend was a contributing factor in Apollo Legend's decision to commit suicide.  He has clearly taken pleasure in this role and in continuing to publicise himself in this way.

*Conclusions – Mr Jobst's conduct merits aggravated damages*

[535]   All of the conduct to which I have referred in this part of my reasons (apart from Mr Jobst's earnings from videos about Mr Mitchell) was aggravating conduct.  Mr Mitchell is aware of it all.  I have no doubt that it has affected him emotionally and it will have added to the obvious hurt that he suffered on seeing the video originally.  Mr Jobst's ongoing conduct has also continued to damage Mr Mitchell's reputation.

[536]   In my view, Mr Jobst's conduct merits a significant award of aggravated damages.

### The award of damages

[537]   Damages for defamation are "at large" and are not susceptible to mathematical calculation.  Nor is damage to reputation "a commodity having a market value."[358]

[538]   In assessing damages, the court takes into account the extent of harm to the plaintiff's reputation, the personal hurt to the plaintiff, the grapevine effect and the defendant's aggravating conduct (if any).  The assessment of damages involves an understanding of the nature and seriousness of the imputations and of the defendant's conduct.[359]

---

[357]   Taken from exhibit 77, part of a video from which another extract is exhibit 66.
[358]   *Rogers v Nationwide News Ltd* (2003) 216 CLR 327, [66].
[359]   *O'Reilly v Edgar* [2019] QSC 24, [225].

[539] It is appropriate to take account of other awards of damages, particularly in Queensland courts, to assist in determining an appropriate amount in this case. But it is not easy to compare damages awarded in different cases in an attempt to determine the appropriate amount in this particular case, as all cases have different facts, imputations, extent of publication and effects of the imputations. It is necessary to be cautious in looking at other cases for such assistance. The amount that is awarded in each case must reflect the subjective effect of the defamation on the plaintiff.[360]

[540] Applegarth J, in *Cerutti v Crestside Pty Ltd*,[361] recorded that cases can be found in which there were substantial awards and others in which more moderate awards were made. His Honour went on to say that a court should not be expected to construct lists of awards in defamation cases, or to have long lists of cases presented to them. They can, however, benefit from the careful selection and citation by counsel of broadly comparable cases. This was the helpful approach taken by counsel before me.

*Other damages awards*

[541] Mr Somers referred to three decisions that he submitted were usefully comparable.

[542] *Sirocki v Klerck (No 2)*[362] concerned 10 publications, of which two were by email and the rest were published on a range of websites, accusing the natural plaintiff (who was the director of the corporate plaintiff) of being, among other things, a fraudster, a scammer, a conman, a drug user, an adulterer, a thief and a liar, as well as incompetent in business. There were wide ranging effects on the first plaintiff personally and professionally, including being asked to resign from a number of voluntary positions and other businesses cancelling their arrangements with him or the company. There were no mitigating factors and the defendants made no apology. Even after the statement of claim was served, the defendants published a further 24 derogatory articles about the plaintiffs. The defendants did not defend the proceeding. The plaintiffs did not claim any aggravated damages.

[543] On an assessment of damages, after receiving considerable evidence of the harm to the plaintiffs' reputations and the personal effects on the first plaintiff, Flanagan J awarded damages in individual sums against each defendant, having regard to their involvement in the separate publications. Individual sums ranged from $5,000 to $80,000. Between them they totalled $190,000 for the first plaintiff and $70,000 for the corporate plaintiff.

[544] In his reasons, Flanagan J reviewed a number of other awards, several of which involved allegations of paedophilia or child abuse. He agreed with an earlier decision in which Gibson DCJ of the New South Wales District Court described accusations of child abuse as "the most serious imputations capable of being made." Gibson DCJ awarded $100,000 to each individual who had been so accused. But Flanagan J noted that other factors informing an appropriate award of damages include the extent of the

---

[360]   *Rogers v Nationwide News Ltd*, [69].
[361]   [2016] 1 Qd R 89, [48]-[49]. His Honour pointed out that a large number of cases have been summarised by Gibson DCJ in "Defamation Case Law Analysis and Statistics*", Australian Defamation Law and Practice*, T K Tobin QC and M G Sexton SC (eds), [60,500]–[60,600]. Summaries of recent cases can also be found in *The Gazette of Law and Journalism* (Lawpress Australia) accessible at www.glj.com.au.
[362]   [2015] QSC 92.

publications, including that, in the case before him, "the defamatory statements can never be truly driven underground."[363]

[545] In *Rayney v State of Western Australia (No 9)*,[364] the plaintiff had been accused by police, in each of four press conferences, of being the only suspect in the murder of his wife; an allegation that received wide and repeated publication. As a result, the plaintiff suffered considerable distress, as well as being shunned by former friends and many other people. Chaney J held that the imputation was at the high end of the range of seriousness of defamatory imputations, with a devastating effect on the plaintiff's life and attended by circumstances of aggravation. His Honour awarded general damages, including aggravated damages, of $600,000.

