## UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA

KARL JOBST,

Plaintiff,

v.

WILLIAM JAMES MITCHELL,

Defendant.

Case No. 0:26-cv-60997-DSW



FILED BY _____ D.C.

JUN 12 2026

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. LAUD.

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

Plaintiff Karl Jobst ("Jobst") responds in opposition to Defendant William Mitchell's ("Mitchell") Motion to Dismiss (ECF No. 16) ("MTD") the First Amended Complaint ("FAC") and states as follows:

## INTRODUCTION

Defendant's MTD fails to interact or engage with the FAC in any meaningful way. Despite the FAC containing 5 counts of defamation per se and outlining numerous defamatory statements, in detail, published by Defendant over the course of 7 months, the MTD does not address, quote or otherwise argue with any specificity against a single instance. There are effectively zero citations or specific references to the factual claims asserted in the FAC. This is likely out of necessity, because Defendant knows that as soon as the alleged statements or facts are acknowledged accurately the defamatory meanings become inescapable. Therefore, all Defendant can do in the MTD is produce generic, boilerplate arguments with no connection to the actual pleading.

1

Perhaps fatally, the MTD appears to misconstrue the legal standard of a Rule 12 motion, with the primary argument being that the FAC does not 'establish' the elements Defendant believes are required. But the duty of a Complaint is simply to allege facts that give rise to plausible inferences, not to establish or otherwise prove its claims. On the contrary, it is the MTD that is replete with legal conclusions that are accompanied by no supportive argument or logic.

Ultimately, the MTD does what it could have only ever done, it evades the issues at the heart of the FAC and attempts to distract the Court from the clearly defined factual allegations that unavoidably give rise to each cause of action. Given the complexity of this case and the mountain of factual allegations, Defendant may not handwave away the entirety of the FAC simply by stating a legal conclusion. A Motion to Dismiss must identify with specificity the deficiencies in a pleading for its arguments to prevail. The MTD does this in no capacity whatsoever, and therefore it fails and must be denied.

## LEGAL STANDARD

On a Rule 12(b)(6) motion, the Court accepts the complaint's well-pleaded factual allegations as true and construes them in the light most favorable to the plaintiff. *Ironworkers Local Union 68 v. AstraZeneca Pharm.*, LP, 634 F.3d 1352, 1359 (11th Cir. 2011). All reasonable inferences must be drawn in the plaintiff's favor. *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1262 (11th Cir. 2004). To survive dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible when the plaintiff pleads factual content allowing the court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court's review is generally limited to the pleadings and exhibits attached to the complaint. *SFM Holdings, Ltd. v. Banc of Am. Sec.*, LLC, 600 F.3d 1334, 1337 (11th Cir. 2010).

2

## ARGUMENT

### I.     Plaintiff Adequately Pleads Defamation Per Se

Under Florida law, defamation has five elements: "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Jews for Jesus, Inc. v. Rapp,* 997 So. 2d 1098, 1106 (Fla. 2008). The FAC pleads sufficient facts to support each element:

#### 1.  PUBLICATION

The FAC identifies the publications at issue by speaker, date, platform, and quoted language. Count I identifies Mitchell's June 24, 2025 X post and December 4, 2025 livestream statements. FAC ¶¶ 80, 81. Count II identifies Mitchell's June 3, 2025 YouTube video, August 12, 2025 X post, and August 27, 2025 livestream statements. *Id.* ¶¶ 89-91. Count III identifies Mitchell's November 12, 2025 livestream statement concerning the 2021 GoFundMe. *Id.* ¶ 99. Count IV identifies Mitchell's November 12, 2025 livestream statement concerning Notch. *Id.* ¶ 107. Count V identifies Mitchell's August 27, October 29, and December 4, 2025 livestream statements. *Id.* ¶¶ 115-117.

Federal Rule 8 governs pleading sufficiency, and a plaintiff in federal court need not satisfy Florida's stricter state-court pleading requirements for publication. *Caster v. Hennessey,* 781 F.2d 1569, 1570 (11th Cir. 1986). Here, Plaintiff pleads far more than Rule 8 requires.

#### 2.  FALSITY

The FAC does not merely allege that Mitchell's statements were false. It pleads specific facts showing why each defamatory accusation **was false**.