[546] In *Wagner v Harbour Radio Pty Ltd*,[365] the plaintiffs were businessmen whom Flanagan J described as enjoying an excellent reputation for honesty and integrity, both in business and community circles, before the publications. They had been accused by three defendants, in 32 broadcasts on popular radio stations, of 80 imputations described by Flanagan J as being extremely serious and of the gravest kind, including being responsible for the deaths of 12 people, including two children, being selfish and greedy, covering up their involvement in those deaths and corruption. They each suffered profound personal hurt as well as damage to their reputations.

[547] His Honour found that there were substantial aggravating circumstances. In particular, the radio personality, Alan Jones, had engaged in unjustifiable conduct, particularly repeating the imputations many times, including during his evidence at the trial; and he was motivated by a desire to injure the plaintiffs' reputations. That conduct, especially repeating in evidence that he believed that the plaintiffs were responsible for the deaths of 12 people, meant that a "substantial award of damages is required to represent a full vindication of the innocence of the plaintiffs, and to be sufficient to convince any bystander of the baselessness of the accusations levelled against the plaintiffs."[366] His Honour awarded each defendant general damages, including aggravated damages, of $750,000 against Mr Jones and Harbour Radio in respect of 27 publications and an additional $100,000 against Mr Jones and Radio 4BC in respect of another five publications. It is material to record that, at that time, the statutory cap on general damages (not including aggravated damages) was $398,500.

[548] Mr de Waard also referred to a number of cases and relied on them as being more indicative of the appropriate award. He principally referred to *Harrington v Shoard*,[367] in which Sheridan DCJ considered four publications accusing the plaintiff of being a paedophile: one on a sign at the boundary of the defendant's home and three in oral statements made to other persons. The publications were not widespread and there was no evidence that they caused the plaintiff any distress. Her Honour found that the harm done to the plaintiff was extremely modest and any injury was short lived. She awarded $15,000 by way of general and aggravated damages for one

---

[363]    [2015] QSC 92, [44].
[364]    [2017] WASC 367.
[365]    [2018] QSC 201.
[366]    [2018] QSC 201, [904] – [905].
[367]    [2023] QDC 11.

108

publication, having upheld a defence for the others.  Had that defence not succeeded, she would have awarded a total of $25,000.[368]

[549]  Her Honour referred to four earlier decisions of this Court in which allegations of paedophilia had been made:  two in which the plaintiff was awarded $100,000, one in which the award was $150,000 (including $30,000 in aggravated damages) and another in which it was $160,000 (including $40,000 in aggravated damages).  Her Honour recorded that the circumstances of each of those decisions were considerably more serious than the case before her, with the publications far more widespread and the impact of them on the plaintiffs much more significant.

[550]  In my view, a number of other cases are of assistance in determining the appropriate amount of general and aggravated damages in this case.  It suffices, without describing each case in these reasons[369] but simply noting the extent of publication and the damages awarded in each, to record that these cases are *O'Reilly v Edgar*,[370] *Hallam v O'Connor*[371] and *Deeming v Pesutto (No 3)*[372].

*Amount of general damages*

[551]  In determining the appropriate amount of general damages (not including aggravated damages), I must particularly keep in mind the requirement under s 35(2), that the maximum damages amount is to be awarded only in the most serious case.  Apart from such cases, the appropriate award depends on the court's assessment of the scale of seriousness of the relevant imputations (and the extent of their publication) in each case.

[552]  Here, the imputations were of varying seriousness, but the most serious and damaging was that Mr Mitchell hounded Apollo Legend to commit suicide.  That imputation implied a deliberate and extended course of conduct by Mr Mitchell that caused such stress to Apollo Legend that he decided to end that stress by killing himself.  While not directly accusing Mr Mitchell of having murdered Apollo Legend, nor of knowingly encouraging Apollo Legend to kill himself, in one sense it might be seen as almost as serious as such imputations would have been.  Those imputations would, in my view, have been among the most serious cases.

[553]  Here also, the publications were very widespread and not only in the locations where Mr Mitchell lives and works, but in several countries around the world where he is known.  Although the publications themselves were only available on Mr Jobst's YouTube channel for a total of 10 days, during that time they were viewed by over 500,000 people and it is likely that some of those people took a copy and may well have republished it since Mr Jobst took it down.[373]

---

[368]    [2023] QDC 11, [173].
[369]    Although, to be clear, I do take into account the different facts in each case.
[370]    [2019] QSC 24, [232].  Comparatively limited publication.  Damages of $250,000, including unspecified aggravated damages.
[371]    [2024] QDC 187, [194] - [206].  Limited publication.  Damages of $275,000, including $55,000 for aggravated damages, against one defendant; and $125,000, including $25,000 aggravated damages, against the other.
[372]    [2024] FCA 1430, [830].  Very extensive publication.  Damages of $300,000, not including aggravated damages.
[373]    It seems, from Mr Mitchell Jnr's evidence to that effect, that at least one copy was still locatable on the internet at the time of the trial.