Count I pleads falsity because the FAC alleges that the bankruptcy trustee's report identified no offences; that the trustee was not aware of any "serious illegal activity"; and that Mitchell did not substantiate his allegations to the trustee upon request. FAC ¶¶ 11, 15, 17,

3

22. Count II pleads falsity because the FAC alleges that Jobst sought legal review before publishing the 2022 GoFundMe; that the 2022 GoFundMe accurately described both the reason it was created and the intended use of the funds; that Mitchell's threatened proceeding had not been withdrawn; and that the funds were used for legal defenses, not personal enrichment. *Id.* ¶¶ 25, 26, 28.

Count III pleads falsity because the FAC alleges that the 2021 GoFundMe was created to assist third parties; that the funds were transferred for that purpose; and that the intended beneficiary testified in court that he had received the funds. *Id.* ¶¶ 39, 40. Count IV pleads falsity because the FAC alleges that Notch's support was voluntary and informed; that Notch's representatives requested, received and reviewed correspondence, pleadings, and invoices; that funding was approved after review; and that Notch later publicly continued to support Jobst. *Id.* ¶¶ 44, 46, 48.

Count V pleads falsity because the FAC alleges that Jobst did not obtain more than half a million dollars through fraud, deception, scams, or falsehoods; that no individual transaction or combination of transactions constituted fraud; and that Mitchell identified no transaction, donor, victim, document, or act of deception supporting the accusation. *Id.* ¶¶ 59, 60.

The MTD asserts that these facts do not establish falsity, though at this stage it is not a requirement for them to do so. MTD at 8. Whether these facts give rise to a finding of falsity will be the duty of a jury to decide. The MTD even concedes that these facts are "subject to differing interpretations" and "reflect competing interpretations". *Id.* at 8, 9. As such, they are, admittedly, plausibly capable of supporting a finding of falsity.

### 3. FAULT

The Plaintiff is not a public figure for the purposes of defamation and should only need to plausibly demonstrate negligence. General public figure status requires clear evidence of general fame or notoriety and pervasive involvement in the affairs of society. *Gertz v.*

4

*Robert Welch, Inc.*, 418 U.S. 323, 352 (1974). Nor does the FAC establish limited public figure status. In its introduction the MTD states as a legal conclusion that Plaintiff is a limited-purpose public figure, yet nowhere in the body or elsewhere does it state the justification for making such a claim. MTD at 1. Under Florida law, limited public figure status requires a public controversy and a sufficiently central role by the plaintiff in that controversy. *See Mile Marker, Inc. v. Petersen Publ'g, L.L.C.*, 811 So. 2d 841, 845 (Fla. 4th DCA 2002). No public controversy existed for Count I, as the allegations relate to a private bankruptcy to which the only affected party is Mitchell as creditor. *Id.* (a public controversy requires persons beyond the immediate participants in the dispute to feel the impact of its resolution). FAC ¶¶ 8-17. Count IV is even further removed from any public controversy because it concerns a private funding arrangement between private participants, and the only party affected by the resolution would be Notch. *Id.* ¶¶ 44-53.

Counts II, III, and V concern allegations that may appear broader because they refer to public fundraising or audience funds. *Id.* ¶¶ 23–35, 36–42, 54–60. However, each of these allegations stem from Mitchell himself and did not exist prior to Mitchell's own actions. A defendant cannot create an existing public controversy himself by making defamatory statements. "Those charged with alleged defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979).

Still, even if the Court considers the Plaintiff to be a public figure and were required to plead actual malice, the FAC does so. Actual malice is publication with knowledge of falsity or reckless disregard for truth. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). To plead actual malice, a plaintiff must allege facts supporting a reasonable inference that the defendant published with knowledge of falsity or reckless disregard. *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702–03 (11th Cir. 2016). Reckless disregard exists where the defendant in fact entertained serious doubts as to truth or acted with a high degree of

5

awareness of probable falsity. *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). In this case, the FAC pleads sufficient facts to support a finding of actual malice against the Defendant.

Count I pleads actual malice because the FAC alleges that the trustee report - confirming that no offences had been identified - was sent to Mitchell as creditor weeks before his June 24, 2025 X post accusing Jobst of serious illegal activity. FAC ¶ 11. The FAC also outlines how Mitchell was put on notice via a public rebuttal and yet continued to levy accusations of criminal behavior. *Id.* ¶¶ 19, 20. Furthermore, Mitchell did not substantiate his accusations to the trustee when requested. *Id.* ¶ 22. Any reasonable person with actual knowledge of wrongdoing, especially a creditor who has a vested interest in the outcome of any investigation into wrongdoing, would aid the trustee when prompted. This lack of response gives rise to the inference that there is, in fact, no evidence to substantiate Mitchell's allegations.