109

[554] The publications have led to a considerable number of people forming the view that Mr Mitchell is a murderer, evil and callous, who should be punished.  Those views continue to be expressed (although less often) widely and to wide audiences and they continue to cause Mr Mitchell ongoing stress and hurt.  The grapevine effect is substantial and is likely to continue, or to spring shoots again in the future.

[555] In the circumstances, only a substantial amount of damages will be sufficient to vindicate Mr Mitchell and to meet all the purposes of such awards.

[556] These imputations are not as serious as being called a paedophile, but they come close to the imputations made against the Wagners and, in my view, they are at least as bad as, if not worse than, those made against Ms Deeming.  The extent of publication does not appear to have been as great as those about the Wagners, Mr Rayney or Ms Deeming, but it was substantial.  The grapevine effect is also substantial and, even if this award were to prune it to some extent, there is a real risk that it will generate new shoots again in the future.

[557] Mr Mitchell seeks $400,000 in general damages.  In my view, that is too high, being too close to the maximum amount.  This is not one of the most serious cases, although it is at the higher end, especially given the most damaging imputation and the extent of publication.

[558] I assess the appropriate sum of general damages at $300,000.

*Aggravated damages amount*

[559] Mr Jobst's aggravating conduct has been serious and ongoing, including in his evidence at trial and his publications about this litigation.  It merits substantial aggravated damages.

[560] Mr Mitchell seeks $50,000 in aggravated damages.  He may well have been justified in seeking a greater sum, but I shall limit the award to the amount he seeks.

**Other matters**

[561] It remains to deal with a number of other matters arising during the trial or as a consequence of my findings.

*Rulings on evidence*

[562] During the trial, many objections were made, by both sides, to evidence proffered by the other.  In my reasons above, I have referred at times to rulings that I made during the trial.  However, in two cases where objections were made, the parties proposed and I agreed that the evidence be led subject to the objection and that I rule on the objection in my reasons for judgment.  It is therefore necessary briefly to address those objections at this point.

[563] The first issue was an objection by Mr Somers to Mr Jobst calling any evidence about the allegation that Mr Mitchell had a pre-existing bad reputation.  The objection was on the basis that the alleged bad reputation concerned a different sector of Mr Mitchell's reputation and therefore was not relevant.  Mr Somers proposed that the evidence be called anyway and that I rule on its admissibility in my reasons for

judgment.[374]   The parties made submissions on the issue in their final written submissions and their addresses and I have dealt with the issue above, finding that the defamatory imputations concerned the same sector of Mr Mitchell's life as the alleged pre-existing bad reputation (as well as the alleged contextual imputations).

[564] Secondly, Mr Somers objected to evidence given by Mr White about "mainstream articles" from which he learned about Mr Mitchell's various pieces of litigation. Mr Somers submitted that Mr Jobst was not entitled to rely on any media articles other than those to which he had referred in the particulars of his defence.   Mr Somers simply noted the objection for the purpose of submissions later and I noted that.[375]

[565] As it turned out, nothing came of the evidence, so it is unnecessary to deal with the objection.

*Interest on damages*

[566] Interest pursuant to s 58 of the *Civil Proceedings Act* 2011 should be awarded on each amount of damages from the date of the original publication to judgment.  As said in other cases, interest is conventionally awarded at 3% per annum from the date of publication.[376]  That rate takes account of both the original damage caused by the publication and the ongoing and increasing harm to the plaintiff's reputation and personal hurt since then.

[567] I therefore propose to order that Mr Jobst pay interest at 3% per annum on each component of the damages awarded, from 26 May 2021 to the date of this judgment. However, if either party wishes to make submissions that this component of the judgment should be different, I shall hear them and reconsider.

*Costs*

[568] Mr Mitchell has succeeded in his claim.  The usual consequence is that he is entitled to an order that Mr Jobst pay his costs of the proceeding, which include any reserved costs.[377]  At present I see no reason why I should not make such an order.  However, I shall give the parties an opportunity to seek an alternative costs order, either upon delivery of this judgment or by written submissions to be provided within 14 days thereafter.  In the absence of any submission within either of those times, an order to that effect will become effective.

---

[374]   T1-28 – 29.
[375]   T6-10 – 11.
[376]   *Cerutti v Crestside Pty Ltd* [2016] 1 Qd R 89, [92]; *O'Reilly v Edgar* [2019] QSC 24, [234] – [235]; *Hallam v O'Connor* [2024] QDC 187, [203].
[377]   *Uniform Civil Procedure Rules* 1999, rr 681, 698.