Count II pleads actual malice because the FAC alleges that the truthfulness of the premise of the GoFundMe was explained to Mitchell through his solicitor in November 2022. *Id.* ¶ 29. Mitchell even admitted that the stated premise of the GoFundMe was true, and he did in fact threaten further litigation. *Id.* ¶ 27. Mitchell, in his June 3, 2025 video, when accusing Jobst of knowing for certain that no further litigation was pending, stated that "at the very least" Jobst was "unsure if it ever was". *Id.* ¶ 30. Thus confirming that Mitchell knew of a plausible alternative explanation that did not involve intentional fraud but continued to make that claim anyway. Beyond Mitchell's own words, the very fact that the GoFundMe accurately described the current state of litigation must have been known to Mitchell, as he was the very cause of that litigation. It is incomprehensible for Mitchell to not know what legal action he was taking and when - and therefore he would know quite well that the GoFundMe's description was truthful.

Count III pleads actual malice because the FAC alleges that the stated beneficiary of the 2021 GoFundMe testified in court that he had received the funds. Mitchell was present for

that testimony and therefore had direct knowledge of the falsity of his claim. *Id.* ¶¶ 40-41. The FAC also outlines that Mitchell's premise that Jobst created the GoFundMe in any way for his own defense could never have been true as Jobst was not sued by Mitchell until 4 months later. *Id.* ¶¶ 37, 42. Again, the GoFundMe was created in response to Mitchell's own litigation. Therefore, he would have intimate knowledge of the accuracy of the GoFundMe's description.

Count IV pleads actual malice because the FAC alleges that Notch continued to provide public support to Jobst after the adverse Judgment. *Id.* ¶ 48. Not only was Mitchell aware of Notch's continued support, as evidenced by Mitchell's interaction with Notch's April 2025 X post, but Mitchell even went so far as to mock it. *Id.* ¶ 49. Clearly, Notch's X post in support of Jobst demonstrated that Notch did not feel aggrieved or deceived by Jobst. In light of such public support, Mitchell actively rejected the obvious inference and instead took the opportunity to attack and belittle Notch. This supports a finding of reckless disregard at a minimum, if not knowledge of falsity. Beyond the public information available that suggested Notch was not a victim, the arrangement between Notch and Jobst was negotiated through **private** correspondence. *Id.* ¶¶ 52-53. The FAC does not allege the specificities of this private arrangement were ever made public. It is for this reason that any third-party allegations as to what Notch did or didn't know, or if he had or hadn't been deceived, must have been fabricated. When claims are fabricated and no facts exist to support the accusation, the Court may find that they were published with reckless disregard. *See St. Amant,* 390 U.S. at 732 (recklessness may be found where allegations are fabricated, inherently improbable, or where there are obvious reasons to doubt the accuracy of the report).

Count V pleads actual malice because the FAC alleges that Mitchell accused Jobst of large-scale fraud involving more than half a million dollars without identifying any specific transaction, donor, victim, document, or act of deception supporting the accusation. *Id.* ¶¶ 54, 60. The FAC also alleges that Mitchell had already been placed on notice that his narrower

7

fraud allegations were false or unsupported, yet he escalated the accusation into a broader claim of wide-scale fraud. *Id.* ¶ 60. Further, as with Count IV, because the FAC alleges that no facts exist to support the accusation, the Court may reasonably infer at the pleading stage that the accusation was fabricated and therefore published with reckless disregard. *Id.* ¶ 59.

Although logically incoherent, the MTD seems to rely upon a blanket, unspecified claim that the FAC does not plausibly allege actual malice. The only attachment to any facts pled in the FAC is a reference to the trustee's report. MTD at 6. The MTD seeks to undermine the significance of the report by referring to the trustee simply as "a third party". A bankruptcy trustee in Australia is a private insolvency practitioner appointed to administer a bankrupt estate under the Bankruptcy Act, exercising statutory powers and duties under Inspector-General oversight. It is the trustee's statutory duty to investigate the debtor's affairs and report to creditors and the Australian Government agency responsible for administering Australia's personal insolvency system. The trustee is not merely any third party, it is the very authority that investigates and dictates if any offences by a bankrupt are committed. While Defendant appears to believe the findings of the trustee irrelevant, the Australian Government, and certainly a jury, may not.

### 4. THE STATEMENTS ARE DEFAMATORY PER SE AND THEREFORE DAMAGES ARE PRESUMED

As the FAC is alleging defamation *per se,* general damages are presumed to result as a matter of law and need not be pleaded with specificity. *See Campbell v. Jacksonville Kennel Club, Inc.*, 66 So. 2d 495, 497 (Fla. 1953); *see also Lawnwood Med. Ctr., Inc. v. Sadow*, 43 So. 3d 710, 727 (Fla. 4th DCA 2010). Under Florida law, a publication is defamatory per se if, when considered alone and without innuendo, it charges that a person committed an infamous crime, tends to subject the person to hatred, distrust, ridicule, contempt, or disgrace, or tends to injure the person in his trade or profession. *See Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953). Florida courts have more recently simplified the standard for accusations

8

imputing criminal behavior: "When a statement charges a person with committing a crime, the statement is considered defamatory per se." *Shafran v. Parrish*, 787 So. 2d 177, 179 (Fla. 2d DCA 2001).

The matter of whether each of the defamation counts accuse Plaintiff of criminal conduct is not in doubt. Each count alleges direct accusations of felonious crime on its face. For Count I, the statements that Jobst "engaged in serious illegal activity" and lied to the trustee "like somebody evading taxes" do not require interpretation. FAC ¶¶ 80, 81. Bankruptcy fraud and tax evasion are felonies, punishable by up to 5 years of imprisonment. *See* 18 U.S.C. § 152; *see also* 26 U.S.C. § 7201.

Counts II through V are concrete allegations of felony theft, and this is best illustrated by looking at the definition contained within Florida's theft statute: "…obtaining money or property by **false pretenses, fraud, or deception.**" Fla. Stat. § 812.012(3)(d)1. For Count II, Mitchell's accusation that Jobst crowdfunded with the "**knowledge and intent**" to do so under "**false premises**" to "**gain $200,000 from his audience**" may as well have been read from the theft statute itself. *Id.* ¶ 89. With the amount of the fraud being such a substantial size, this would be classed as a first degree felony, punishable by up to 30 years imprisonment. *See* Fla. Stat. § 812.014(2)(a)1. Mitchell's accusation that Jobst "SCAMMED $200,000" also cannot reasonably be understood to mean anything other than fraudulent behaviour. FAC ¶ 90. The word "scam" carries an ordinary meaning of fraud and deception. *See Paul v. Findeisen*, No. SA-24-CV-717-OLG (HJB), slip op. at 10–11 (W.D. Tex. Mar. 26, 2025) (R&R) (recognizing that "scam" means "a fraudulent or deceptive act or operation" and that to "scam" means to "deceive" or "defraud"). Mitchell solidified this interpretation by stating that if he engaged in the same conduct he would "probably be in jail". FAC ¶ 91.

Counts III and IV both rely on the terminology "deceptively took" to carry the defamatory sting. *Id.* ¶¶ 99, 107. As shown above, Florida's theft statute defines **obtaining money by deception** as theft. Count III also alleges misappropriation: Mitchell asserted that

9

Jobst took money for his own defense even though the money was raised for third parties. FAC ¶¶ 98–99. Misappropriation is likewise included in the same statutory definition of theft.

The above also applies to the statements alleged in Count V, specifically that Jobst "…scammed his viewers out of more than $500,000" and "…took over half a million dollars of people's money… based upon the falsehood… if I did that, I would go to jail…" FAC ¶¶ 115, 117. Mitchell's third alleged statement that Jobst "…took over half a million dollars **fraudulently** from his listeners" leaves little to interpretation. *Id.* ¶ 116. Given that Mitchell's statements rise to the level of defamation per se, they also, by necessity, meet the standard of the final element of defamation; that the statement must be defamatory.

Defendant attempts to mischaracterize each statement at issue by reducing them down to a single word. MTD at 7. Indeed, in a vacuum the word 'scam' without any surrounding words or context may not be actionable. However, Plaintiff is not basing his claim on a single word. Each publication involves many words, with each extra word providing further meaning. Even simply adding a precise dollar amount will give rise to an actionable claim. For example, by Defendant saying "scammed $200,000" the audience is now told many things. The specific transaction (The 2022 GoFundMe), the victims (Jobst's audience), and the mechanism (fraudulent fundraising) are all expressed by merely adding specificity to the statement. Therefore, it becomes subject to verification and is susceptible to being proven true or false.

## II.    Mitchell's Statements Are Not Pure Opinion Or Rhetorical Hyperbole

"Whether the statement is one of fact or opinion and whether a statement of fact is susceptible to defamatory interpretation are questions of law for the court." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018). Statements of fact are "readily capable of being proven true or false" *Id.* at 1263 (citing Michel v. NYP Holdings, Inc., 816 F.3d 686, 697 (11th Cir. 2016)). As in *Shriteh v. News Corp.*, Mitchell's accusations are not pure opinion because whether Jobst committed fraud, scammed donors, deceptively took funds, or engaged in

serious illegal activity can be proven false. No. 2:25-cv-704-SPC-DNF, slip op. at 16 (M.D. Fla. Feb. 11, 2026). Accusations of criminal or unethical conduct are "subject to factual verification," and therefore cross "the borderline between fact and opinion." *Id.* (quoting *Trump v. Chi. Trib. Co.*, 616 F. Supp. 1434, 1435 (S.D.N.Y. 1985)). Similarly, in *Milkovich v. Lorain Journal Co.*, the U.S. Supreme Court held that the connotation that the plaintiff committed perjury was "sufficiently factual to be susceptible of being proved true or false." 497 U.S. 1, 21 (1990).

The context of Mitchell's statements only strengthens the conclusion they were statements of fact, not opinion. When assessing whether a statement is fact or opinion, the court should construe statements "in their totality," considering any cautionary or qualifying terms. *Turner,* 879 F.3d at 1262. Courts should also consider the "full context of the communication" and the "broader social context and surrounding circumstances" in deciding whether listeners would understand a statement as fact or opinion. *Michel*, 816 F.3d at 697. First and foremost, Mitchell is the dominant creditor in Jobst's bankruptcy. FAC ¶ 8. Mitchell was also the opposing party in the litigation for which Jobst crowdfunded his defense. FAC ¶ 26. These relationships gave Mitchell access to sources of information unavailable to ordinary listeners. Therefore, Mitchell's accusations concerning Jobst's bankruptcy or litigation may be reasonably understood as assertions of fact, or at minimum as opinions implying undisclosed defamatory facts. See *Turner*, 879 F.3d at 1262 (quoting *Stembridge v. Mintz*, 652 So. 2d 444, 446 (Fla. 3d DCA 1995)) (an opinion may be actionable when it reasonably implies the existence of undisclosed defamatory facts justifying the opinion).

It is clear that Mitchell's intention was to portray his statements as factual. In Count I, Mitchell paired his defamatory remark with the **threat of legal action** based on this allegation. FAC ¶ 80. ("I may take him back to court") Mitchell had also previously primed his audience to believe that Jobst was engaging in creditor defeating behavior by republishing a misleading reddit post. *Id.* ¶ 9. In Count II, Mitchell makes sure to let the audience know

11

that his claim was factual by ending with the words "Period. End of paragraph." *Id.* ¶ 89. Mitchell also emphasized that if he acted in a similar way to Jobst, he would "probably be in jail." *Id.* ¶ 91. In Counts III and IV, Mitchell ends his defamatory tirade with the words "If that doesn't piss you off, I can't help you." *Id.* ¶ 37 This is a direct admission that Mitchell was attempting to convey a factual accusation and that the public should be outraged **because** of that same fact. In Count V, Mitchell again states that the alleged conduct should result in incarceration. *Id.* ¶ 57. Mitchell also stated: "So there, I'm telling you something that isn't reported." Conveying that he had knowledge of undisclosed defamatory facts unknown to the public. *Id.* ¶ 55.

The MTD asserts that Mitchell's statements are non-actionable opinion because they "reflect Defendant's interpretation and characterization of underlying events that are themselves described and disputed within the Complaint and its incorporated materials." MTD at 5. Yet it does not specify in any detail which events Mitchell relied on, which events are disputed, or which materials Defendant is referencing. Without stating in clear language which event is supposedly being relied upon to support which allegation, it is simply impossible for Plaintiff to adequately respond. Nor should it be possible for the Court to determine the MTD has any merit.

Strikingly, whilst arguing that Mitchell's statements are non-actionable opinion, the MTD again concedes that "[a]t most, the Complaint alleges a disagreement between the parties as the interpretation and significance of publicly known events." *Id.* at 6. As held by the Court in *Rubin v. U.S. News & World Report, Inc.* "[I]f an allegedly defamatory publication is reasonably susceptible of two meanings, one of which is defamatory and one of which is not, it is for the trier of fact to determine the meaning understood by the average reader." 271 F.3d 1305, 1306 (11th Cir. 2001). Given that the MTD admits Mitchell's statements are a disagreement in interpretation, it would be improper to dismiss the FAC at this stage.

12

For the same reasons, the statements are not protected rhetorical hyperbole. Hyperbole protects loose, figurative, or exaggerated language that no reasonable listener would understand as stating actual facts. *See Milkovich*, 497 U.S. at 20. Here, the FAC alleges the opposite: Mitchell made specific accusations of criminal and fraudulent misconduct, tied them to litigation, bankruptcy, donor deception, and incarceration, and repeatedly framed them as factual assertions rather than figurative insult. In this context, the statements would reasonably be understood as factual accusations, not rhetorical hyperbole.

### III.    Plaintiff Does Not Rely On Statements By Third Parties

The MTD argues that the FAC improperly relies on statements by third parties, but no defamation count relies on or identifies any third-party statements to establish liability. To the extent any third-party statement is referenced in the factual background, it is to provide context to better understand how the statements at issue were interpreted by Mitchell's audience. Furthermore, Mitchell's agreeance and adoption of third-party statements allows for more accurate inferences to Mitchell's state of mind.

### IV.    Plaintiff Adequately Pleads Unauthorized Use Of Likeness

Florida's unauthorized publication of name or likeness statute is incredibly simple: "No person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without the express written or oral consent." Fla. Stat. § 540.08(1). This is precisely what the FAC alleges in detail. FAC ¶¶ 61-67.

Defendant created and advertised discount codes containing Jobst's literal name in order to drive sales to his hot sauce company, including the codes "JOBST", "KARL LOST" and "KARL LOBST". The MTD argues that discount codes are merely "expressive content", and that references to Jobst only appear "alongside revenue-generating activity". MTD at 10. Yet if that were the case, Jobst's name would not be a functional code that allowed customers to receive a discount upon purchase. The entire, and only purpose of a discount code is to

13

incentivize customers to purchase a product by offering a discount. Defendant's argument that a discount code functions as content and is not a tool for commercial use is nonsensical. Certainly, if Mitchell had simply expressed the words contained within the discount codes his speech would not have been actionable, but a discount code is not speech. It is a mechanism within which the **customer** enters a phrase, word, or combination of letters or numbers on a sales page in order to receive a discount.

The MTD cites *Tyne v. Time Warner Entm't Co.*, to support its proposition that the "First Amendment protects expressive works that incorporate a person's identity where the use occurs as part of expressive commentary or depiction, rather than as a stand-alone commercial endorsement or advertisement." MTD at 11. It further states that "the Amended Complaint itself alleges that Defendant used Plaintiff's likeness in the context of online videos, commentary, and related content critiquing Plaintiff's conduct, financial dealings, and related public controversy." *Id.* at 12. But the FAC alleges neither that Mitchell used Jobst's likeness as part of expressive commentary, nor that Mitchell used Jobst's likeness in the context of commentary and critique. The MTD fails to cite, point to, or explain which facts pled in the FAC give rise to these characterizations.

The MTD further cites *Lane v. MRA Holdings, LLC,* because in that case the Court held that the Girls Gone Wild video was an expressive work created solely for entertainment purposes. 242 F. Supp. 2d 1205, 1212–13 (M.D. Fla. 2002). Not only is that not what the FAC alleges, but the opinion itself specifically addresses Defendant's conduct as a breach of the statute. Relying upon Section 47 of the Restatement (Third) of Unfair Competition, the Court affirmed that "The names, likeness and other indicia of a person's identity are used "for the purposes of trade"…if they are used in advertising the user's goods or services, or are placed on merchandise marketed by the user..." *Id.* at 1213.

The FAC alleges that Mitchell offered for sale on his website merchandise in the form of a signed picture prominently featuring Jobst's name and likeness as part of the product

14

itself. The product contained a photoshopped image using Jobst's face, and the sales page referenced Jobst by his full name for promotional purposes. FAC ¶ 65. Defendant cites his own failed right of publicity claim against Cartoon Network, Inc., filed in the District of New Jersey. The MTD attempts to use Defendant's failed lawsuit to argue that the sold merchandise is transformative and therefore is protected by the First Amendment. MTD at 13. However, a common law tort in New Jersey has no bearing on the legal standards governing a Florida state statute. Even if this argument could possibly be persuasive, the MTD grossly mischaracterizes the Court's opinion. In *Mitchell v. Cartoon Network, Inc.*, the Court dismissed Mitchell's right of publicity claim precisely because the character at issue was **not** Mitchell: "GBF is not a literal recreation of Plaintiff at all: GBF looks different from Plaintiff..." No. 15-5668, ECF No. 15 at 11 (D.N.J. 2015). In the current case, Mitchell used Jobst's literal face on merchandise and used Jobst's full name on the same sales page to promote it.

For the stated reasons the FAC sufficiently alleges a claim for unauthorized use of likeness and the count must not be dismissed.

### V.     Plaintiff Adequately Pleads Intentional Infliction Of Emotional Distress

Florida recognizes intentional infliction of emotional distress ("IIED") under the definition set forth in the Restatement (Second) of Torts § 46 (1965). *Metropolitan Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278–79 (Fla. 1985). Section 46 provides that a defendant is liable where, "by extreme and outrageous conduct," he intentionally or recklessly causes severe emotional distress to another. Restatement (Second) of Torts § 46(1).

The FAC alleges a pattern of conduct spanning the course of an entire year, and while Mitchell's behavior in of itself plausibly meets the high standard that IIED requires, to best understand the cause of action the Court must look at Mitchell's behavior through the lens of the relationship of the parties. In *Dependable Life Insurance Co. v. Harris*, the Court acknowledged that outrageousness may arise "not so much from what is done as from abuse

15

by the defendant of some relation or position which gives the defendant actual or apparent power to damage the plaintiff's interests." 510 So. 2d 985, 988 (Fla. 5th DCA 1987) (quoting Prosser & Keeton, The Law of Torts § 12, at 61 (5th ed. 1984)). "Successful actions have been prosecuted in this context based on outrageously high pressure tactics of collection agencies, **other creditors**, and insurance adjusters seeking to force an unfair settlement." *Id.* (quoting Prosser & Keeton, The Law of Torts § 12, at 62) (emphasis added).

Mitchell is the dominant creditor in Jobst's bankrupt estate – holding approximately 90% of the unsecured debt. FAC ¶ 8. Jobst's debt to Mitchell totaled approximately $1,000,000, with the ultimate recoverable amount being only a fraction – far less than Jobst's post judgment settlement offer of $300,000. *Id.* ¶¶ 13, 90. After receiving the trustee's report outlining the findings of their investigation and realizing that Jobst's debt would not be recoverable, it is reasonable to infer at this stage that Mitchell was unhappy with the result, especially given Mitchell's following actions. *Id.* ¶ 11. First, Mitchell vented his frustration to tens of thousands of people through his defamatory June 24, 2025 X post, accusing Jobst of serious illegal activity, pairing the allegation with the threat of legal action. *Id.* ¶ 12. Given the seriousness of both the accusation and the foreshadowed action, Jobst made a reasonable and justified private enquiry with the trustee. *Id.* ¶ 14. In response, Mitchell again posted to X, publishing a picture depicting Mitchell hanging Jobst to death. *Id.* ¶ 18. A creditor of a bankrupt estate publishing a graphic image depicting himself hanging the debtor to death after the debtor privately enquired with the trustee is not defamation, but it is certainly an abuse of his power. The message was clear: do not contact the trustee or there will be public retaliation. Finally, as if his conduct wasn't already outrageous enough, Mitchell felt it necessary to monetize his death imagery with a promotion of his hot sauce company using the discount code "CRY BABY".

Comment "e" to section 46 of the Restatement (Second) of Torts seeks to address this exact kind of abuse. As cited in *Dependable Life Insurance Co. v. Harris*, "[t]he extreme and

16

outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests… In particular police officers, school authorities, landlords, and **collecting creditors** have been held liable for extreme abuse of their position." 510 So. 2d at 990 n.7 (emphasis added). The Court in *Dependable* held that a bad-faith verbal attack, paired with threats of legal action to frighten the plaintiff from pursuing his rights, constituted outrageous behavior in light of the defendant's relationship and economic power. 510 So. 2d at 989. Mitchell's behavior of responding to Jobst's attempts to defend his reputation with violent imagery was repeated after Jobst's August 11, 2025, rebuttal video. Immediately after release, Mitchell posted to X an image depicting Jobst being restrained by Mitchell on a leash, with Mitchell holding a baseball bat. FAC ¶ 74.

The effect of this abuse of power on Jobst was foreseeable. The FAC pleads that Mitchell's actions were having such an impact on Jobst that it was immediately apparent to the public through Jobst's work. During Mitchell's August 27, 2025 livestream, a viewer commented "Karl's voice is shaking in his recent video. He's on the ropes badly." Mitchell read this comment aloud and responded with "You ain't seen nothing yet." *Id.* ¶ 70. In *Dependable Life Insurance Co. v. Harris,* the Court acknowledged comment "f" of section 46 in the Restatement: "The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know." 510 So. 2d at 989.

In the instant case, Jobst's shaking voice is the physical peculiarity. The viewer understood that Jobst's shaking voice meant that he was distressed, as inferred by the viewer's description of Jobst being "on the ropes badly". Mitchell's reading of the comment aloud and endorsing it with his proclamation of escalation confirms Mitchell's knowledge

17

that Jobst was susceptible. With this knowledge, Mitchell stated his intent to not only continue his course of conduct, but to intensify it such that Jobst's physical condition would continue to worsen even further.

Mitchell would follow through on his stated goal with his months long defamation campaign increasing in ferocity. The amount of the alleged fraud increased from $200,000 to "over half a million dollars". Jobst's alleged victims increased in scope to include the creator of the best selling video game of all time. The number of alleged fraud transactions multiplied. Meanwhile Mitchell would use the very distress he was causing to promote his hot sauce company. FAC ¶ 76.

Mitchell's conduct is very telling because on one hand he will express dissatisfaction with the bankruptcy process, accusing Jobst of illegal activity and bankruptcy fraud, but on the other hand he will gloat about the fine dining experiences afforded by the equity in Jobst's home. *Id.* ¶ 71. On multiple occasions Mitchell endorsed the idea of destroying Jobst's earning capacity, flying in the face of his own financial interest as creditor. *Id.* ¶¶ 69-70. If Mitchell's intent as creditor was to make any kind of recovery, attempting to destroy Jobst's reputation is the antithesis of such a goal. Thus, the only reasonable inference is that Mitchell's intent was not recovery, but instead to inflict as much emotional and reputational damage as possible.

Over the course of months Mitchell continuously sought to humiliate Jobst in front of hundreds of thousands of people with his demeaning tweets. He mocked Jobst for being on welfare, monetized Jobst's bankruptcy, generated and published AI images showing Jobst in embarrassing positions, boasted about taking the equity in Jobst's family home. All while taunting Jobst with further lawsuits and threatening to destroy his career. *Id.* ¶¶ 69-73. While describing Mitchell's behavior, given the length of such detail, it is important not to forget that each action is but another piece of his overall conduct. No single instance viewed in

isolation need rise to the standard demanded by a claim for IIED. But Mitchell's conduct was not one single action, instead, it was many, and all must be considered in totality.

The MTD attempts to simplify this claim down to something it never purported to be. Defendant states that the claim of IIED is duplicative of the defamation claim: "[I]t is based on the same alleged statements and publications that form the basis of his defamation counts. The Complaint does not identify any independent conduct that would support a separate emotional distress claim." MTD at 15. Clearly, as outlined above, this is not the case.

In summation, Mitchell's behavior is not a defamation cause of action redressed as a claim for IIED, nor is it simply a fiery disagreement between two online parties. The FAC alleges that Mitchell is a dominant creditor abusing his position of power with the admitted goal of "busting" Jobst's career, reputation, and health to pieces. Therefore, the FAC adequately pleads a claim for IIED.

## VI.     The First Amended Complaint Is Not A Shotgun Pleading

The MTD alleges that the FAC is a shotgun pleading. It relies on two propositions. The first is that the FAC "asserts multiple defamation counts based on overlapping and repetitive allegations, without clearly identifying which specific statements correspond to each count." MTD at 16. Plaintiff is confused by this as each count in the FAC clearly identifies the exact publications and statements they rely upon, as outlined above in the 'publication' portion of the defamation counts argument.

Secondly, the MTD alleges that "the pleading obscures the basis of Plaintiff's claims and makes it difficult to determine which factual allegations support which causes of action." MTD at 16. Again, Plaintiff is unsure as to how much clearer the factual allegations could have been, given that each section of facts were clearly grouped within the appropriate subheading giving reference to its related count.

Defendant cites *Weiland* as identifying "complaints that contain multiple counts incorporating all preceding allegations, complaints that fail to separate distinct causes of

19

action, and complaints that do not clearly connect specific factual allegations to particular claims.". *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321–23 (11th Cir. 2015). The FAC overcomes all three deficiencies. Each count does not incorporate all preceding allegations, each count separates its factual basis by heading, and each count specifies the exact date, platform, speaker and publication at issue.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter an Order denying Defendant's Motion to Dismiss, or in the alternative, granting Plaintiff leave to amend such deficiencies as it may deem necessary.

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this 11th day of June 2026, I caused the foregoing document to be filed with the Clerk of Court at the Clerk's Office. I further certify that a true and correct copy of the foregoing document was served on Defendant's counsel by email at mtmitchell@jambg.com and cintron@jambg.com on the same date.

Dated: June 11, 2026

Respectfully submitted,

K.Jobst

Karl Jobst
32 Ventura Street
Pallara, QLD, Australia 4110
Karljobstgaming@gmail.com
+61 432 597 334
Pro Se Plaintiff

20